**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JAMEE DEIRDRE HUNDLEY (AKA JAMES DERRICK HUNDLEY), | Case No.: 3:19-cv-00458-RCJ-WGC |
| Plaintiff, | Order |
| vs. | |
| ROMEO ARANAS, *et al.,* | |
| Defendants. | |

Plaintiff, who is incarcerated in the custody of the Nevada Department of Corrections ("NDOC"), has submitted a first amended[1] civil rights complaint pursuant to 42 U.S.C. § 1983, and has filed an application to proceed in forma pauperis. (ECF Nos. 1, 15, 15-1.) Plaintiff also has filed a motion for appointment of counsel, a motion for a temporary restraining order, a motion for a preliminary injunction, a motion for an order to show cause why a preliminary injunction should not issue, and a motion for a decision on the motions for injunctive relief. (ECF Nos. 12, 13, 14, 16, and 17.) The Court now screens Plaintiff's first amended civil rights complaint under 28 U.S.C. § 1915A and finds it to be without merit. It therefore dismisses the complaint with prejudice, grants Plaintiff's in forma pauperis application, and denies the motions as moot.

---

[1] An amended complaint replaces an earlier complaint. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989). Therefore, the first amended complaint is the operative complaint.

1  **I.      SCREENING STANDARD**

2          Federal courts must conduct a preliminary screening in any case in which an incarcerated

3  person seeks redress from a governmental entity or officer or employee of a governmental entity.

4  *See* 28 U.S.C. § 1915A(a). In its review, the Court must identify any cognizable claims and dismiss

5  any claims that are frivolous, malicious, fail to state a claim upon which relief may be granted, or

6  seek monetary relief from a defendant who is immune from such relief. *See id.* § 1915A(b)(1), (2).

7  Pro se pleadings, however, must be liberally construed. *See Balistreri v. Pacifica Police Dep't*,

8  901 F.2d 696, 699 (9th Cir. 1990). To state a claim under 42 U.S.C. § 1983, a plaintiff must allege

9  two essential elements: (1) the violation of a right secured by the Constitution or laws of the United

10  States; and (2) that the alleged violation was committed by a person acting under color of state

11  law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

12          In addition to the screening requirements under § 1915A, under the Prison Litigation

13  Reform Act ("PLRA"), a federal court must dismiss an incarcerated person's claim if "the

14  allegation of poverty is untrue" or if the action "is frivolous or malicious, fails to state a claim on

15  which relief may be granted, or seeks monetary relief against a defendant who is immune from

16  such relief." 28 U.S.C. § 1915(e)(2). Dismissal of a complaint for failure to state a claim upon

17  which relief can be granted is provided for in Federal Rule of Civil Procedure 12(b)(6), and the

18  Court applies the same standard under § 1915 when reviewing the adequacy of a complaint or an

19  amended complaint. When a court dismisses a complaint under § 1915(e), the plaintiff should be

20  given leave to amend the complaint with directions as to curing its deficiencies, unless it is clear

21  from the face of the complaint that the deficiencies could not be cured by amendment. *See Cato v.*

22  *United States*, 70 F.3d 1103, 1106 (9th Cir. 1995).

23          Review under Rule 12(b)(6) is essentially a ruling on a question of law. *See Chappel v.*

24  *Lab. Corp. of Am.*, 232 F.3d 719, 723 (9th Cir. 2000). Dismissal for failure to state a claim is

proper only if it is clear that the plaintiff cannot prove any set of facts in support of the claim that would entitle him to relief. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999). In making this determination, the Court takes as true all allegations of material fact stated in the complaint, and the Court construes them in the light most favorable to the plaintiff. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir. 1996). Allegations of a pro se complainant are held to less stringent standards than formal pleadings drafted by lawyers. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980). While the standard under Rule 12(b)(6) does not require detailed factual allegations, a plaintiff must provide more than mere labels and conclusions. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A formulaic recitation of the elements of a cause of action is deficient. *Id.*

Additionally, a reviewing court should "begin by identifying pleadings [allegations] that, because they are no more than mere conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported with factual allegations." *Id.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Finally, all or part of a complaint filed by an incarcerated person may be dismissed sua sponte if that person's claims lack an arguable basis either in law or in fact. This includes claims based on legal conclusions that are untenable (e.g., claims against defendants who are immune from suit or claims of infringement of a legal interest which clearly does not exist), as well as claims based on fanciful factual allegations (e.g., fantastic or delusional scenarios). *See Neitzke v. Williams*, 490 U.S. 319, 327–28 (1989); *see also McKeever v. Block*, 932 F.2d 795, 798 (9th Cir. 1991).

