# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

JAMEE DEIRDRE HUNDLEY,

    Plaintiff

v.

ROMEO ARANAS, et al.,

    Defendants

Case No.: 3:19-cv-00458-ART-CSD

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 75

This Report and Recommendation is made to the Honorable Anne R. Traum, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Plaintiff's motion for preliminary injunction. (ECF Nos. 75, 75-1 to 75-13.) Defendants responded, (ECF Nos. 81, 81-1 to 81-3, 83-1 to 83-4 (sealed)), and Plaintiff replied. (ECF Nos. 91, 91-1 to 91-7.) Per the court's order, Defendants submitted a supplemental declaration, (ECF No. 97-1), and Plaintiff responded. (ECF Nos. 100, 100-1 to 100-4.)

After a thorough review, it is recommended that Plaintiff's motion for preliminary injunction be denied.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (ECF No. 30.) The events giving rise to this action took place while Plaintiff was housed at Lovelock Correctional Center (LCC). (*Id.*)

The operative complaint in this case is Plaintiff's Second Amended Complaint (SAC). (ECF No. 30.) The court screened Plaintiff's SAC and allowed her to proceed on the following claims:

(1) Eighth Amendment deliberate indifference to her need for gender conforming surgery (GCS) against Romeo Aranas, Michael Minev, Donald Poag, Kim Adamson, James Dzurenda, and Dana Marks for all purposes and against Defendants Joseph Lombardo, Aaron Ford, Cisco Aguilar, David Rivas, David Greene, and Tim Garrett for only injunctive and declaratory relief;

(2) Eighth Amendment deliberate indifference to her need for hormone therapy against Aranas, Minev, Poag, Martin Naughton, Sarah Rushton, and Marks for all purposes and against Lombardo, Ford, Aguilar, Rivas, Greene, and Garrett for only injunctive and declaratory relief;

(3) Fourteenth Amendment equal protection against Aranas, Minev, Poag, Adamson, Naughton, Marks, Rushton, David Bequette, and Russelle Donnelly for all purposes and against Defendants Lombardo, Ford, Aguilar, Rivas, Greene, and Garrett for only injunctive and declaratory relief;

(4) First Amendment retaliation against Aranas, Minev, Poag, Adamson, Naughton, Rushton, Bequette, and Donnelly for all purposes and against Lombardo, Ford, Aguilar, Rivas, Greene, and Garrett for only injunctive and declaratory relief; and

(5) breach of contract under Nevada Law against Defendants Joseph Lombardo, Aaron Ford, Cisco Aguilar, David Rivas, David Greene, James Dzurenda, and Tim Garrett for all purposes.

(*See* ECF No. 32.)

Plaintiff subsequently filed the subject motion for a preliminary injunction. (ECF No. 75.) Plaintiff requests the court order Defendants to provide Plaintiff with:

(1) hormone replacement therapy dosages, in pill or injection form, necessary to maintain Hundley's estrogen levels between 200-300 pg/ml.

(2) a referral for GCS, including but not limited to vaginoplasty and breast augmentation, and

(3) a 5 alpha reductase inhibitor (such as finasteride or dutasteride) and topical minoxidil to increase scalp hair.

2

1   (*Id.* at 26.) Plaintiff argues a preliminary injunction is warranted because Defendants' conduct

2   constitutes deliberate indifference, and Plaintiff faces a threat of serious harm if an injunction is

3   not granted. (*See* ECF No. 75.)

4           Defendants oppose the motion, arguing that Plaintiff's request for hormone replacement

5   therapy is moot because Hundley is currently receiving hormone therapy and the *Winter* factors

6   do not support a preliminary injunction. (ECF No. 81.) Defendants argue that Dr. Marks,

7   Plaintiff's treating physician in NDOC custody, is currently treating Plaintiff for gender

8   dysphoria in a medically acceptable manner, and therefore, Plaintiff's argument amounts to mere

9   difference of medical opinion. (*Id.*)

10          Plaintiff responded, disputing Defendants' characterization that Dr. Marks is providing

11  medically acceptable care. (ECF No. 91.) Plaintiff argues the court should not accept Dr. Marks'

12  declaration as evidence because it contains conclusory statements unsupported by any

13  explanation or evidence. (*Id.*) Plaintiff argued that because Dr. Marks' declaration is deficient,

14  the only medically acceptable opinion is from their expert, Dr. Gorton, and therefore, this is not a

15  case of difference of medical opinion. (*Id.*)

16          The court held a hearing on the motion for preliminary injunction on March 31, 2025.

17  (ECF No. 93.) At the hearing, the court advised that Dr. Marks' initial declaration lacked

18  sufficient information and provided a list of additional questions for Dr. Marks to address. (*Id.*)

19  The court directed Defendants to provide a supplemental declaration from Dr. Marks over the

20  objection of Plaintiff's counsel. (ECF Nos. 93, 94.)

