1
2
3
4

UNITED STATES DISTRICT COURT

5

DISTRICT OF NEVADA

6

JAMEE DEIRDRE HUNDLEY,

Case No. 3:19-cv-00458-ART-CSD

7

Plaintiff,

**ORDER ON MOTION FOR
PRELIMINARY INJUNCTION**

v.

8

ROMEO ARANAS, *et al.*,

(ECF No. 75)

9

Defendants.

10
11        Plaintiff Jamee Deidre Hundley, a transgender woman and inmate

12   incarcerated in the Nevada Department of Corrections ("NDOC") at Lovelock

13   Correction Center ("LCC"), sues Defendants State of Nevada and Dr. Dana Marks

14   ("Dr. Marks") for a preliminary injunction. (ECF No. 75.) Magistrate Judge Craig

15   S. Denney issued a report and recommendation ("R&R") recommending denial of

16   that motion. (ECF No. 101.) For the reasons set forth below, the Court adopts in

17   part and rejects in part the R&R, and grants in part and denies in part Plaintiff's

18   motion for a preliminary injunction.

19   **I.        BACKGROUND**

20             **A.    Hundley's Gender Dysphoria**

21        Hundley has been in NDOC custody since 1996. (ECF No. 75-10 at 3.)

22   Hundley is a transgender woman who was assigned male sex at birth. (ECF No.

23   75-10 at 3.) Hundley suffers from gender dysphoria ("GD"). Hundley was first

24   diagnosed with GD in February 1995, prior to her incarceration. (ECF No. 75-10

25   at 3; ECF No. 75-1 at 12.) In 2005, Hundley was transferred to LCC. (ECF No.

26   75-10 at 3.) In 2009, after being transferred to LCC, Hundley began to seek help

27   from NDOC officials to treat her GD. (*Id.*)

28   //

**B.    The April 2012 Agreement**

In April 2012, as part of a prior lawsuit against NDOC before this court, Hundley entered into a private settlement agreement with the State of Nevada. *Hundley v. Poag et al.*, Case No. 3:10-cv-00406-RCJ-CLB. Under that settlement agreement, the State of Nevada agreed, among other things, to "have Hundley examined by a qualified medical expert . . . to determine if Hundley is a candidate for Gender Identity Disorder (GID) hormonal therapy" and agreed that "if the Expert determines that Hundley is a candidate for transsexual hormonal therapy then State will provide, at State's expense, all recommended hormonal therapy to Hundley during the period of time [she] is incarcerated by the NDOC." (ECF No. 81-2 at 3–4.)

According to the complaint, in July 2012, the Nevada Attorney General's Office hired an independent psychiatrist who diagnosed Hundley with "severe and persistent gender dysphoria / transsexualism" and Hundley began hormone replacement therapy treatment ("HRT"). (ECF No. 65 at ¶ 57.)

**C.    Hundley's Hormone Replacement Therapy Treatment**

In August 2012, medical professionals at NDOC prescribed Hundley HRT. (ECF No. 75-10 at 3–4; ECF No. 75-1 at 14.) The dosages were increased until Hundley was prescribed a weekly dose of around 30 mg estradiol. (ECF No. 75-10 at 4; ECF No. 75-1 at 14.) These HRT dosages partially alleviated Hundley's GD symptoms. (ECF No. 75-10 at 4.)

In 2014, Hundley's medication was increased significantly. (*Id.*) According to Plaintiffs' expert, Dr. Gorton, the dose was exceedingly high based on both current and contemporary standards of treatment. (*Id.*) In June 2015, Hundley was informed that she could no longer receive estradiol injections. (ECF No. 75-1 at 15.) This sudden reduction in HRT dosages "caused [Hundley] physical and emotional illness which exacerbated the symptoms of [her] GD, including severe mood swings, increased facial and body hair, bad headaches, unwanted

erections, depression and anxiety, and also caused [her] to suffer a small stroke which negatively affected [her] speech." (ECF No. 75-10 at 4.) At some point after this she was restarted at a dose of 20 mg. (ECF No. 75-1 at 15.)

In July 2016, Hundley reports that she was given a much higher dose of estradiol by injection than she had previously received. (*Id.*) Several weeks later, after having labs drawn, her estradiol was decreased to 10 mg weekly because her levels were too high. (*Id.*) After this abrupt decrease, Hundley described experiencing "increased facial fair growth, distressing nocturnal erections . . ., and worsening of her anxiety and depression[.]" (ECF No. 75-1 at 18–19.)

Between 2017 and 2020, Hundley's HRT dosages were increased to alleviate her symptoms of GD. (ECF No. 75-10 at 6.) In March 2020, Hundley's estrogen levels were 208 pg/ml. (*Id.* at 7.) During an appointment in 2020, Dr. Naughton told Hundley that he wanted to cut her hormone doses due to the possibility of developing a prolactinoma or hyperlactinemia. (*Id.* at 7.)