## II.   SCREENING OF FIRST AMENDED COMPLAINT

In the Complaint, Plaintiff sues multiple Defendants for events that allegedly took place while Plaintiff was incarcerated at Lovelock Correctional Center ("LCC"). (ECF No. 15 at 1.) Plaintiff sues former NDOC Medical Director Dr. Romeo Aranas, current NDOC Medical Director Dr. Michael Minev, LCC Laundry Supervisor David Bequette, Dr. Naughton, Rusty Donnelly, former LCC Director of Nursing Dan Poag, former NDOC Director James Dzurenda, Dr. Kim Adamson, and John Does 1–5 and Jane Does 1–5, who are members of the Utilization Review Panel. (*Id.* at 1–4.) Plaintiff brings five counts and seeks declaratory and injunctive relief. (*Id.* at 17, 22.) The Court will address each of these claims in turn.

### A.   Claim 1

Claim 1 alleges the following: Plaintiff is a transgender woman who was diagnosed with "Severe and Persistent Gender Dysphoria/Transsexualism" on July 20, 2012 and began taking estrogen hormone therapy ("EHT") on August 8, 2012. (ECF No. 15 at 1.) On May 12, 2015, Plaintiff made a written request via medical kite "to be considered and evaluated for advancement pursuant to the WPATH standards of care for advancement to sex reassignment surgery." (*Id.*) On May 13, 2015, Plaintiff received a response stating, "I regret the procedure you are requesting is not available thru NDOC." This was signed by Defendant Poag, former Director of Nursing at LCC. (*Id.*) On May 18, 2015, Plaintiff made a second formal request by medical kite for sex reassignment surgery ("SRS"). (*Id.*) Defendant Poag responded on June 3, 2015 by stating, "I will forward your request to the Medical Director." (*Id.*)

On July 21, 2015, Plaintiff was called to LCC Medical for an appointment with Defendant Aranas. (*Id.*) Defendant Poag also was in attendance. (*Id.*) When Plaintiff was having Plaintiff's blood pressure checked, Poag was telling someone about Plaintiff's alleged previous taking of illicit hormones and "trying to poison Defendants Aranas['s] views of Plaintiff." (*Id.* at 6.)

Defendant Aranas had a two-page printout which was shown to Plaintiff as a preface to Plaintiff being told how high Plaintiff's estrogen, prolactin, and testosterone levels were. (*Id.*) Defendant Aranas went on to tell Plaintiff that, according to some research he had done recently, Plaintiff's levels were disconcerting to him and that Plaintiff was at an elevated risk for deep vein thrombosis, heart attack, and brain lesions. (*Id.*) Plaintiff told Aranas and Poag that Plaintiff was aware of this risk and had signed waivers stating this understanding. (*Id.*) Defendant Aranas reduced Plaintiff's EHTs and discontinued the prescription for progesterone as it was "unnecessary." (*Id.*) When Plaintiff asked about SRS or even orchiectomy, "it was immediately shut down" by Aranas as he looked to Defendant Poag for support. (*Id.*) Plaintiff asked to be evaluated several times, but was denied each time, with Aranas stating at one point that "Nevada has never done this before." (*Id.*) Plaintiff asked to be evaluated by an outside doctor, but Aranas said "no" and concluded the meeting. (*Id.*)

Based on these allegations, Plaintiff brings an Eighth Amendment claim. (*Id.* at 6.) Plaintiff concludes that Dr. Aranas "knows" that Plaintiff has a serious medical need and tries to interfere or hinder Plaintiff's medical care when he denies access or fails to follow a physician's orders and this constitutes deliberate indifference to Plaintiff's serious medical needs. (*Id.* at 7.) Plaintiff similarly concludes that the former Director of Nursing Poag "knows" that Plaintiff has a serious medical need and tries to interfere or hinder Plaintiff's medical care when he denies access or fails to follow a physician's orders and this constitutes deliberate indifference to Plaintiff's serious medical needs. (*Id.*) Plaintiff also concludes that former NDOC Director Dzurenda "knows" Plaintiff has a serious medical need and refuses to allow Plaintiff "access" by having his subordinates do whatever they want and this constitutes deliberate indifference to Plaintiff's serious medical needs because Dzurenda, as NDOC Director, could have told the Medical Director to change regulations and allow the procedure Plaintiff was requesting. (*Id.*) Plaintiff also

concludes that Jane and John Does 1–5, as being members of the Utilization Panel, knows Plaintiff has a serious medical need and "hides behind regulations to deny access to medically necessary surgery." (*Id.*)

The Court previously explained to Plaintiff the following applicable legal standards. (ECF No. 10 at 6–9.) The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). A prison official violates the Eighth Amendment when he acts with "deliberate indifference" to the serious medical needs of an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "To establish an Eighth Amendment violation, a plaintiff must satisfy both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012). To establish the first prong, "the plaintiff must show a serious medical need be demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations omitted). To prove deliberate indifference, a plaintiff must prove that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (en banc).

Thus, a complaint that a medical professional has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. *Estelle*, 429 U.S. at 106. Even gross negligence is insufficient to establish ///

deliberate indifference to serious medical needs. *See Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

Similarly, a difference of opinion between medical professionals concerning the appropriate course of treatment generally does not amount to deliberate indifference to serious medical needs. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Additionally, "[a] difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981). Rather, if a prisoner or another doctor disagrees with a doctor's course of treatment, to establish deliberate indifference, a prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (emphasis added).