21          Defendants submitted Dr. Marks' supplemental declaration on April 7, 2025. (ECF No.

22  97.) Plaintiff responded, arguing that Dr. Marks failed to address multiple questions from the

23

1  court, and the supplemental declaration still failed to qualify as an acceptable medical opinion.

2  (ECF No. 100.)

3  **II. LEGAL STANDARD**

4  The purpose of a preliminary injunction or temporary restraining order is to preserve the

5  status quo if the balance of equities so heavily favors the moving party that justice requires the

6  court to intervene to secure the positions until the merits of the action are ultimately determined.

7  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Injunctions and temporary restraining

8  orders are governed procedurally by Federal Rule of Civil Procedure 65, but case law outlines the

9  substantive requirements a party must satisfy to obtain an injunction or restraining order. *See*

10  *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999) ("[T]he

11  general availability of injunctive relief [is] not altered by [Rule 65] and depend[s] on traditional

12  principles of equity jurisdiction.").

13  A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded

14  as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). Instead, in every

15  case, the court "must balance the competing claims of injury and must consider the effect on each

16  party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense*

17  *Council, Inc.*, 555 U.S. 7, 23 (2008) (internal quotation marks and citation omitted).

18  The instant motion requires the court determine whether Plaintiff has established the

19  following: (1) Hundley is likely to succeed on the merits; (2) Hundley is likely to suffer irreparable

20  harm in the absence of preliminary relief; (3) the balance of equities tips in Hundley's favor; and

21  (4) an injunction is in the public interest. *Id.* at 20 (citations omitted).). The Ninth Circuit has held

22  that "serious questions going to the merits and a hardship balance that tips sharply toward the

23  plaintiff can support the issuance of an injunction, assuming the other two elements of the *Winter*

4

1  test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011)

2  (citation and quotation marks omitted).

3       There are two types of preliminary injunctions: (1) a mandatory injunction that orders a

4  responsible party to act; and (2) a prohibitory injunction that prohibits a party from acting and

5  preserves the status quo pending a determination of the action on the merits. *Arizona Dream Act*

6  *Coalition v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (quoting *Marlyn Nutraceuticals, Inc. v.*

7  *Mucos Pharma GmbH & Co.,* 571 F.3d 873, 878–79 (9th Cir. 2009)). A more stringent standard

8  is applied where mandatory, as opposed to prohibitory preliminary relief is sought. The Ninth

9  Circuit has noted that although the same general principles inform the court's analysis, "[w]here a

10  party seeks mandatory preliminary relief that goes well beyond maintaining the status quo

11  pendente lite, courts should be extremely cautious about issuing a preliminary injunction." *Martin*

12  *v. International Olympic Committee*, 740 F.2d 670, 675 (9th Cir. 1984) (citation omitted). Thus,

13  an award of mandatory preliminary relief is not to be granted unless both the facts and the law

14  clearly favor the moving party and extreme or very serious damage will result. *See Anderson v.*

15  *United States*, 612 F.2d 1112, 1115 (9th Cir. 1979) (citations omitted). "[I]n doubtful cases" a

16  mandatory injunction will not be issued. *Id*.

17       The Prison Litigation Reform Act (PLRA) mandates that prisoner litigants must satisfy

18  additional requirements when seeking preliminary injunctive relief against prison officials.  The

19  PLRA provides, in relevant part:

20          Preliminary injunctive relief must be narrowly drawn, extend no
           further than necessary to correct the harm the court finds requires
21          preliminary relief, and be the least intrusive means necessary to
           correct that harm. The court shall give substantial weight to any
22          adverse impact on public safety or the operation of a criminal
           justice system caused by the preliminary relief and shall respect the
23          principles of comity set out in paragraph (1)(B) in tailoring any
           preliminary relief.

1  18 U.S.C. § 3626(a)(2).