In December 2022, Hundley had a telemedicine visit with Rob Phoenix APRN, a nurse who has experience treating transgender patients. (ECF No. 75-1 at 20; ECF No. 75-10 at 7; ECF No. 75-12.) Nurse Phoenix recommended several changes to her medication, including changing her estrogen therapy to oral estradiol (2 mg daily) with a goal of estradiol levels between 150-300 [pg/ml]. (ECF No. 75-1 at 20; ECF No. 75-12.) Nurse Phoenix also recommended finasteride to increase scalp hair and Metformin to address weight gain caused by HRT alterations. (*Id.*; ECF No. 65 at ¶ 136.) According to the complaint, Nurse Phoenix warned Hundley that Dr. Marks might refuse to fulfill the prescriptions, even though Dr. Marks "should" provide all the prescribed medications to Ms. Hundley. (ECF No. 65 at ¶ 137.) These recommendations were not followed. (ECF No. 75-1 at 20; ECF No. 75-10 at 8.)

In February 2023, Hundley filed an informal grievance against Dr. Marks for failing to correct her estrogen levels despite saying himself that her levels were

3

too low. (ECF No. 75-10 at 8; ECF No. 75-3.) In March 2023, Hundley filed a medical kite requesting a meeting with Director of Nursing Services Erin Parks to discuss the issues. (ECF No. 75-10 at 8; ECF No. 75-4.) After receiving no response, Hundley filed a first-level grievance later that month, stating that she "just want[ed] her levels back where they were when [she] was at the 'golden spot' of 203 pg/ml estradiol, and the finasteride and metform[i]n as sought by the specialist." (ECF No. 75-10 at 8; ECF No. 75-5.) Hundley filed a second-level grievance in May 2023. (ECF No. 75-10 at 8; ECF No. 75-6.) Hundley received a response in the form of a post-it note attached to the front of her grievance stating: "Here is some info to consider until we meet next week, for further discussion." (ECF No. 75-10 at 8; ECF No. 75-7.) Also attached was a printout from a medical manual with certain sections highlighted, including a sentence which says: "E2 concentrations should be monitored to avoid supraphysiologic levels (e.g., maintain levels <200 pg/mL[.]") (*Id.*)

In May 2023, Hundley met with Dr. Marks who informed her that she would be prescribed pills, rather than injections, to raise her estrogen levels. (ECF No. 75-10 at 8.) However, Hundley did not receive pills and instead received a small number of transdermal HRT patches. (*Id.* at 9.) These patches have not increased Hundley's estrogen and are prone to fall off due to hot and humid conditions at LCC. (*Id.*) In June 2023, Hundley began receiving oral dosages of HRT again. (*Id.*) When Hundley's HRT dosages were cut, she experienced restless leg syndrome, severe forgetfulness, and an increase in anxiety, depression, and other symptoms of GD. (*Id.*)

In February 2024, Hundley requested that Dr. Marks increase her HRT because her last estradiol level had dropped to 47. (ECF No. 75-1 at 22.) Dr. Marks responded confirming that he had received a copy of the results but that "we follow the well established evidence-base[d] [website] 'Up To Date' and their recommended range is 100-200." (*Id.*)  He stated that "[t]here are many variables

4

that affect all medications/hormone levels and therefore most medications are not changed based on one lab result" and that a "53 point drop to 47 is small compared to month to month changes in cis women." (*Id.* at 22; ECF No. 75-8.)

Hundley's average estradiol level through 2023 and 2024 was 69, with her lowest level at 47. (ECF No. 75-2 at 18 n.15, 19 n.17.)

### D.    Referral for Gender Confirming Surgery

Although HRT, when prescribed, helped abate Hundley's symptoms of GD, it did not fully alleviate what she describes as the "anguish, anxiety and pain" that GD causes her. (ECF No. 75-10 at 4.) Specifically, the presence of male genitalia, which she considers "a birth defect and abhorrent" causes her "extreme emotional distress, depression, anxiety, and to hate [her] own body." (*Id.*)

In May 2015, Hundley requested via medical kite to be seen by a physician for a referral for Gender Confirming Surgery ("GCS"). (ECF No. 75-10 at 4; ECF No. 75-1 at 15.) Director of Nursing Services Donald Poag informed her that GCS was not available through NDOC. (ECF No. 75-10 at 4.) She filed a second request via medical kite several days later. (*Id.*) In June 2015, Poag said that he would forward her request to the medical director. (*Id.*) In July 2015, Hundley met with Romeo Aranas, an NDOC physician, and Donald Poag to discuss both her HRT treatment and surgery. (*Id.*) During the meeting, she again asked to be evaluated for GCS, and they told her: "Nevada won't do that." (*Id.*) Between 2018 and 2020, Hundley sent several medical kites requesting to be seen by Kim Adamson and Michael Minev for evaluation for GCS. (ECF No. 75-10 at 7.)

In December 2022, Dr. Marks recommended gender confirmation surgery. (ECF No. 75-9; ECF No. 97-1 at 5.) According to Dr. Marks, that referral was denied by the Utilization Review Panel ("URP"). (ECF No. 97-1 at 5.)

### E.    Non-Hormonal Gender Dysphoria Treatments

During the December 2022 consultation, Nurse Phoenix recommended, among other things, that Hundley be prescribed 1g finasteride daily to increase

scalp hair. (ECF No. 75-12.) Dr. Marks did not prescribe finasteride, noting that "#1 it is not needed and #2 there is no evidence for use in HAT in gender dysphoria." (ECF No. 75-1 at 20.) In his supplemental declaration, Dr. Marks states that "there is no available data for its use in transgender individuals" and in his opinion, the medication is "not indicated in [his] treatment of [] Hundley." (ECF No. 97-1 at 5.)