To satisfy the deliberate indifference prong, a plaintiff must show "(a) purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d at 1096. When a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay led to further harm. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (holding that "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference"). Prison officials who know of a substantial risk to an inmate's health and safety are liable only if they responded unreasonably to the risk, even if the harm ultimately was not averted. *Farmer*, 511 U.S. at 844. What is reasonable depends on the circumstances, including the defendant's authority, capabilities, and resources. *Peralta*, 744 F.3d at 1084–85.

If prison officials deny medical care by establishing an administrative policy that they know would require some inmate to suffer medically, then there may be deliberate indifference.

*Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014). However, a policy that requires subordinates to commit constitutional violations cannot be the basis for § 1983 liability if the policy does not proximately cause the plaintiff's constitutional harm. *OSU Student All. v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012). In addition, merely including a conclusory allegation that there is a policy is insufficient. *Iqbal*, 556 U.S. at 680–8. A plaintiff must go beyond bare assertions and plead facts sufficient to show that there is a policy, what the policy is, and what role the particular defendant played in creating the policy. *Id.* at 678–81.

Furthermore, a defendant is liable under 42 U.S.C. § 1983 "only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. There must be a sufficient causal connection between the supervisor's wrongful conduct and the Constitutional violation. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).

With regard to Plaintiff's hormone prescriptions, the Court finds that Plaintiff fails to state a colorable Eighth Amendment claim. Plaintiff points to the alleged diagnosis of gender dysphoria, but that allegation alone is not sufficient to show that Plaintiff has a serious medical need for a particular hormone prescription at a particular point in time. The FAC accordingly does not contain allegations of fact sufficient to show that the hormone levels prescribed by Defendants were medically improper.

More significantly, Plaintiff does not allege facts sufficient to show deliberate indifference by any Defendant. Plaintiff does not allege facts sufficient to show that any Defendant believed that Plaintiff needed different prescriptions. Even if Plaintiff were aware of and willing to accept the risk of deep vein thrombosis, heart attack, and brain lesions and to sign waivers, that would

not mean that Defendant Aranas believed that Plaintiff's chosen dosages were medically appropriate. Moreover, a mere difference in opinion about the appropriate treatment does not constitute deliberate indifference to serious medical needs. Furthermore, the allegation that Poag mentioned Plaintiff's alleged previous use of illicit hormones does not show that Poag believed that Plaintiff's preferred hormone prescriptions were medically appropriate or that Poag was the one who decided what prescriptions Plaintiff would receive from the doctor. Plaintiff also has not alleged facts sufficient to show that Defendants Dzurenda or Does 1–5 were deliberately indifferent with regard to the change in hormone prescription. The Court therefore dismisses this portion of Claim 1 with prejudice as amendment would be futile based on the Court's prior explanation of this legal standard and Plaintiff's repeated failure to state this claim.

With regard to the denial of surgery, the Court again finds that Plaintiff fails to state a colorable Eighth Amendment claim. The Court previously informed Plaintiff that a conclusory allegation that SRS was medically necessary was insufficient to allege a serious medical need. (ECF No. 10 at 9.) The original complaint referred to standards of care and appeared to allege that WPATH Standards of Care were the relevant standard of care for treating gender dysphoria and that SRS should be considered on a case-by-case basis and provided when determined to be medically necessary for a patient. (ECF No.1-1 at 6, 7.) When screening the original complaint, the Court explained that accepted standards of care within the medical community are highly relevant in determining what care is medically acceptable and unacceptable. (ECF No. 10 at 9;) *see Edmo v. Corizon, Inc.*, 935 F.3d 757, 786 (9th Cir. 2019) (applying WPATH standard of care when determining medical necessity of surgery for gender dysphoric inmate). The Court further noted that, as the Ninth Circuit recognized that "not every gender dysphoric person has the same medical needs" and providers must "individually diagnose, assess, and treat individuals' gender dysphoria." (ECF No. 10 at 9 (quoting *Edmo*, 935 F.3d at 769–70).) For example, the *Edmo* court

recognized that some people with gender dysphoria may need surgery, but many do not, and surgery may be medically inappropriate for some gender dysphoric persons requesting surgery. *Edmo*, 935 F.3d at 770–71.