2      Thus, the PLRA limits the court's power to grant preliminary injunctive relief to inmates.

3  *See Gilmore v. People of the State of California*, 220 F.3d 987, 998 (9th Cir. 2000). "Section

4  3626(a) therefore operates simultaneously to restrict the equity jurisdiction of federal courts and

5  to protect the bargaining power of prison administrators—no longer may courts grant or approve

6  relief that binds prison administrators to do more than the constitutional minimum." *Id.* at 999.

7  ### III. DISCUSSION

8  **A. Eighth Amendment Deliberate Indifference**

9      "The government has an 'obligation to provide medical care for those whom it is

10  punishing by incarceration,' and failure to meet that obligation can constitute an Eighth

11  Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th

12  Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

13      A prisoner can establish an Eighth Amendment violation arising from deficient medical

14  care if he can prove that prison officials were deliberately indifferent to a serious medical need.

15  *Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two

16  elements: "the seriousness of the prisoner's medical need and the nature of the defendant's

17  response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other*

18  *grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

19      "A 'serious' medical need exists if the failure to treat a prisoner's condition could result

20  in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974

21  F.2d at 1059 (citing *Estelle*, 429 U.S. at 104). Examples of conditions that are "serious" in nature

22  include "an injury that a reasonable doctor or patient would find important and worthy of

23  comment or treatment; the presence of a medical condition that significantly affects an

individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken, and mouth was wired shut for several months demonstrated a serious medical need). Gender dysphoria is a sufficiently serious medical need to implicate the Eighth Amendment. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (collecting cases).

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104. "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted). "'[A] prisoner need not prove that he was completely denied medical care' in order to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at 1132), *overruled on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury.

1 | *Stewart v. Aranas,* 32 F.4th 1192, 1195(9th Cir. 2022) (citing *Shapley v. Nev. Bd. of State Prison*
2 | *Comm'rs,* 766 F.2d 404, 407 (9th Cir. 1985)); *McGuckin*, 974 F.2d at 1060.

3 | "Accepted standards of care and practice within the medical community are highly
4 | relevant in determining what care is medically acceptable and unacceptable." *Edmo*, 935 F.3d at
5 | 786 (citations omitted). A difference of opinion will amount to deliberate indifference "only if
6 | the dueling opinions are medically unacceptable under the circumstances." *Id*. (citation omitted).

7 | The court "need not defer to the judgment of prison doctors or administrators." *Hunt v.*
8 | *Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). "Nor does it suffice for 'correctional
9 | administrators wishing to avoid treatment … simply to find a single practitioner willing to attest
10 | that some well-accepted treatment is not necessary.'" *Edmo*, 935 F.3d at 786 (quoting *Kosilek v.*
11 | *Spencer*, 774 F.3d 63, 90 n. 12 (9th Cir. 2014)).

12 | **B. Facts**

13 | Both parties agree that Plaintiff has been diagnosed with gender dysphoria.[1] (ECF No. 75
14 | at 3, ECF No. 91-1 at 4, ECF No. 91-7.) According to Plaintiff's expert, Dr. Gorton,
15 | "[i]ndividuals with Gender Dysphoria experience incongruence between their gender identity
16 | and birth-assigned sex and distress as a result." (ECF No. 75-1 at 7.) Dr. Gorton explains that if
17 | not treated, individuals with gender dysphoria "often suffer clinically significant emotional

---

[1] Previously, Plaintiff settled a case relating to her treatment for gender dysphoria while incarcerated. (ECF No. 81-2.) The settlement agreement called for Plaintiff to be examined by a qualified medical expert to see if she was a candidate for hormone therapy treatment. (*Id.* at 2.) If she was a candidate, NDOC agreed to provide her with the recommended hormonal therapy. (*Id.* at 3.) However, Plaintiff agreed that if hormone therapy was provided and it was medically determined that the treatment may cause harm or injury, then the treatment may be discontinued. (*Id.*) In exchange, Plaintiff agreed to dismiss the case and released and discharged any future conduct that were or could have been brought in that suit. (*Id.* at 6.) This agreement was executed in April 2012. (*Id.* at 7.)

distress, including anxiety, depression, suicidal thoughts, and impairment of functioning in their daily lives." (*Id.*)