### F.    Expert Report: Dr. Ryan Nicholas Gorton

In connection with this litigation, Plaintiff consulted an expert in the treatment of individuals with gender dysphoria, Dr. Ryan Nicholas Gorton. Dr. Gorton has personally treated over 500 transgender patients and supervised the treatment of over 1,000 transgender patients as a supervising physician for other healthcare providers. (ECF No. 75-2 at 6.) Dr. Gorton authored an initial report based on (incomplete) medical records provided by NDOC and a supplemental report after conducting a three-hour evaluation of Hundley via zoom (ECF Nos. 75-1, 75-2).

In his initial report, Dr. Gorton states that Hundley's most recent lab results "in the context of her significant persistent gender dysphoria indicate . . . that she is currently inadequately treated for her GD from a medical perspective." (ECF No. 75-1 at 28.) He explains that "[h]er providers went from the extreme of an extraordinarily high dose of GCHRT for several years when she was first started to now the other extreme of woefully inadequate treatment" and that "[t]hese wild swings of the pendulum have exposed Ms. Hundley to significant risks and years of inappropriately treated gender dysphoria." (*Id.*) Dr. Gorton notes that "[u]ntreated gender dysphoria is well known to cause in addition to the dysphoria, significant anxiety, depression, and even suicidal ideation." (*Id.* at 14.) He opines that "[a]dequate medical treatment of her gender dysphoria is an urgent clinical need . . . that has been neglected and should be promptly rectified." (*Id.*)

In his supplemental report, Dr. Gorton elaborates on his diagnosis, stating that Hundley has "severe genital dysphoria, moderate to severe physical dysphoria . . . and moderate general physical dysphoria." (ECF No. 75-2 at 31.) Dr. Gorton states that Hundley is "suffering greatly due to her gender dysphoria being inadequately treated and the persistent and repeated delays and denials of care she has received from her providers at NDOC[.]" (*Id.*)

The World Professional Association for Transgender Health ("WPATH") promulgates standards of care ("SOC") for transgender individuals (*Id.* at 28.)  Dr. Gorton concludes that Hundley meets the WPATH SOC8 criteria for surgical referral and met the WPATH SOC7 criteria in 2015 when she initially requested surgical care. (*Id.* at 31.)

Dr. Gorton recommends: (1) immediate referral to a surgeon experienced in GAST, specifically in vaginoplasty; (2) immediately increasing her estradiol dose to maintain her in the 200-300 range; and (3) immediately starting on a 5 alpha reductase inhibitor (finasteride or dutasteride) and a topical minoxidil. (*Id.* at 31–32.)

### G.    Procedural History

Hundley filed her Third Amended Complaint in June 2024. (ECF No. 65.) She sues Defendants the State of Nevada ex rel. Nevada Department of Corrections ("NDOC"), the Board of State Prison Commissioners (the "Board"), Joseph Lombardo, Aaron Ford, Cisco Aguilar, David Rivas (the current NDOC Medical Director), David Greene, James Dzurenda, Tim Garrett, Romeo Aranas Michael Minev, David Bequette, Russelle Donnelly, Donald Poag, Martin Naughton, Kim Adamson, Sarah Rushton, and Dana Marks. (*Id.* at ¶¶ 16 – 36.) She brings nine causes of action: (1) violation of the Eighth Amendment for denial of necessary care in the form of gender confirmation surgery; (2) violation of the Eighth Amendment for denial of necessary care in the form of hormone treatment; (3) violation of the Fourteenth Amendment for equal protection; (4) violation of

1    the First Amendment for retaliation; (5) breach of contract under Nevada law; (6)

2    violation of the Nevada constitution for denial of necessary care in the form of

3    GCS; (7) violation of the Nevada constitution for denial of necessary care in the

4    form of hormone treatment; (8)  violation of the Nevada constitution for equal

5    protection; and (9) violation of the Nevada constitution for retaliation. (*Id.* at ¶¶

6    177–276.)

7        Hundley now moves for a preliminary injunction "ordering Defendants

8    State of Nevada and Dana Marks to treat her with the medically prescribed

9    Hormone Replacement Therapy, refer her for Gender Confirmation Surgery and

10   provide her with other medications required to sufficiently alleviate her symptoms

11   of gender dysphoria." (ECF No. 75 at 2.) Specifically, Hundley requests that the

12   Court order Defendants to: (1) provide Hundley the hormone replacement therapy

13   dosages, in pill or injection form, necessary to maintain her estrogen levels

14   between 200-300 pg/ml; (2) provide Hundley a referral for GCS, including but

15   not limited to vaginoplasty and breast augmentation; and (3) provide Hundley

16   with a 5 alpha reductase inhibitor (such as finasteride or dutasteride) and topical

17   minoxidil to increase scalp hair. (ECF No. 75 at 24.)