In its original screening order, the Court determined that the complaint did not allege facts sufficient to show how the alleged standards of care applied to Plaintiff and required SRS for Plaintiff, so the Court determined that Plaintiff had not adequately alleged a serious medical need or that any Defendant had caused Plaintiff harm by not providing Plaintiff with SRS. (ECF No. 10 at 10.) The Court therefore dismissed the claim without prejudice and with leave to amend. (*Id.*) The Court instructed Plaintiff that, if Plaintiff chose to amend the claim, the amended complaint must allege facts sufficient to show that Plaintiff needed SRS and must not only allege that Plaintiff was denied the surgery, but must allege facts sufficient to show, for each defendant, what action that particular defendant took to unreasonably deny the surgery with deliberate indifference. (*Id.*) The Court further instructed Plaintiff that, if the amended complaint relied on a policy to establish an Eighth Amendment violation, it must not only allege facts sufficient to show Plaintiff's need for SRS and what the policy is but must allege true facts sufficient to show what role each defendant played in adopting the policy with deliberate indifference and the harm they caused Plaintiff. (*Id.*)

Despite these rulings and instructions, in Claim 1 of the FAC, Plaintiff has eliminated all references to the standard of care and has not alleged facts sufficient to show SRS was medically necessary and any Defendant believed that SRS was medically necessary for Plaintiff but nevertheless denied the surgery. In addition, Claim 1 of the FAC merely makes conclusory allegations that Defendant Dzurenda and the Doe Defendants "know" Plaintiff has a serious medical need and makes vague references to regulations used to deny the procedure or surgery. ///

As the Court has explained, such conclusions and assertions are not sufficient to state a colorable claim. The Court therefore dismisses this portion of Claim 1 with prejudice.

Lastly, liberally construed, Claim 1 of the FAC alleges that Defendant Aranas refused to permit Plaintiff to even be evaluated for surgery, denying those requests and saying that "Nevada has never done this before." The Court also denies this claim with prejudice. *Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir. 1986) ("A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution.").

**B.     Claim 2**

Claim 2 alleges the following: On April 2, 2019, Plaintiff put in a kite requesting to be seen by NDOC Medical Director Dr. Minev to discuss Plaintiff's transgender therapy and other "transgender issues." (ECF No. 15 at 8.) These requests go unanswered and ignored. (*Id.*) Dr. Minev, as Medical Director, is in charge of formulating health policy regarding the healthcare delivery system, including developing and monitoring standards and procedures for healthcare services for all inmates confined within the facilities and has overall responsibility for the clinical operation of the Medical Division. (*Id.*)

Dr. Minev "refuses" to have his medical department provide "constitutionally adequate individualized care for [Plaintiff's] serious medical needs." (*Id.*) Defendant Minev "knows of [Plaintiff's] serious medical need by way of grievance and refused to provide Plaintiff medical care except to allow his staff to reduce or completely cut off [Plaintiff's] Estrogen Hormone Therapy." (*Id.*)

Based on these allegations, Plaintiff brings an Eighth Amendment claim. (*Id.*)

For a discussion of the relevant law regarding deliberate indifference to serious medical needs, *see* Section II.A *supra*.

As the Court previously explained, conclusory allegations and merely alleging that a person is a supervisor or has certain general job responsibilities are not sufficient to state a colorable Eighth Amendment claim; a plaintiff is required to allege facts sufficient to show a particular medical need and must allege facts sufficient to show that the particular defendant was deliberately indifferent to that serious medical need. Claim 2 does not allege facts sufficient to state a particular serious medical need or that Defendant Minev believed that Plaintiff had a particular serous medical need and unreasonably chose not to provide specified treatment for that serious medical need. Plaintiff's vague and conclusory allegations are not sufficient to state a colorable Eighth Amendment claim. The Court therefore dismisses this Eighth Amendment claim with prejudice because that Court has previously explained this standard to Plaintiff.

## C.    Claim 3

Claim 3 alleges the following: Plaintiff is a transgender woman who is housed at LCC, which is a male prison. (ECF No. 15 at 9.) Then Deputy Director Sheryl Foster approved Plaintiff to receive state issued bras in the same quantity and style as female inmates. (*Id.*) This memo was dated May 14, 2014. (*Id.*) At that time, Plaintiff did receive bras from laundry. (*Id.*) This did not last long and has been very inconsistent throughout the years. (*Id.*)

On December 6, 2018, Plaintiff went to the laundry for Plaintiff's 6-month issue of state clothing and undergarments. (*Id.*) In the bag issued to Plaintiff were 3 t-shirts, 3 pairs of socks, and 3 men's boxer shorts. (*Id.*) When Plaintiff explained that the state clothing was inconsistent with Plaintiff's female gender-identity, the issuing inmate said, "Mr. Bequette thought you would say that" and called over Defendant Bequette. (*Id.* at 9–10.) Bequette approached the Plaintiff in front of other inmates and yelled, "Look, you're a male inmate. You have a penis and you're in a male prison. I'm not ever going to give you female underwear." (*Id.* at 10.) Plaintiff concludes that Defendant Bequette's refusal to provide Plaintiff with this clothing is discriminatory and in

violation of Plaintiff's First and Fourteenth Amendment right to equal protection and freedom from gender discrimination. (*Id.*) Defendant Bequette denied Plaintiff female undergarments and demeaned Plaintiff in front of other inmates because of his personal feelings. (*Id.*) This action against Plaintiff was discriminatory and was devastating as Plaintiff was reminded that Plaintiff's body does not match Plaintiff's psychological gender. (*Id.*)

Based on these allegations, Plaintiff brings a claim for "First and Fourteenth Amendment right to Equal Protection of the law and to be free from discrimination for plaintiff's gender." (*Id.* at 9.) Although the Fourteenth Amendment provides for equal protection and precludes gender discrimination, the First Amendment does not. The Court therefore construes this claim as a Fourteenth Amendment claim, not a First Amendment claim.