The treatment for individuals with gender dysphoria "generally includes Social Transition, Gender Conforming Hormone Replacement Therapy – GCHRT (medical transition), most often Gender Conforming Surgery (GCS), and often mental health treatment." (*Id.* at 9.) Social Transition is a process by which the patient lives their life in the gender role that corresponds to their gender identity. (*Id.*) Medical Transition generally occurs through GCHRT, which results in the development of female secondary sex characteristics "such as breast development, redistribution of body fat to a more female distribution, decreased muscle mass, decreased density and speed of growth of body hair, softening of skin and changes in sebum production and odor, changes in mood, decreased testicular size and decreased sperm production, emotional and some subtle neuropsychological changes." (*Id.* at 9-10.) GCS "is individualized, and the surgeries needed are dependent on individual patient needs and how well gender dysphoria is addressed with other treatments." (*Id.* at 10.) Based on Dr. Gorton's experience, "genital reconstruction (almost always by vaginoplasty) is the most often necessary surgery for transgender women and can dramatically improve gender dysphoria." (*Id.*)

In July 2016, Dr. Marks was contacted for advice by the medical team at LCC regarding Plaintiff's hormone levels which were "substantially elevated at >10,000."[2] (ECF No. 97-1 at 2.)

---

[2] Plaintiff disputes whether Dr. Marks was contacted to consult on Plaintiff's health or if he was contacted to discuss another inmate's health. (ECF No. 100 at 5.) However, Dr. Marks' declaration states that he realized he was consulted while reviewing *Plaintiff's* records. (ECF No. 97-1 at 2.)

Dr. Marks began working at LCC in May 2020 and next reviewed Plaintiff's hormone therapy on July 21, 2020. (*Id.*) Dr. Marks renewed Plaintiff's hormone therapy on January 5, 2021, and again on November 11, 2021. (*Id.* at 3.)

Dr. Marks ordered "new Hormone levels" on April 24, 2022. (*Id.*) Dr. Marks renewed Plaintiff's hormone treatment again on October 25, 2022. (*Id.*)

On May 31, 2023, Dr. Marks "started [Plaintiff] on dermal estrogen therapy." (*Id.*) The hormone therapy was renewed on July 19 and September 27 of 2023. (*Id.*)

On December 23, 2023, the oral form of estradiol was approved, and Plaintiff started receiving it for her hormone therapy. (*Id.* at 4.) On March 18, 2024, Dr. Marks increased Plaintiff's oral estradiol medication to 6 mg per day. (*Id.*) The hormone treatment was renewed on August 12, 2024, but was reduced to 4 mg per day on February 5, 2025. (*Id.*)

During this time, Dr. Marks also ordered and reviewed Plaintiff's lab work, including estradiol and estrogen levels. (*See* ECF No. 97-1.) Dr. Marks also clarified that estradiol levels are the standard test for hormone treatment and that the labs tested Plaintiff's estrogen levels in error. (*Id.* at 5.) However, Plaintiff's estrogen levels were tested on more than one occasion. (*Id.* at 3, 5.) Dr. Marks also notes that Plaintiff has been seen by a psychiatrist and is being actively treated for mental health issues. (*Id.* at 5.)

On December 29, 2022, Dr. Marks referred Plaintiff to see a surgeon regarding sex reassignment surgery. (ECF No. 75-9.) However, the Utilization Review Panel (URP) denied the referral. (ECF No. 97-1 at 4.) In the supplemental declaration, Dr. Marks states that on his own time, he has sought out a surgeon who would perform this type of surgery on inmates but has not found such a surgeon in Nevada. (*Id.*)

As to Finasteride or other treatments for increased facial hair, Dr. Marks stated that "facial hair will creep up to baselines in transgender individuals [and t]he only permanent solution is procedures such as electrolysis." (ECF No. 97-1 at 5.) Dr. Marks further states that his medical opinion is that Finasteride is not indicated in his treatment of Plaintiff. (*Id.*)

Plaintiff provides the expert report from Dr. Gorton as support for the motion for preliminary injunction. (ECF Nos. 75-1, 75-2.) Dr. Gorton concludes that Plaintiff's hormone treatment "does not seem to be adequately dosed to treat her gender dysphoria." (CF No. 75-1 at 21.) Dr. Gorton states that Dr. Marks is not using the correct hormone levels, even for a very conservative course of treatment. (*Id.* at 22-23.) Dr. Gorton also finds that GCS would be medically necessary for Plaintiff and that she should be referred to a surgeon as soon as possible. (*Id.* at 25-27.)