18       Before issuing the R&R, Judge Denney held a hearing on the motion at

19   which he advised Defendants that Dr. Marks's declaration lacked sufficient

20   information and ordered Dr. Marks to submit a supplemental declaration. (ECF

21   No. 93.) Dr. Marks filed that supplemental declaration (ECF No. 97) and Plaintiff

22   responded with a supplement in support of her motion for a preliminary

23   injunction (ECF No. 100).

24       The R&R recommends denial of the motion in its entirety. (ECF No. 101.)

25   First, it recommends denying the request for HRT based on a finding that Dr.

26   Marks's opinion is credible and that the evidence suggests a difference in medical

27   opinion. Second, it recommends denying the referral to GCS because the Court

28   lacks jurisdiction over the URP. Third, it recommends denying the request for

1    other medications because the evidence suggests a difference of medical opinion.

2    Plaintiff filed objections to the R&R (ECF No. 108), Defendants responded (ECF

3    No. 114), and Plaintiffs filed a motion for leave to file a reply (ECF No. 115), along

4    with a proposed reply, which the Court grants and considers in this order.

5    **II.    STANDARD OF REVIEW**

6        Under the Federal Magistrates Act, a Court "may accept, reject, or modify,

7    in whole or in part, the findings or recommendations made by [a] magistrate

8    judge." 28 U.S.C. § 636(b)(1). Where a party timely objects to a magistrate judge's

9    report and recommendation, then the court is required to "make a *de*

10   *novo* determination of those portions of the [report and recommendation] to which

11   objection is made." 28 U.S.C. § 636(b)(1).

12       "A party seeking a preliminary injunction must meet one of two variants of

13   the same standard." *All. For the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th

14   Cir. 2017). Under the *Winter* standard, a plaintiff is entitled to a preliminary

15   injunction if they demonstrate that: (1) they are likely to succeed on the merits,

16   (2) they are likely to suffer irreparable harm in the absence of preliminary relief,

17   that the balance of equities tips in their favor, and (3) an injunction is in the

18   public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In

19   cases against the government, the last two factors merge into one. *Drakes Bay*

20   *Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir.), *as amended* (Jan. 14, 2014).

21       Under the Ninth Circuit's "sliding scale" variant of the *Winter* test, a plaintiff

22   is entitled to a preliminary injunction if they demonstrate: (1) serious questions

23   going to the merits, (2) a likelihood of irreparable injury, (3) a balance of hardships

24   that tips sharply towards the plaintiff, and (4) that the injunction is in the public

25   interest. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180,

26   1190 (9th Cir. 2024) (quoting *All. for the Wild Rockies*, 865 F.3d at 1217). Under

27   this test, "if a plaintiff can only show that there are serious questions going to the

28   merits—a lesser showing than likelihood of success on the merits—then a

preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *All. for the Wild Rockies*, 865 F.3d at 1217 (quoting *Shell Offshore, Inc., v. Greenpeace, Inc.,* 709 F.3d 1281, 1291 (9th Cir. 2013) (internal quotations omitted)).

Injunctive relief can be prohibitory or mandatory. "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571 F.3d 873, 878 (9th Cir. 2009) (cleaned up). A mandatory injunction orders a party to take action. *Id.* at 879. Because a mandatory injunction "goes well beyond simply maintaining the status quo pendente lite [it] is particularly disfavored." *Id.* (cleaned up). "In general, mandatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.'" *Id.* (quoting *Anderson v. United States,* 612 F.2d 1112, 1115 (9th Cir.1979)).

Under the Prison Litigation Reform Act ("PLRA"), preliminary injunctive relief must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). "The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." *Id.*

In considering a motion for a preliminary injunction, the Court may "give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).

//

//

//

1    **III.    ANALYSIS**

2        The Court first addresses the likelihood of success on the merits, evaluating

3    each of Plaintiff's requests separately. It then evaluates whether Plaintiff has

4    shown irreparable injury, and whether the balance of equities and public interest

5    favors granting a preliminary injunction. The Court holds that Plaintiff is entitled

6    to preliminary injunctive relief in the form of adequate HRT and a referral to see

7    a surgeon for evaluation for GCS, as outlined below.

8        **A.    Likelihood of Success on the Merits**

9        To obtain a preliminary injunction, Hundley must first establish either that

10   she is likely to succeed on the merits or that there are serious questions going to

11   the merits. In this motion, Hundley contends that Defendants violated 42 U.S.C.

12   § 1983 by denying her medically necessary treatment for gender dysphoria—

13   including by ignoring prescribed HRT dosages and other medical interventions

14   and refusing to provide referrals for GCS—in violation of the Eighth Amendment's

15   prohibition against cruel and unusual punishment. (ECF No. 75 at 3–4.)

16       "[D]eliberate indifference to serious medical needs of prisoners constitutes

17   the 'unnecessary and wanton infliction of pain' proscribed by the Eighth

18   Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (internal citation

19   omitted). Such indifference may be "manifested by prison doctors in their

20   response to the prisoner's needs or by prison guards in intentionally denying or

21   delaying access to medical care or intentionally interfering with the treatment

22   once prescribed." *Id.* In the Ninth Circuit, a plaintiff alleging deliberate

23   indifference must first "show a serious medical need by demonstrating that

24   failure to treat a prisoner's condition could result in further significant injury or

25   the unnecessary and wanton infliction of pain." *Jett v. Penner,* 439 F.3d 1091,

26   1096 (9th Cir. 2006) (citing *Estelle,* 429 U.S. at 104) (internal quotation marks

27   omitted). Second, she "must show the defendant's response to the need was

28   deliberately indifferent." *Id.* To "show deliberate indifference, the plaintiff 'must

11

show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to the plaintiff's health.'" *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (quoting *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014 (en banc)).