To state a claim for a violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against a person based upon that person's membership in a protected class. *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003.) The Ninth Circuit has recognized that discrimination against an individual based on his transgender status is actionable under the Equal Protection Clause under an intermediate scrutiny standard. *Karnoski v. Trump*, 926 F.3d 1180, 1202 (9th Cir. 2019).

The Court finds that Plaintiff has failed to state a colorable equal protection claim against Defendant Bequette. While Plaintiff has alleged facts that show that Bequette refused to provide Plaintiff with female undergarments, Plaintiff has not alleged any facts showing that Defendant Bequette was treating Plaintiff differently than other inmates on the basis of the alleged gender dysphoria diagnosis. Compare this alleged policy to the one in *Karnoski*, in that case, the government "broadly prohibit[ed] military service by transgender persons." *Id.* at 1199. According to the allegations here, Plaintiff does not seek equal treatment but special treatment. The Court therefore denies this claim with prejudice.

1

D.     **Claim 4**

2

Claim 4 alleges the following: Plaintiff is a transgender woman who is living as much as

3

possible as a woman. (ECF No. 15 at 11.) Plaintiff has been taking EHT since August 8, 2012.

4

(*Id.*) Plaintiff's EHT treatment has gone unabated until Plaintiff starts to ask for "advancement" of

5

Plaintiff's treatment to include SRS. (*Id.*) On May 12, 2015, Plaintiff sent a medical kite to be

6

evaluated and considered for SRS. (*Id.*)

7

On June 1, 2015, Plaintiff's Estradiol injection was cut[2] due to "no longer being carried by

8

NDOC Pharmacy." (*Id.*) Plaintiff made numerous attempts with medical, corrections, and

9

administrative staff to try and remedy the situation. (*Id.*) All other medication stayed the same.

10

(*Id.*) There was no reason for a cut to Plaintiff's EHTs, and Plaintiff concludes that the failure to

11

find an alternative is retaliation for asking for SRS. (*Id.* at 11–12.) Sometime in June of 2015,

12

Plaintiff's 1X/week 30 mg injection of Estradiol was reduced to 20 mg/week. (*Id.* at 12.) These

13

dosages stayed the same for a year. (*Id.*)

14

On July 1, 2016, Plaintiff received what appeared to be more than three times the normal

15

dose of Estradiol. (*Id.*) On July 12, 2016 and July 13, 2016, Plaintiff had blood draws. (*Id.*) On

16

July 19, 2016, Plaintiff had an unrequested appointment with NDOC Medical Director Aranas and

17

Dr. Adamson to discuss the blood draw results, stating the Estradiol levels were toxic and they

18

wanted to further reduce Plaintiff's Estradiol injections. (*Id.*) Plaintiff explained the "odd event"

19

that transpired on July 1 and asked them to consider holding off the discussed reduction in

20

Estradiol. (*Id.*) They agreed that there would be another blood draw given and checked in one

21

///

22

23

24

---

[2] Plaintiff's allegations are unclear. Plaintiff appears to suggest that the Estradiol was entirely eliminated on the first day of June of 2015 but then says that the Estradiol was reduced that same month. For purposes of this order, the Court will construe the allegations as alleging that Plaintiff briefly received no Estradiol and then received a lower dose of Estradiol.

month's time prior to any further reduction in Plaintiff's injection. (*Id.*) Plaintiff's oral medication was to remain untouched. (*Id.*)

On July 20, 2016, Plaintiff went to get Plaintiff's oral dose of hormone medication. (*Id.*) Upon arrival at the pill window, Plaintiff did not receive that dose. (*Id.* at 12–13.) When asked about this, the nurse said, "You talked to the doctor yesterday. They're discontinued. You can grieve if you want." (*Id.* at 13.) When Plaintiff asked to see the doctor, the nurse told Plaintiff three times that the doctor was not there. (*Id.*) Plaintiff mentioned that Plaintiff would contact the Attorney General's Office and left. (*Id.*) As Plaintiff was walking back to work, Plaintiff was paged to go to the infirmary. (*Id.*) Upon entering the exam room, Dr. Adamson said, "What's your problem?" (*Id.*) Plaintiff explained the cut from daily hormones after being told there was to remain a status quo for one month and that the daily medication was never in question. (*Id.*) Plaintiff also claimed to have no ill side effects from the oral medications and injections for the past four years. (*Id.*) Dr. Adamson's response was, "I don't give a damn what you take by injection, orally, or stick up you're a**. I don't like your levels and I cut it." (*Id.*) He told Plaintiff "hang in there for a month before anything would be done further" and "It's all in your head." (*Id.*)