Dr. Gorton also provided a summary of his opinion, assessments, and recommendations for Plaintiff's treatment. (*Id.* at 28-29.) Dr. Gorton recommends increasing Plaintiff's estradiol dosing for an ultimate goal of estradiol levels between 200-350. (*Id.* at 28.) He recommends Plaintiff be prescribed either finasteride or dutasteride for concerns regarding hair. (*Id.* at 21, 28.) Dr. Gorton opines that hormone therapy alone is unlikely to adequately treat Plaintiff's gender dysphoria. (*Id.* at 28-29.) Dr. Gorton believes that a referral for GCS is "an urgent need." (*Id.* at 29.) Dr. Gorton further recommends that Plaintiff be seen by a mental health professional who specializes in treating transgender patients and gender dysphoria symptoms. (*Id.*)

**C. Analysis**

In this case, Plaintiff seeks a mandatory preliminary injunction because Hundley seeks the court to order a responsible party to act. *Arizona Dream Act Coalition*, 757 F.3d at 1060 (citations omitted). This is because Plaintiff requests Defendants to provide medication to

increase Hundley's levels, provide GCS, and provide Finasteride, all of which Hundley alleges are not currently being provided. An award of mandatory preliminary relief is not to be granted unless both the facts and the law clearly favor the moving party and extreme or very serious damage will result and a mandatory injunction will not be issued "in doubtful cases." *See Anderson*, 612 F.2d at 1115 (citations omitted). The court will now address each request in turn.

### 1. Hormone Treatment

The court will first address Plaintiff's request that "[t]he Defendants [be] ordered to provide Ms. Hundley the hormone replacement therapy dosages, in pill or injection form, necessary to maintain Ms. Hundley's estrogen levels between 200-300 pg/ml."[3] (ECF No. 75 at 24.)

Plaintiff argues this is not a case of dueling medical experts because Dr. Marks' declaration is "uncorroborated self-serving testimony," citing the Ninth Circuit's opinions in *Edmo v. Corizon*, 935 F.3d 757, 785 (9th Cir. 2019), and *Poretti v. Dzurenda*, 11 F.4th 1037, 1048-49 (9th Cir. 2021). (*See* ECF No. 91, ECF No. 100 at 5.) In *Edmo*, the Ninth Circuit made clear that the issue was not that of dueling experts. 935 F.3d at 787. In that case, the Ninth Circuit held that the District Court permissibly credited the testimony of the Plaintiff's experts but gave "virtually no weight" to the opinion of the Defendant's experts. *Id.*

In *Poretti*, the Ninth Circuit again found that the District Court properly found that the case was also not that of dueling experts because the expert reports provided by the defendants in that case were uncredible. 11 F.4th at 1048-49. The Ninth Circuit found the credibility determinations were proper because Dr. Exum, one of the defendants' experts, provided only a

---

[3] This number is based on a recommendation from Dr. Gorton. (ECF No. 75-2 at 31.)

four-page report that relied exclusively on a short interview with Poretti. *Id.* The District Court

also noted Dr. Exum's failure to review Poretti's medical records or discuss Poretti's experience

with the subject medication. *Id.* The District Court's credibility determination for Dr. Carroll, the

other expert, was likewise upheld because Dr. Carroll only examined Poretti one time for a few

minutes over videoconference and testified that Poretti exhibited drug-seeking behavior although

the record showed no formal diagnosis of drug abuse. *Id.*

First, the court finds that Dr. Gorton's expert opinion is credible. Dr. Gorton provided

both an initial and supplemental report, totaling over 24 and 31 pages respectively, excluding the

supplemental facts and data included as exhibits. (*See* ECF Nos. 75-1, 75-2.) Dr. Gorton

provides extremely detailed observations, assessments, and recommendations based on a

thorough review of Plaintiff's medical records. Dr. Gorton's qualifications and resume show

decades of experience as an emergency medicine physician and that he has experience through

volunteer work and publications dealing directly with transgender healthcare. (ECF No. 75-1 at

6-7, 31-40.) This is consistent with the Ninth Circuit's finding in *Edmo* that Dr. Gorton's opinion

in that case was also credible. 935 F.3d at 790 ("Dr. Ettner and Dr. Gorton cogently and

persuasively explained why GCS is medically necessary for Edmo and why Edmo meets the

WPATH criteria for GCS.")

The court now turns to Defendant's evidence. In this case, Dr. Marks has been Plaintiff's

treating physician for almost five years. Dr. Marks has personally examined Plaintiff on many

occasions and has been providing consistent care, in contrast to *Poretti* where Dr. Exum and Dr.