### 1. Serious Medical Need

The R&R found that gender dysphoria is a sufficiently serious medical need to implicate the Eighth Amendment, citing *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019). (ECF No. 101 at 7.) Neither party objected to this finding and the Court adopts the R&R's analysis on this issue.

### 2. Deliberate Indifference

The R&R addressed each request in turn: HRT, the referral for GCS, and the provision of other non-hormonal treatments. (ECF No. 101 at 11–20.) Plaintiff objected to all three portions, so the Court conducts *de novo* review.

### a. Hormone Replacement Therapy

The R&R found that Plaintiff failed to show likelihood of success on the merits because it found Dr. Marks credible and found that his HRT treatment plan was not medically unacceptable under the circumstances. (ECF No. 101 at 12–15.) Plaintiff objects to both findings, arguing that the R&R erred in finding Dr. Marks a credible expert and overlooked evidence that hormone treatment has been knowingly inadequate. (ECF No. 108 at 11–17.)

Typically, "[a] difference of opinion between a physician and the prisoner— or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987. "But that is true only if the dueling opinions are medically acceptable under the circumstances." *Edmo*, 935 F.3d at 786. "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, we need not defer to

the judgment of prison doctors or administrators." *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1989). Ignoring the recommendations of treating specialists and instead relying upon the opinions of non-specialist and non-treating medical officials can constitute deliberate indifference.  *Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014).

A review of the record suggests, contrary to the R&R's finding, that "this is not a case of dueling experts." *Edmo*, 935 F.3d at 787. There is only one expert in this case. The Court adopts the R&R's finding that Dr. Gorton, just as he was in *Edmo*, is a credible expert. (ECF No. 101 at 13 (citing *Edmo*, 935 F.3d at 790).) Dr. Gorton provided a twenty-four-page initial repot and a thirty-page supplemental report. (ECF Nos. 75-1, 75-2.) Those reports provide extremely detailed observations, assessments, and recommendations based on a thorough review of Hundley's medical records and a three-hour evaluation of Hundley. (*See id.*) Dr. Gorton has provided primary care for over 500 transgender patients and supervised the treatment of over 1,000 transgender patients. (ECF No. 75-2 at 6.) Dr. Gorton has published peer-reviewed articles concerning the treatment of GD. (ECF No. 75-1 at 32–34.)

Although Dr. Marks is Hundley's treating physician, he is not an expert and Defendants do not argue that he is. In *Edmo*, the Ninth Circuit upheld the district court's decision to credit the testimony of the plaintiff's experts (including Dr. Gorton) and discredit the testimony of the defendants' experts where the latter had "substantial experience providing health care in institutional settings, but lack[ed] meaningful experience directly treating people with gender dysphoria." *Edmo*, 935 F.3d at 787. Like the defense experts in *Edmo*, Dr. Marks lacks experience providing healthcare to people with gender dysphoria. According to his declaration, Dr. Marks has been the senior physician at LCC since 2020. (ECF No. 97-1 at 2.) He does not discuss any experience providing treatment to individuals with GD aside from Hundley. (*See* ECF No. 97-1.) In *Edmo*, the Ninth

Circuit gave very little weight to the opinions of two treating physicians, even though they were held out as experts. Here, Defendants have offered no experts, and the Court considers the opinion of Dr. Marks to be that of a treating physician with limited experience providing transgender care.

Dr. Gorton's expert report provides extensive evidence to support a conclusion that Defendants' care has been medically unacceptable. Dr. Gorton states that Dr. Marks has been "systematically undertreating Ms. Hundley's gender dysphoria." (ECF No. 75-1 at 19.) He states that Hundley's estradiol is at "unacceptable levels." (ECF No. 75-1 at 18.) He opines that, in refusing to provide her additional medication because her estradiol level is not at the bottom end (or below) the 100-200 pg/ml range, Hundley's providers have "failed the most basic concept in medical therapeutics of 'treat the patient, not the number.'" (ECF No. 75-1 at 22.)

Dr. Marks's failure to follow the recommendations of the expert that NDOC hired provides further evidence that his care has been medically unacceptable. In December 2022, Nurse Phoenix, who has experience treating transgender patients, recommended that Hundley's HRT be increased with a goal of estradiol levels between 150 to 300 pg/ml and recommended that Hundley be prescribed finasteride. (ECF No. 75-12 at 3.) Dr. Gorton describes this as a "very reasonable recommendation for Ms. Hundley based on the current community-based standards for treating transgender women." (ECF No. 75-1 at 20.) Dr. Marks ignored Nurse Phoenix's recommendations. (*Id.*) His only explanation for doing so is a mostly illegible note that neither Defendants' briefing nor Dr. Marks's declaration explains. (*Id.*) Defendants do not mention Nurse Phoenix in their response to Plaintiff's objections. (ECF Nos. 81, 97-1, 114.) Even after Judge Denney requested that Dr. Marks provide a supplemental declaration to include, among other things, an explanation of how his treatment is following or diverging from Nurse Phoenix's recommendations, Dr. Marks again failed to mention Nurse

14

1    Phoenix. (ECF Nos. 94, 97-1.) According to the only expert in this case, "[b]ecause

2    Dr. Marks ignored the recommendations of the expert that NDOC hired [Hundley]

3    still remains inadequately treated." (ECF No. 75-1 at 22.)