Plaintiff's lab draw was scheduled for October. (*Id.*) On November 7, 2016, during evening pill call, Plaintiff received 0.3 mg Premarin and was told Plaintiff would be receiving this for 21 days and then off for 7 days because the doctor did some research and found this to be an effective replacement. (*Id.*) This was a reduction in estrogen and a "100% drop" in progesterone. (*Id.*)

Plaintiff filed a motion for a temporary restraining order and breach of contract in Plaintiff's previous lawsuit that forced the NDOC to provide Plaintiff with EHTs. (*Id.* at 14.) As a result, the NDOC contacted a specialist at Northern Nevada Hopes. (*Id.*) On December 16, 2016, Plaintiff was transported to Northern Nevada Hopes and was seen by Victoria Skocdopole, APRN. (*Id.*) After review of Plaintiff's lab history and medical file, she said Plaintiff's levels were "very

high" several months ago, though not "alarmingly" so, and were now at safe levels. (*Id.*) After much discussion between Plaintiff, Victoria Skocdopole, and the NDOC representative, she gave the order for Estradiol Cypionate (5 mg/ml intramuscular bi-weekly and for Depo Provera progesterone (150 mg/ml intramuscular monthly). (*Id.*) Plaintiff began receiving these medications and was receiving them for two years. (*Id.*) There were some alterations due to "emotional issues," the Depo Provera was split to 75 mg/ml bi-weekly. (*Id.*) After increased body hair, facial hair, and spontaneous erections, the Estradiol was increased to 6 mg/ml per week. (*Id.*)

In August of 2019, Plaintiff filed a 42 U.S.C. § 1983 action[3] requesting SRS and brought other gender-related claims. (*Id.*)

On March 19, 2020, Plaintiff had an unscheduled and unrequested doctor's appointment with Dr. Naughton. (*Id.*) Dr. Naughton is at another prison facility and the visit was done by video. (*Id.*) During this visit, all he wanted to do was cut Plaintiff's EHTs because of a "very low possibility of a prolactinoma." (*Id.*) Plaintiff alleges that "All other questions were we can't do anything for it, even for my possible return of my skin cancer I have on my arm," but also alleges that Plaintiff was told "Oh, we will send you on a day trip to Carson City for an evaluation." (*Id.*) There has been no mention of it again. (*Id.*)

On April 6, 2020, Plaintiff was called to "Medical" for an unscheduled and unrequested doctor's appointment with Dr. Naughton. (*Id.*) He checked the settlement agreement reached by Plaintiff and the NDOC to provide Plaintiff with EHTs. (*Id.*) He also conferred with another doctor and stated, "This is for your health, and no judge will go against it." (*Id.*) When Plaintiff "tried to warn of the Court order/protection, he said 'I don't care. This is happening.'" (*Id.*) Plaintiff asked how much he was going to cut the EHTs, Dr. Naughton stated that he had not decided yet. (*Id.*)

---

[3] These allegations appear to be a reference to the original complaint in this action. The original complaint did not allege any claims against Dr. Naughton and was never served on anyone.

On April 1, 2020, Plaintiff was called for a blood draw to test for prolactin levels. (*Id.*) On May 1, 2020, Plaintiff reported for Plaintiff's weekly scheduled Estradiol injection, and the nurse stated, "Your Estrogen has been cut to 2 mg/wk. It is a gradual decrease in your Estrogen injections." (*Id.*) When Plaintiff asked about the Depo Provera shots (progesterone), the nurse said that they were completely stopped. (*Id.*)

Plaintiff concludes that these cuts to Plaintiff's EHT are in retaliation for filing grievances and asking for SRS. (*Id.*) Plaintiff asserts that Defendants Aranas, Minev, and Dr. Naughton are retaliating against Plaintiff in violation of Plaintiff's First Amendment right to "file grievances and access to the courts in hope of [Plaintiff] dropping [Plaintiff's] lawsuit and hope that [Plaintiff's] levels will return to what the specialist in transgender care prescribed." (*Id.*) Plaintiff also concludes that LCC Director of Nursing Rusty Donnelly is retaliating against Plaintiff by "preventing Plaintiff from access to adequate medical care" as Donnelly is the Director of Nursing and in charge of the administrative supervision of all medical employees and could have intervened and prevented "all this by reporting to [Donnelly's] supervisor what is going on but refuses to." (*Id.*) Plaintiff asserts that this is because Plaintiff is a litigator. (*Id.*)

Based on these allegations and conclusions, Plaintiff brings First Amendment and Fourteenth Amendment claims "to be free from filing grievances and access to the courts for redress and asking for medical care." (*Id.* at 11.)

### 1.    Access to the Courts Claim

To state a colorable access to the courts claim, a plaintiff must allege facts sufficient to show that he has suffered an actual injury, a jurisdictional requirement that flows from the standing doctrine and may not be waived. *Lewis v. Casey*, 518 U.S. 343, 349 (1996). An "actual injury" is actual prejudice with respect to litigation. *Id.* at 348. The FAC does not allege such an injury, and this action is still ongoing. Plaintiff therefore does not a state a colorable access to the courts claim.