Carroll had only very brief interactions with Poretti. Unlike Dr. Carroll who testified to the

existence of drug-seeking behavior where Poretti had not been diagnosed with drug abuse, Dr.

Marks' declaration is consistent with Plaintiff's diagnosis of gender dysphoria. This is evidenced by his continued treatment by hormone therapy and referral for GCS.

Dr. Marks is also different from the experts in *Edmo*, one of whom was a psychiatrist and the other had a PhD in social work, whereas Dr. Marks is Plaintiff's treating physician. Further, in *Edmo*, Defendants' experts did not recommend GCS and they did not have meaningful experience treating patients for gender dysphoria other than assessing them for the existence of the condition, in contrast to Dr. Marks who has been treating Plaintiff's gender dysphoria since at least July 2020. Thus, the court finds the instant case is distinct from both *Edmo* and *Poretti* because Dr. Marks does provide a credible medical opinion.

Here, based on the findings above, the court cannot conclude that Dr. Marks' treatment plan is medically unacceptable under the circumstances. *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) ("[T]o show deliberate indifference, the plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to the plaintiff's health.") Further, even if the treatment plan was medically unacceptable, the court cannot find that Dr. Marks or the other Defendants chose this course of action in *conscious* disregard of an excessive risk to Plaintiff's health. *Id.* Rather, the evidence provided shows that Dr. Marks has adjusted Plaintiff's hormone therapy to reach a blood estradiol level of 100-200. Although Dr. Gorton states that her levels should be at 200-300, because Dr. Marks provides a medically acceptable opinion, the *difference in medical opinion* between Dr. Gorton and Dr. Marks does not rise to the level of deliberate indifference. *Edmo*, 935 F.3d at 786.

In evaluating a motion for preliminary injunction, the likelihood of success on the merits "is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968

14

F.3d 985, 989 (9th Cir. 2020). Therefore, if a movant fails to show a likelihood of success on the merits, the "court need not consider the other factors." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). Thus, having determined that Plaintiff has not shown a likelihood of success on the merits of this request for relief, the court will not examine the remaining *Winters* factors. *Id.*

Furthermore, an award of mandatory preliminary relief is not to be granted unless both the facts and the law clearly favor the moving party and extreme or very serious damage will result, and a mandatory injunction will not be issued "in doubtful cases." *See Anderson*, 612 F.2d at 1115 (citations omitted). Here, the court cannot conclude that the facts clearly favor Plaintiff, and thus recommends that Plaintiff's first request for injunctive relief be denied. *Id.*

**2. GCS**

The court next turns to Plaintiff's request for "a referral for GCS, including but not limited to vaginoplasty and breast augmentation." (ECF No. 75 at 26.) Plaintiff argues that because Defendants have provided no medical reason for denying a referral for GCS, the court must grant this request for injunctive relief. (ECF No. 100 at 15.)

A federal court may issue an injunction only "if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court." *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1985) (as amended). Accordingly, "[u]nder Federal Rule of Civil Procedure 65(d), an injunction binds only 'the parties to the action, their officers, agents, servants, employees, and attorneys, and. . . those persons in active concert or participation with them.'" *Zepeda*, 753 F.2d at 727.

Critically, the existence of an action relating to conduct by *specific* prison officials does not give the court jurisdiction over prison officials in *general*. *Baston v. Yett*, 2018 WL 460546,

at *2 (E.D. Cal. Jan. 18, 2018), *report and recommendation adopted*, 2018 WL 746545 (E.D. Cal. Feb. 7, 2018) (citing *Zepeda*, 753 F.2d at 727); *Carr v. Abdou*, 2023 WL 3981353, at *5 (C.D. Cal. May 5, 2023), *report and recommendation adopted*, 2023 WL 4466428 (C.D. Cal. July 10, 2023). Nor does a prisoner's action against prison officials automatically give the court jurisdiction over NDOC as an entity. *See Balzarini v. Diaz*, 2020 WL 4343694, at *2 (C.D. Cal. Mar. 30, 2020) ("Here, Plaintiff's requested relief is directed at [the California Department of Corrections and Rehabilitation (CDCR)] – not Defendants. Because CDCR is not a named defendant and has not been served, the Court lacks personal jurisdiction over [the] CDCR and cannot issue an injunction against it."); *Silveira v. CoreCivic*, 2019 WL 2932645, at *2 (C.D. Cal. May 23, 2019) ("The court 'may not attempt to determine the rights of persons not before the court.' As the CDCR is not a named defendant and has not been served, the Court lacks personal jurisdiction over the CDCR and cannot issue an injunction against it.") (quoting *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)); *Allen v. Asuncion*, 2018 WL 5858446, at *1 (C.D. Cal. June 19, 2018) ("The Court cannot grant an injunction against the CDCR, [Secretary of the CDCR] Scott Kernan, or any other individuals not named as defendants in the SAC as it has no personal jurisdiction over these non-parties.").