4        Even if Dr. Marks's decision to reject Nurse Phoenix's recommendation was

5    medically acceptable, Plaintiff has presented evidence that Dr. Marks has failed

6    to follow even his own recommendations. The R&R found that Dr. Marks's opinion

7    that Hundley should be treated with hormone therapy such that her estradiol

8    levels are between 100 and 200 pg/ml is a medically acceptable opinion. (ECF

9    No. 101 at 14.) But the record shows that Dr. Marks's treatment has not caused

10   Hundley to meet those levels. Dr. Gorton explains: "even if we were to use these

11   conservative levels, Ms. Hundley has been under the lower limit of that range in

12   all 4 levels tested in 2023 and 2024, and the average of the four has been 69

13   [p]g/ml.." (ECF No. 75-2 at 19.) Dr. Marks's failure to follow even his own

14   treatment recommendations suggests that he has been acting in conscious

15   disregard of an excessive risk to Hundley's health.

16       Dr. Marks's response to this in his supplemental declaration misrepresents

17   Hundley's medical records. Dr. Marks states that "[t]he estradiol levels ranged as

18   high as 118 and have included levels at 111 and 95 over the last two years." (ECF

19   No. 97-1 at 4–5.) Dr. Marks's declaration was submitted in April 2025, so this

20   period spans April 2023 to April 2025. According to the medical records before

21   the Court, Hundley's estradiol levels did not reach 100 between April 2023 and

22   April 2025. In August 2023, Hundley's estradiol level was 91.9 (ECF No. 100-2 at

23   14); in December 2023, it was 47.2 (*Id.* at 9); in March 2024, it was 54 (*Id.* at 2);

24   and in August 2024, it was 83.3 (*Id.* at 4). (*See* ECF No. 100-3 at 4–5.) Dr. Marks's

25   supplemental declaration misstates crucial facts, harming his credibility and

26   supporting Plaintiff's argument that his care has been medically unacceptable.

27   Accordingly, the Court gives little weight to Dr. Marks's opinions. *See Norsworthy*

28   *v. Beard,* 87 F. Supp. 3d 1164, 1188 (N.D. Cal.), *appeal dismissed and remanded,*

802 F.3d 1090 (9th Cir. 2015) (giving "very little weight" to the opinions of defendants' expert who, among other things, misrepresented the WPATH standard of care); *Edmo*, 935 F.3d 757, 780 (9th Cir. 2019) (same). And despite this ongoing litigation, Defendants have failed to provide any estradiol tests after August 2024. Dr. Marks states that Hundley's blood *estrogen* levels were 1150 pg/ml in January 2025, which he goes on to admit is the incorrect test—these levels were "tested by mistake." (*Id.*) Dr. Marks does not explain any effort to do the correct test in the three months between that incorrect test and his declaration. (*Id.*) This lack of follow up care supports a finding that Dr. Marks has acted in conscious disregard of an excessive risk to Hundley's health.

Plaintiff has presented evidence suggesting that Dr. Marks's HRT treatment has been "medically unacceptable under the circumstances" and chosen "in conscious disregard of an excessive risk" to her health. *Hamby*, 821 F.3d at 1092. Dr. Marks's declaration, rather than rebutting that evidence, provides further support for that conclusion and harms his credibility. Therefore, the Court finds that Hundley has raised serious questions going to the merits of her Eighth Amendment claim against Dr. Marks. Accordingly, the Court grants in part Hundley's request for preliminary injunctive relief requiring Dr. Marks to provide her adequate HRT treatment, as detailed below.

### b. Referral for Gender Confirmation Surgery

Hundley's second request is that Defendants provide her a referral evaluation for GCS. This is not a request for surgery but a request to be referred to a qualified surgeon who would evaluate her qualification for sex-reassignment surgery.

### i. Jurisdiction

The Court first addresses a jurisdictional issue which the R&R raised. The R&R found that the Court cannot issue a preliminary injunction requiring a referral for GCS because that referral—previously made by Dr. Marks—was

blocked by a non-Defendant, the URP. (ECF No. 101 at 15–19.)

Plaintiff initially named the URP as a defendant when she first filed this lawsuit in 2019 (ECF No. 1), but the Court, when this case was before Judge Jones, dismissed all claims against the URP in a screening order, instructing Plaintiff that only individual members of the URP could be sued. (ECF No. 10 at 3–4.) The Court then dismissed the case entirely (ECF No. 20), was reversed by the Ninth Circuit (ECF No. 26) and allowed Plaintiff to amend her complaint. (ECF No. 29.) In 2023 Plaintiff filed a second amended complaint. (ECF No. 30.) Plaintiff did not name the URP in her amended complaint, and the URP is not a named Defendant here.