Accordingly, the Court dismisses the access to the courts claim with prejudice, as amendment would be futile.

### 2.   Retaliation Claim

To state a viable First Amendment retaliation claim in the prison context, a plaintiff must allege facts sufficient to show: "(1) a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2004). Total chilling is not required; it is enough if an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities. *Id.* at 568–69.

Thus, to state a retaliation claim, the plaintiff must allege facts sufficient to show that the particular defendant engaged in adverse conduct. *Id.* at 567. Furthermore, the plaintiff must allege facts sufficient to show that the particular defendant was aware of the protected conduct and that the protected conduct provided that particular defendant with a retaliatory motive; mere speculation is insufficient. *Pratt v. Rowland*, 65 F.3d 802, 808–09 (9th Cir. 1995). Timing may sometimes provide some circumstantial evidence of retaliatory intent when adverse conduct takes place shortly after the plaintiff engages in protected conduct. *See Bruce v Ylst*, 351 F.3d 1283, 1288–89 (9th Cir. 2000) (suspect timing of adverse conduct soon after protected conduct, combined with statements by defendants and evidence of pretext created triable issue of fact concerning retaliatory motive). However, there must be something more than such timing to show retaliatory intent; retaliation is not established simply by showing adverse activity after the occurrence of protected speech, but rather a plaintiff must show a connection between the two events. *Husky v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000); *Pratt*, 65 F.3d at 808 ("suspect timing" of inmate's transfer to different prison, without more, insufficient to support inference that

the transfer was done in retaliation for inmate's exercise of First Amendment rights); *Phillippi v. Patterson*, 599 F. App'x 288, 289 (9th Cir. 2015); *Rupe v. Beard*, No. CV-08-2454-EFS PC, 2013 WL 6859278, at *7 (E.D. Cal. Dec. 24, 2013). Moreover, the plaintiff bears the burden of pleading the absence of legitimate correctional goals for the conduct of which he complains. *Pratt*, 65 F.3d at 806. In addition, retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'" *Pratt*, 65 F.3d at 807 (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995)).

Furthermore, a defendant is liable under 42 U.S.C. § 1983 "only upon a showing of personal participation by the defendant." *Taylor*, 880 F.2d at 1045; *Iqbal*, 556 U.S. at 676 (holding that "[b]ecause vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"). Thus, a person does not become liable for retaliation merely because he is employed with, supervised by, or a supervisor of someone who engages in retaliation. Furthermore, a defendant's mere knowledge of someone else's retaliation is insufficient to hold that defendant liable for retaliation. *Cf. Iqbal*, 556 U.S. at 677; *see also Heilman v. Wasko*, No. 2:12-CV-1966 GGH P, 2012 WL 4468417, at *2 (E.D. Cal. Sept. 25, 2012). Rather, for each defendant, a plaintiff must allege facts sufficient to show that the Defendant took a particular adverse retaliatory course of conduct because of particular protected conduct. Speculative, collective, conclusory, and vague allegations are not sufficient.

Plaintiff alleges protected conduct in the form of a May 12, 2015 medical kite asking to be evaluated and considered for SRS. Plaintiff appears to allege that Plaintiff briefly went without Estradiol in June of 2015 and that the dosage of Estradiol was reduced later that month. Even if this were considered adverse conduct, Plaintiff has not alleged facts sufficient to show that any

Defendant took that adverse conduct, much less facts sufficient to show that the particular Defendant engaged in such conduct because of the kite. Plaintiff therefore fails to state a colorable retaliation claim based on the May 12, 2015 kite.

Plaintiff also alleges that, over a year after Plaintiff sent the kite requesting the surgery, Defendants Aranas and Adamson changed Plaintiff's hormone medication. Plaintiff does not allege facts sufficient to show that these Defendants even knew of the kite, much less facts sufficient to show that these Defendants took any action because of the kite.

In addition, Plaintiff appears to be alleging that Dr. Naughton's medical decisions on March 19, 2020 and April 6, 2020 were retaliation for Plaintiff filing this action more than seven months earlier. The original complaint did not mention Dr. Naughton and was not served on anyone. Accordingly, the Court dismisses this claim with prejudice.

### E.      Claim 5

Claim 5 alleges the following: Plaintiff has requested numerous times to see the doctor about "various issues," including the possible return of skin cancer and an abrupt reduction in prescription pain medication. (ECF No. 15 at 17.) Plaintiff has had a couple of appointments with the doctor, none of which were dealing with Plaintiff's "other medical needs." (*Id.*) The only thing "they" are concerned about are Plaintiff's EHTs and how dangerous they are. (*Id.*) Plaintiff has signed medical waivers, but "they" still insist on tinkering with Plaintiff's EHTs. (*Id.*) The last time "they" cut the progesterone it caused a "mini stroke" that "Medical" refused to see Plaintiff for. (*Id.* at 17–18.)