Under Federal Rule of Civil Procedure 65, restraining orders and injunctive relief may bind only "parties defendant in a suit" and individuals "in active concert" with those defendants. *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 112 (1969). However, Rule 65 does not confer personal jurisdiction where it otherwise is lacking. *Hill v. Oakley*, No. 3:11-CV-00609-RCJ-WGC, 2015 WL 727926, at *1 (D. Nev. Jan. 29, 2015), *report and recommendation adopted*, No. 3:11-CV-00609-RCJ-WGC, 2015 WL 714060 (D. Nev. Feb. 19, 2015); *Harris v. Rios*, 2013 WL 1681776, at *2 (E.D. Cal. Apr. 17, 2013) (citing *Citizens Concerned for*

1 *Separation of Church and State v. City and County of Denver,* 628 F.2d 1289, 1299 (10th

2 Cir.1980)). "Having a relationship to an enjoined party of the sort set forth in Rule 65(d) exposes

3 a non-party to contempt for assisting the party to violate the injunction, but does not justify

4 granting injunctive relief against the non-party in its separate capacity." *Federal Trade Com'n v.*

5 *Productive Marketing, Inc.,* 136 F.Supp.2d 1096, 1104 (C.D.Cal.2001) (citing *Additive Controls*

6 *& Measurement Systems, Inc., v. Flowdata, Inc.,* 96 F.3d 1390, 1395–96 (Fed.Cir.1996)).

7       Courts in the Ninth Circuit and District of Nevada have routinely denied motions for

8 preliminary injunctions or temporary restraining orders that seek to bind individuals not named

9 as defendants in the case. *See Saddozai v. Bolanos*, No. 20-17488, 2022 WL 500931, at *1 (9th

10 Cir. Feb. 18, 2022) ("The district court did not abuse its discretion by denying Saddozai's

11 requests for injunctive relief because the district court lacked the authority to grant such relief

12 related to non-parties.") (citing *Zepeda*, 753 F.2d at 727); *Bullock v. Nevens*, No. 3:14-CV-

13 00195-RCJ-VPC, 2015 WL 5177800 (D. Nev. Sept. 4, 2015) (denying injunction because

14 plaintiff sought to bind non-parties); *Hill*, 2015 WL 727926, at *2 (recommending denial of

15 motion for injunction because the court does not have jurisdiction over non-parties and plaintiff

16 did not demonstrate that the Rule 65(d)(2)(C) exception applied); *Gurrier v. LeGrand*, No. 3:10-

17 cv-00719-LRH, 2012 WL 458617 (D. Nev. Jan. 4, 2012), *report and recommendation adopted,*

18 2012 WL 460460 (D. Nev. Feb. 9, 2012) ("The court recommends that plaintiff's motion for

19 injunctive relief [] be denied because it seeks injunctive relief against NNCC, an entity that is not

20 a party to this lawsuit. . ."); *Jones v. Holmes*, No. 3:11-CV-00047-LRH-WGC, 2015 WL

21 13466135 (D. Nev. May 26, 2015), *report and recommendation adopted*, 2015 WL 13466132

22 (D. Nev. July 14, 2015) ("[T]he court does not have jurisdiction to issue an injunction directed to

23 a non-party.") (citing *Zenith*, 395 U.S. at 112); *Wollersheim v. Ngyuen*, No. 2:24-CV-00432-

JAD-EJY, 2024 WL 1300009 (D. Nev. Mar. 26, 2024) (denying request for injunction because it contained new assertions of misconduct by non-parties); *Ratcliff v. Caldarone*, No. 2:21-CV-01155-CDS-BNW, 2022 WL 17542860, at *4 (D. Nev. Nov. 10, 2022) (finding Plaintiff had insufficiently pled that non-parties named in request for injunctive relief would constitute "other persons who are in active concert" with defendants in the case under Rule 65); *see also Bain v. California Teachers Assoc.*, 891 F.3d 1206, 1213 n.5 (9th Cir. 2018) (noting that seeking an injunction against a non-party "arguably runs afoul of the Federal Rules of Civil Procedure and skirts a due process violation.") (citations omitted).