Plaintiff argues that "it is unclear why an injunction against NDOC could not bind the [URP], which is not an entity but a committee of NDOC that the Director and Medical Director may delegate to and on which the Medical Director, a defendant, sits, as does Defendant Marks." (ECF No. 108 at 10.) "The URP consists of the Medical Director, several other doctors, and the prisoner's treating physician. *Michaud v. Bannister*, No. 2:08-CV-01371-MMD, 2012 WL 6720602, at *1 n.1 (D. Nev. Dec. 26, 2012). Although the URP decides whether cosmetic or elective off-site medical services is medically necessary, "[t]he Medical Director has the final authority to decide whether surgery is medically necessary." *Id.* The Medical Director is a Defendant in this lawsuit.

Plaintiff also points to *Porretti*, where the plaintiff was told by an individual doctor that certain treatments were "appropriate [] but not available in light of the NDOC's new administrative policy" and was granted injunctive relief against defendants including the NDOC director, even though that individual doctor was not a defendant. *Porretti v. Dzurenda*, 11 F.4th 1037, 1044 (9th Cir. 2021). Defendants do not address Plaintiff's argument that the correct Defendants (NDOC, the Medical Director, and Dr. Marks) have been named, stating merely that "[t]he URP as a collective would need to approve the procedure." (ECF No.

114 at 9.) They do not explain why an injunction against NDOC and other Defendants in this case would not bind the URP.

Because URP appears to be a committee within NDOC, and because the named Defendants include NDOC and two of the members of the URP, the Court rejects the R&R's finding that there is a jurisdictional barrier to issuing a preliminary injunction requiring a referral for evaluation for GCS.

### ii. Merits

Hundley's request for a referral for an evaluation for GCS raises no issues of difference of medical opinion because Dr. Marks and Dr. Gorton agree that Hundley should receive a referral. Dr. Marks confirms in his declaration that he "made a referral for Ms. Hundley to see a surgeon regarding her desire for sex reassignment surgery." (ECF No. 97-1 at 5.) Dr. Gorton agrees that it would be "more than reasonable to refer her to an appropriate surgeon for further evaluation and discussion of options." (ECF No. 75-1 at 26.)

The evidence indicates that NDOC is ignoring the recommendation of both Hundley's treating physicians and instead relying upon the opinions of non-specialist and non-treating medical officials (namely, the URP) who appear to be making decisions based on prison policy. *See Colwell*, 763 F.3d at 1069 (denying summary judgment where the record indicated that NDOC ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy); *Michaud*, 202 WL 6720602, at *7 (genuine issue of fact whether URP was deliberately indifferent when it knew that the prisoner faced permanent blindness but denied the recommendation for cataract surgery and instead ordered an eye patch and headache pills). Hundley has therefore raised serious questions going to the merits of this claim.

### c. Other Gender Dysphoria Treatments

The R&R denied Hundley's request for treatment to increase scalp hair on

the ground that this treatment issue involved a case of dueling experts. (ECF No. 101 at 19–20.) The Court reaches the same result but for a different reason. Although the Court rejects the finding that this is a case of dueling experts, for the same reasons outlined above, it finds that there is a difference of medical opinion and denies Hundley's request for treatment on that basis.

Nurse Phoenix recommended finasteride in December 2022. In the note that rejected Nurse Phoenix's treatment recommendations, Dr. Marks noted that: "Consultant also rec finasteride for testosterone suppression but [with] a level <3 #1 it is not needed and #2 there is no evidence for use in HAT in gender dysphoria." (ECF No. 75-1 at 20.) In his supplemental declaration, Dr. Marks states that "there is no available data for [finasteride's] use in transgender individuals." (ECF No. 97-1 at 5.) This statement is supported by the website UpToDate. (ECF No. 81-1.) Dr. Gorton describes UpToDate as a "for-profit point of care reference for health providers" that is "quite useful" particularly for treating patients with conditions in which the provider is not well versed, although not a source he would consult for areas in which he has expertise. (ECF No. 75-1 at 22.)

Dr. Gorton opines that it is "even less reasonable" that Dr. Marks refused to follow Nurse Phoenix's recommendations to provide finasteride. (ECF No. 75-1 at 21.) Dr. Gorton describes finasteride as a "virtually harmless medication in transgender women that is an inexpensive generic" that is "used commonly in practice with transgender women, especially those with hair concerns (which Ms. Hundley has)." (ECF No. 75-1 at 21.) However, Dr. Gorton recommends a different treatment plan for Hundley's hair concerns, stating that: "[w]hile Mr. Phoenix recommended finasteride, dutasteride is more effective and both are currently available as a generic, so I would recommend dutasteride." (ECF No. 75-2 at 32.)

The Court finds that Plaintiff has not provided sufficient evidence at this stage to show that Dr. Marks's care, specifically his decision to not prescribe

finasteride, was medically unacceptable under the circumstances. The Court therefore denies this request.

### B.    Likelihood of Irreparable Harm

Hundley has established that she is currently suffering irreparable harm and that it will likely continue in the absence of a preliminary injunction. "Emotional distress, anxiety, depression, and other psychological problems can constitute irreparable injury." *Norsworthy*, 87 F. Supp. at 1192. And the deprivation of Hundley's constitutional rights is itself sufficient to establish irreparable harm. *Id.*; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (the deprivation of constitutional rights "unquestionably constitutes irreparable injury"); *Nelson v. Nat'l Aeronautics & Space Admin,* 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134, 131 (2011) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm.").