Defendant Rusty Donnelly is the LCC Director of Nursing Services and is the LCC Healthcare Administrator and therefore is responsible for ensuring that all inmates have access to healthcare at LCC. (*Id.* at 18.) Plaintiff concludes that Defendant Donnelly is deliberately

///

indifferent to Plaintiff's serious medical needs by denying access to health care because of Donnelly's personal beliefs. (*Id.*)

Plaintiff has kited multiple times for medical attention. (*Id.*) "All say 'you will be scheduled.'" (*Id.*) This was months ago. (*Id.*) Other people who do not grieve or litigate to get access to medical care are seen a lot quicker, usually within weeks. (*Id.*) But, since Plaintiff grieved for access and litigated for EHTs and SRS, Plaintiff has been the focus of Donnelly's demeaning comments concerning Plaintiff's pain and suffering with words like "buck up and quit being a pussy" and "You don't have arthritis. This is arthritis," showing Plaintiff her hands. (*Id.*)

Based on these allegations, Plaintiff brings an Eighth Amendment claim against Rusty Donnelly. (*Id.* at 17)

As the Court has explained, a defendant may not be held liable merely because of his supervisory position; a plaintiff must allege facts sufficient to show that the defendant personally was deliberately indifferent to a particular serious medical need.

Plaintiff appears to allege that Donnelly was aware of Plaintiff's belief that Plaintiff has arthritis, but also appears to allege that Donnelly did not believe that Plaintiff had arthritis. Thus, even assuming that Plaintiff has arthritis, Plaintiff does not allege facts sufficient to show that Donnelly was deliberately indifferent to the arthritis.

Plaintiff does not allege facts sufficient to show that Donnelly was aware of any other particular medical condition much less facts sufficient to show that Donnelly was deliberately indifferent to such a serious medical condition. Furthermore, although Plaintiff allegedly had to wait to see a doctor for some medical conditions, Plaintiff does not allege facts that would be sufficient to show that Donnelly was aware of this, believed that Plaintiff's medical conditions required more immediate attention and treatment than the medical conditions of other prisoners waiting to see a doctor, and nevertheless unreasonably refused to ensure that Plaintiff was

advanced on the waiting list as necessary. *Cf. Peralta*, 744 F.3d 1076, 1084–85 (holding that merely placing a patient prisoner on a waiting list was not sufficient to show deliberate indifference where plaintiff did not show that defendant had resources to see him sooner and that defendant believed that plaintiff needed to be seen before other patients waiting for medical care). Accordingly, the Court dismisses this claim with prejudice as the Court as previously explained this standard to Plaintiff.

### III. Plaintiff's Motions

Plaintiff has filed a motion for appointment of counsel, a motion for a temporary restraining order, a motion for a preliminary injunction, a motion for an order to show cause why a preliminary injunction should not issue, and a motion for a decision on the motions for injunctive relief. As the Court dismisses this case, the Court denies these motions as moot.

### III. CONCLUSION

IT IS HEREBY ORDERED that the case is dismissed with prejudice for failure to state a claim.

IT IS FURTHER ORDERED that Plaintiff's application to proceed in forma pauperis (ECF No. 1) without having to prepay the full filing fee is GRANTED. Plaintiff shall not be required to pay an initial installment fee. Nevertheless, the full filing fee shall still be due, pursuant to 28 U.S.C. § 1915, as amended by the Prisoner Litigation Reform Act.

IT IS FURTHER ORDERED that, pursuant to 28 U.S.C. § 1915, as amended by the Prisoner Litigation Reform Act, the Nevada Department of Corrections shall pay to the Clerk of the United States District Court, District of Nevada, 20% of the preceding month's deposits to the account of Jamee Deirdre Hundley (aka James Derrick Hundley), #51212 (in months that the account exceeds $10.00) until the full $350 filing fee has been paid for this action. The Clerk shall

///

send a copy of this order to the attention of Chief of Inmate Services for the Nevada Department of Prisons, P.O. Box 7011, Carson City, NV 89702.

IT IS FURTHER ORDERED that Motion for Appointment of Counsel (ECF No. 12) is DENIED AS MOOT.

IT IS FURTHER ORDERED that Motion for Preliminary Injunction (ECF No. 13) is DENIED AS MOOT.

IT IS FURTHER ORDERED that Motion for Temporary Restraining Order (ECF No. 14) is DENIED AS MOOT.

IT IS FURTHER ORDERED that Motion to Show Cause (ECF No. 16) is DENIED AS MOOT.

IT IS FURTHER ORDERED that Motion to Submit Court Decision (ECF No. 17) is DENIED AS MOOT.

IT IS FURTHER ORDERED that this Court certifies that any in forma pauperis appeal from this order would be taken "in good faith" pursuant to 28 U.S.C. § 1915(a)(3).

IT IS FURTHER ORDERED that the Clerk of the Court shall close the case and enter judgment.

IT IS SO ORDERED.

Dated March 29, 2021.

_____
ROBERT C. JONES
United States District Judge