Originally, Plaintiff named the Utilization Review Panel (URP) as a defendant in this case. (ECF No. 1-1.) However, the court dismissed all claims against the URP because it is an arm of the State of Nevada and not a "person" for the purposes of 42 U.S.C. § 1983. (ECF No. 10 at 3-4 (citing *Doe v. Lawrence Livermore Nat. Lab.*, 131 F.3d 836, 839 (9th Cir. 1997); *Black v. Nevada Dep't of Corr.*, 2:09-cv-2343-PMP-LRL, 2010 WL 2545760, *2 (D. Nev. June 21, 2010).) Thus, the URP is not a party to this lawsuit.

The evidence shows that both Dr. Marks and Dr. Gorton agree that Plaintiff should be seen by a surgeon to evaluate her for potential GCS. However, it was the URP who made the decision not to send Plaintiff to be seen for a GCS consult, not Dr. Marks or any of the other named Defendants. The evidence establishes that Dr. Marks recommended that Plaintiff be seen and when the URP denied the referral, Dr. Marks tried to find another source to provide Plaintiff with the surgery.[4] However, Dr. Marks himself cannot override a decision of the URP.

---

[4] Even were Dr. Marks to find such a surgeon, a prisoner has no constitutional right to outside medical care to supplement the medical care provided by the prison even where the prisoner is willing to pay for the treatment. *See Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir. 1986).

"[A] person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Preschooler II v. Clark Cnty. Sch. Bd. of Trs*., 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)); *see Lacey v. Maricopa County*, 693 F.3d 896, 915-16 (9th Cir. 2012) (en banc); *Stevenson v. Koskey*, 877 F.2d 1435, 1438–39 (9th Cir. 1989); *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). When making the causation determination, the court "must take a very individualized approach which accounts for the duties, discretion, and means of each defendant." *Leer*, 844 F.2d at 633-34.

Here, as the members of the URP who are responsible for actually denying the referral for GCS are not named individually as members of this lawsuit, the actors who would be liable for this alleged deliberate indifference cannot be bound by a preliminary injunction absent a showing under Rule 65. *Saddozai v. Bolanos*, 2022 WL 500931, at *1; *Hill*, 2015 WL 727926, at *2. As the URP is not a party, and Plaintiff did not demonstrate that the URP satisfies the requirements under Rule 65, the court recommends that Plaintiff's second request for injunctive relief be denied for lack of jurisdiction over the URP. *Id*.

**3. Finasteride**

Finally, the court will turn to Plaintiff's request that "Defendants [be] ordered to provide Ms. Hundley with a 5 alpha reductase inhibitor (such as finasteride or dutasteride) and topical minoxidil to increase scalp hair." (ECF No. 75 at 26.) Again, Plaintiff argues that this is not a case of dueling medical experts because Dr. Marks' declaration "offers conclusory and self-serving testimony designed to support Defendants' litigation position as to hormonal treatment and finasteride." (ECF No. 100 at 13.)

Here, as discussed above, the court does find that Dr. Marks provided a credible medical opinion. Dr. Marks stated that "facial hair will creep up to baselines in transgender individuals [and t]he only permanent solution is procedures such as electrolysis." (ECF No. 97-1 at 5.) Dr. Marks further states that his medical opinion is that Finasteride is not indicated in his treatment of Plaintiff. (*Id.*)

While Dr. Gorton also provides an acceptable medical opinion, a difference of medical opinion by two doctors does not amount to deliberate indifference where there are two medically acceptable opinions. *Edmo*, 935 F.3d at 786. Consequently, the court finds this does constitute a case of dueling experts, and deliberate indifference has not been established. *Id.* Thus, having determined that Plaintiff has not shown a likelihood of success on the merits of this request for relief, the court will not examine the remaining *Winters* factors. *Disney Enters.*, 869 F.3d at 856. Therefore, the court recommends Plaintiff's third request for injunctive relief be denied.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Plaintiff's motion for preliminary injunction.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: April 23, 2025

_____
Craig S. Denney
United States Magistrate Judge