Defendants argue that Hundley has only shown that "her emotional state is affected" and that this case is distinguishable from *Edmo* because in that case "the plaintiff had attempted, on two separate occasions to castrate herself." (ECF No. 81 at 7.) Hundley's harm does not need to reach that extreme before injunctive relief is warranted. Plaintiff's own account of the harm she is experiencing is corroborated by Dr. Gorton's expert report, which states that Hundley "is currently suffering severe gender dysphoria – with levels of depression, anxiety, and even suicidality (per the PHQ9) that cause her severe suffering and represent a risk to her life and health." (ECF No. 75-1 at 23.)

### C.    Balance of Equities and Public Interest

The third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry when the government opposes a preliminary injunction. *See Drakes Bay*, 747 F.3d at 1092. The "balance of equities" concerns the burdens or hardships to the plaintiff compared

with the burden on defendants if an injunction is ordered. *See Winter*, 555 U.S. at 24–31. The "public interest" mostly concerns the injunction's "impact on nonparties rather than parties." *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003) (citation omitted).

The balance of equities tips sharply in Plaintiff's favor. Defendants' failure to provide Hundley adequate medical failure is causing her irreparable harm. Defendants have presented no argument regarding the potential burden of providing adequate hormone therapy or providing a referral for Hundley to see a surgeon. *See Robinson v. Labrador,* 747 F. Supp. 3d 1331, 1342 (D. Idaho 2024) (balance of equities tipped sharply in plaintiff's favor where defendants made no argument regarding potential burden of continuing to provide hormone therapy). Defendants note that the latter may not be practicable, because "Dr. Marks has not been able to locate a provider willing to perform the procedure on prison inmates," but do not argue that merely making the referral would cause a burden.

Although these factors merge, the Court also notes that an injunction is in the public interest. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation and citation omitted). Additionally, "[t]he public has an interest in ensuring the continued dignity of those incarcerated in federal prisons." *Porretti v. Dzurenda*, No. 217CV01745RFBDJA, 2020 WL 2857498, at *7 (D. Nev. May 31, 2020), *aff'd*, 11 F.4th 1037 (9th Cir. 2021). "Inherent in that dignity is the recognition of serious medical needs, and their adequate and effective treatment." *Id.* There is no public interest in Hundley's continued suffering during the pendency of this litigation. *See Norsworthy,* 87 F. Supp. 3d at 1194.

Applying the sliding scale approach to injunctive relief, *All. for the Wild Rockies*, 632 F.3d at 1139, the Court holds that Hundley has raised serious questions on the merits, demonstrated a likelihood of irreparable harm absent

injunctive relief, demonstrated that the balance of equities tips sharply in her favor, and shown that a preliminary injunction is in the public interest. She is therefore entitled to a narrowly tailored preliminary injunction as stated below.

### D.    Scope of Preliminary Injunctive Relief and PLRA

The Court grants preliminary injunctive relief to provide HRT treatment to maintain Hundley's estradiol levels in the range of 150 to 300 pg/ml and a referral for an evaluation for GCS. The HRT treatment is consistent with what the two physicians who have experience treating transgender individuals (Nurse Phoenix and Dr. Gorton) recommend. Although the Court found that Dr. Marks lacks credibility and lacks expertise in transgender care, the lower end of this range falls within his conservative treatment plan. Similarly, Hundley's treating physician, Dr. Marks, already recommended referral for GCS. The preliminary injunctive relief ordered does not require that Hundley be provided surgery, but merely requires that Hundley be referred to a qualified surgeon to evaluate whether she is an appropriate candidate for GCS.

A preliminary injunction granting Hundley adequate medical care, including adequate HRT treatment and a referral to a surgeon for evaluation for GCS, is narrowly drawn, extends no further than necessary to prevent imminent harm from the alleged constitutional violation, and is the least intrusive means necessary to do so. *See* 18 U.S.C. § 3626. There is no evidence that granting this relief will have "any adverse impact on public safety or the operation of the criminal justice system." 18 U.S.C. § 3626(a)(2).

//

//

//

//

//

1

## IV.    CONCLUSION

2

The Court grants Plaintiff's Motion for Leave to File a Reply (ECF No. 115).

3
4

The Court adopts in part and rejects in part the Report and Recommendation (ECF No. 101), as outlined in this order.

5
6

The Court grants in part and denies in part Plaintiff's Motion for a Preliminary Injunction (ECF No. 75). Accordingly:

7
8
9

(1) Dr. Marks is ordered to provide Hundley the hormone replacement therapy dosages, in pill or injection form, necessary to maintain Hundley's estradiol levels between 150-300 pg/ml.

10
11

(2) The State of Nevada is ordered to provide Hundley a referral to see an outside surgeon for evaluation for gender confirming surgery.

12

DATED: August 15, 2025

13
14
15

_____
ANNE R. TRAUM

16

UNITED STATES DISTRICT JUDGE

17
18
19
20
21
22
23
24
25
26
27
28

23