MARGARET A. MCLETCHIE, Nevada Bar No. 10931
LEO S. WOLPERT, Nevada Bar No. 12658
**MCLETCHIE LAW**
602 South Tenth Street
Las Vegas, NV 89101
Telephone: (702) 728-5300; Fax: (702) 425-8220
Email: maggie@nvlitigation.com
*Counsel for Plaintiff Jamee Deirdre Hundley*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| JAMEE DEIRDRE HUNDLEY, aka, JAMES DERRICK HUNDLEY,<br><br>    Plaintiff,<br>vs.<br><br>STATE OF NEVADA ex. rel. BOARD OF PRISON COMMISSIONERS; STATE OF NEVADA ex. rel. NEVADA DEPARTMENT OF CORRECTIONS; JOSEPH LOMBARDO, in his official capacity; AARON FORD, in his official capacity; CISCO AGUILAR, in his official capacity; DAVID RIVAS, in his official capacity; DAVID GREENE, in his official capacity; JAMES DZURENDA, in his official and individual capacities; TIM GARRETT, in his official capacity; ROMEO ARANAS, in his individual capacity; MICHAEL MINEV, in his individual capacity; DAVID BEQUETTE, in his individual capacity; RUSSELLE DONNELLY, in her individual capacity; DONALD POAG, in his individual capacity; MARTIN NAUGHTON, in his individual capacity; KIM ADAMSON, in his individual capacity; SARAH RUSHTON, in her individual capacity, DANA MARKS, in his individual capacity, DOES I – X,<br><br>    Defendants. | Case. No.: 3:19-cv-00458-ART-CSD<br><br>**PLAINTIFF'S MOTION FOR AN ORDER TO SHOW CAUSE AS TO WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT** |

Plaintiff JAMEE DEIRDRE HUNDLEY ("Ms. Hundley" or "Plaintiff"), an individual, by and through her counsel of record, hereby moves for an Order to Show Cause as to why Defendants should not be held in contempt for failure to comply with this Court's August 15, 2025, Order granting, in part, Ms. Hundley's Motion for Preliminary Injunction. (ECF No. 116) on an emergency basis.

This Motion is based on all pleadings and papers on file, the Memorandum of Points and Authorities attached and exhibits hereto, and any further argument and evidence as may be presented at hearing.

DATED this the 21st day of November, 2025.

*/s/ Leo S. Wolpert*
Margaret A. McLetchie, Nevada Bar No. 10931
Leo S. Wolpert, Nevada Bar No. 12658
602 South Tenth Street
Las Vegas, NV 89101
Telephone: (702) 728-5300; Fax: (702) 425-8220
Email: maggie@nvlitigation.com
*Counsel for Plaintiff Jamee Deirdre Hundley*

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff Jamee Deirdre Hundley respectfully requests that this Court issue an Order to Show Cause ("OSC") why Defendants Dana Marks and the Nevada Department of Corrections ("NDOC") should not be adjudged in contempt and sanctioned for ongoing failures to comply with the Court's August 15, 2025, Order granting, in part, Ms. Hundley's Motion for Preliminary Injunction. (ECF No. 116, the "Order".) Specifically, the Court should issue an order to show cause why Defendant Marks and NDOC should not be held in civil contempt for noncompliance with the Court's Order regarding hormone dosages and providing Ms. Hundley a referral for gender confirming surgery ("GCS").

Civil contempt is appropriate because Defendant Marks willfully and intentionally violated the Court's unambiguous order mandating that he take appropriate steps to raise Ms. Hundley's blood estradiol levels above 150 pg/mL. Far from even attempting to follow the Court's order—and his duties as a medical professional—Defendant Marks told Ms. Hundley to her face that he would not comply. (Hundley Decl., ¶ 14.) Perhaps this explains why Defendant Marks is no longer employed as a medical professional at LCC (Hundley Decl., ¶ 29), and thus can no longer be coerced into compliance with the Preliminary Injunction. However, Defendant Marks is still liable for his willful disobedience to this Court, and this Court should award compensatory sanctions to Ms. Hundley for the damages caused by Defendant Marks' willful defiance of the Court's order, which include (but are not limited to) harms caused by the still-ongoing delays in treating Ms. Hundley's gender dysphoria, as well as attorney's fees and costs incurred in bringing the instant Motion.

Regarding the court-mandated referral for GCS, NDOC has not provided Ms. Hundley any information about the status of her referral, except. (Hundley Decl., ¶¶ 5, 35.) And as demonstrated below, Ms. Hundley's counsel's efforts to obtain compliance with this portion of the Order have not yielded much better results. As with the Dr. Marks' defiance of the Order regarding HRT, NDOC's defiance of the Order regarding GCS continues to

1

cause Ms. Hundley harm. This Court should therefore exercise its authority to hold Defendants in contempt.

## II.   RELEVANT FACTS REGARDING INADEQUATE HRT.

### A.   Background

The Court, in its Preliminary Injunction Order, ably recites the facts underling this matter. (*See generally* ECF No. 116, pp. 1:21 – 9:4.) To summarize, Ms. Hundley has been incarcerated at Lovelock Correctional Center ("LCC") since 2005. In 2009, she began to seek treatment for gender dysphoria ("GD") from NDOC officials. As part of a prior lawsuit, Ms. Hundley and NDOC entered into a 2012 Settlement Agreement in which NDOC agreed to provide examination by a medical expert to determine whether she would be a candidate for hormone replacement therapy ("HRT"). In 2012, NDOC began providing HRT to treat Ms. Hundley's severe and persistent GD. Between 2012 and 2020, NDOC provided Ms. Hundley HRT—albeit inconsistently and with little regard for her well-bring—that put her blood estradiol levels in the "sweet spot" between 150-300 pg/mL and alleviated her GD symptoms.

In 2020, Ms. Hundley's HRT treatment was cut, causing her significant distress. In 2022, Ms. Hundley had a telemedicine visit with Rob Phoenix, APRN, a nurse who has experience treating transgender patients, who recommended, *inter alia*, HRT sufficient to get her blood estradiol levels between 150-300 pg/mL. Defendant Dr. Marks ignored these recommendations, failed to raise Ms. Hundley's blood estradiol levels sufficiently for years while being deliberately indifferent to Ms. Hundley's wanton suffering.

As this Court put it, Ms. Hundley "presented evidence suggesting that Dr. Marks's HRT treatment has been 'medically unacceptable under the circumstances' and chosen 'in conscious disregard of an excessive risk' to her health." (ECF No. 116, p. 16:11-13.) To that end, this Court granted "preliminary injunctive relief to provide HRT treatment to maintain Hundley's estradiol levels in the range of 150 to 300 pg/mL"—which is "consistent with what the two physicians who have experience treating transgender individuals (Nurse

2

Phoenix and Dr. Gorton) recommend" as well as a referral for an evaluation for Gender Confirming Surgery ("GCS").

However, as detailed below, in the over three months since the Court issued the Preliminary Injunction, Defendants have openly and willfully defied it in continued deliberate indifference to Ms. Hundley's health and safety.

### B. Defendant Marks Failed to Comply and Expressly Stated He Would Not Comply with the Order.

For nearly a month after the Court issued the Preliminary Injunction Order, Defendants made no efforts to increase Ms. Hundley's HRT dosages. (Hundley Decl., ¶ 7; Gorton Decl., ¶ 6.) On or about September 9, 2025, Ms. Hundley was called to medical to visit Dr. Marks. Far from adequately increasing Ms. Hundley's HRT dosages, Dr. Marks complained to Ms. Hundley about the instant matter, expressing resentment at being called "deliberately indifferent." (Hundley Decl., ¶¶ 11-12.) Ms. Hundley explained—as she has numerous times previously via grievances and kites—the severity of her symptoms and the necessity of adequate HRT dosages as mandated by the Court's order. (Hundley Decl., ¶ 13.) Dr. Marks explicitly stated he was refusing to comply with the Order: he said that her necessary GD treatment was "new science" and that Ms. Hundley could find a doctor who could give her "everything she asks for" but that he would not be that doctor. (Hundley Decl., ¶ 14.)

As noted in the Order, Dr. Marks previously misstated Ms. Hundley's blood estradiol levels, which never even reached "100 between April 2023 and April 2025," as in August 2023 the level was 91.9, in December 2023 it was 47.2, in March 2024 it was 54, and in August 2024 it was 83.3." (ECF No. 116, p. 15:21-24 (citations omitted).) Just before the Order issued, Ms. Hundley's blood estradiol levels were similarly dire. For instance, in a lab collected August 12, 2025, her blood estradiol level was extremely low, 27.0 pg/mL. (Hundley Decl., ¶ 6; **Ex. 1** at NDOC 002999.) Then in a lab collected on or about September 9, 2025, Ms. Hundley's blood estradiol level was just 44.0 pg/mL. (Hundley Decl., ¶ 8; Gorton Decl., ¶ 7; **Ex. 1** at NDOC 003019].) Notably, like all Ms. Hundley's previous labs,

3

because the tests were submitted as if Ms. Hundley were a cisgender male, these levels were flagged as "high;" they are not high at all because Ms. Hundley is a transgender woman, not a cisgender man. (**Ex. 1** at NDOC 002999, 003019; Hundley Decl., ¶ 8, n. 1.)

On or about September 9, 2025, Dr. Marks raised Ms. Hundley's oral estradiol dosage from 4 mg to 6 mg daily. (Hundley Decl., ¶ 10; Gorton Decl., ¶ 8; **Ex. 1** at NDOC 002993.) On or about September 18, 2025, Dr. Marks also cancelled one of Ms. Hundley's prescriptions unrelated to gender dysphoria, the steroid painkiller prednisone. (Hundley Decl., ¶ 16.)

Dr. Marks' refusal to comply with the Court's Preliminary Injunction has caused Ms. Hundley to continue suffering the intense pain and emotional distress that motivated the instant suit, such as restless leg syndrome, forgetfulness, extreme anxiety, depression, anger, hatred of her own body, contemplation of self-harm (such as self-castration), bad headaches, unwanted erections, severe mood swings, increased blood pressure, trouble breathing, and increased growth of facial and body hair, which leads to severe irritation from shaving (Hundley Decl., ¶ 33.)

### C. Inadequate Treatment After Dr. Marks' Refusal.

It appears that Dr. Marks is no longer at NDOC. (Hundley Decl., ¶ 29.) On or about October 2, 2025, Ms. Hundley received a new prescription for 8 mg of oral estradiol daily, an increase of 2 mg; the prescribing physician was not Dr. Marks, but Dr. Williams, NDOC's medical director. (Hundley Decl., ¶ 17; Gorton Decl., ¶ 8.) On or about October 15, 2025, Ms. Hundley was examined at LCC medical by a person named "Jen" who claimed to be Ms. Hundley's new provider. (Hundley Decl., ¶ 18.) Jen informed Ms. Hundley that she had an endocrinology referral, and that she had a surgical referral had not yet been authorized. (Hundley Decl., ¶ 19.) Ms. Hundley suggested that, to get her blood estradiol level above 150 pg / mL, Jen return her to what her hormone dosages and method of administration were in February 2020; Jen replied that she was not allowed to do this and maintained Ms. Hundley's oral estradiol dosage at 8 mg daily. (Hundley Decl., ¶¶ 20-21.)

4

On or about November 5, 2025, Ms. Hundley was transported[1] from LCC to an endocrinologist office in Reno, where she was examined by Dr. Gonzalez. (Hundley Decl., ¶ 22.) In addition to the 8 mg of oral estradiol, Dr. Gonzalez prescribed Ms. Hundley 100 mg of progesterone daily. (Hundley Decl., ¶ 23.) However, NDOC is currently refusing to provide the prescribed progesterone to Ms. Hundley. (Hundley Decl., ¶¶ 26-28.) Although the addition of progesterone may assist in treating Ms. Hundley's GD, it is unlikely to raise her blood estradiol level to the prescribed level of 150 pg/mL. (Gorton Decl., ¶ 13.)

According to Ms. Hundley's retained expert in this matter, Dr. Ryan Nicholas Gorton, this treatment is wholly inadequate to treat Ms. Hundley's gender dysphoria or raise her blood estradiol levels to 150 pg / mL. (Gorton Decl., ¶ 10.) Indeed, research indicates that with oral estradiol, blood estradiol levels increase approximately linearly with increasing dose—thus, increasing the dose by 50%, as Dr. Marks did, would be expected to raise Ms. Hundley's blood estradiol levels to only between 40.5 and 66 pg/mL. (Gorton Decl., ¶ 9.) Even increasing the dose by 100%, as Ms. Hundley's new provider did, would be expected to raise Ms. Hundley's blood estradiol levels to only between 54 and 88 pg/mL. (Gorton Decl., ¶ 11.) Furthermore, 8 mg of daily oral estradiol is generally considered the maximum dose for transgender women on oral HRT like Ms. Hundley. (Gorton Decl., ¶ 12.) Thus, it is plain that NDOCs' medical provider(s) should provide Ms. Hundley with intramuscular estradiol injections to sufficiently increase her blood estradiol levels in accordance with the Court's Order. (Gorton Decl., ¶¶ 14-15.)

D.      **Plaintiff Has Tried to Work with Defendants to Address the Violation of the Order on Hormone Treatment.**

Through counsel, Plaintiff has repeatedly attempted to obtain compliance from Defendants. On August 18, 2025, Ms. Hundley's counsel, Margaret McLetchie, emailed Douglas Rands, Defendants' counsel, demanding that NDOC continue to provide Ms.

---

[1] During transport, Ms. Hundley was strip-searched by male officers, which Ms. Hundley believes was retaliatory and in violation of PREA standards and NDOC's policies. (Hundley Decl., ¶ 25.)

5

Hundley with estradiol refills and requesting updates regarding compliance with the order. (**Ex. 2**.) The next day, Mr. Rands responded that he had a call with Dr. Marks. (**Ex. 3**.)

On September 2, 2025, Ms. McLetchie again requested an update on the status of Defendants' compliance with the Court order. (**Ex. 4**.) The next day, Mr. Rands responded that he requested Dr. Marks provide confirmation that the dosage was increased. (**Ex. 5**.)

On September 8, 2025, Ms. Hundley's counsel, Leo Wolpert, emailed Mr. Rands, noting the continued delays in Defendants' compliance with the Order. (**Ex. 6**.) That same day, Mr. Rands replied stating that he spoke with Dr. Marks, who was "hesitant" to comply with the Order but eventually agreed to do so. (**Ex. 7**.) However, as noted above, the very next day, on September 9, Dr. Marks went back on this purported agreement, denying Ms. Hundley a prescription for sufficient estardiol to raise her blood estradiol level above 150 pg/mL. (Hundley Decl., ¶¶ 11-14.) On September 10, 2025, Ms. McLetchie and Mr. Wolpert met and conferred telephonically. (**Ex. 8**.) On September 15, 2025, Ms. McLetchie again followed up by email, reminding Mr. Rands that his client, Dr. Marks, could not continue to disobey the Court's order because he disagreed with them. (**Ex. 9**.) That same day, Mr. Rands responded that Dr. Williams was attempting to move Ms. Hundley's care to UMC which would satisfy the medication issue. (**Ex. 10**.) On September 29, 2025, Mr. Wolpert followed up regarding changing Ms. Hundley's medical provider and providing her adequate HRT. (**Ex. 11**.) On September 30, 2025, Mr. Rands responded stated his belief that it had been "taken care of" and that he would speak with Dr. Williams regarding Ms. Hundley's medical provider and HRT. (**Ex. 12**.)

Despite these efforts, as noted above, Ms. Hundley's estradiol dosages remain inadequate to treat her gender dysphoria, and she continues to suffer from this lack of treatment.

**III.    RELEVANT FACTS REGARDING GCS CONSULT.**

    **A.    Background**

In the Order, the Court noted that Ms. Hundley's "request for a referral for an evaluation for GCS raises no issues of difference of medical opinion because Dr. Marks and

6

1 Dr. Gorton agree that Hundley should receive a referral." (ECF No. 116, p. 18:8-10.) To that
2 end, the Court ordered the NDOC (an arm of the State of Nevada) to "provide Hundley a
3 referral to see a outside surgeon for evaluation for gender confirming surgery." (*Id.*, p. 23:
4 10-11.)

### B. NDOC Has Not Provided a Referral or Information Regarding Same, Despite Multiple Efforts by Ms. Hundley to Follow Up.

As a threshold matter, Ms. Hundley has not received any information regarding a referral for GCS. (Hundley Decl., ¶¶ 5, 35.) While her medical provider Jen relayed that Ms. Hundley had a surgical referral, she also stated that it had "not yet been authorized." (Hundley Decl., ¶ 19.) Counsel for Ms. Hundley has followed up numerous times, offered to assist, and asked for information about who had been contacted and what efforts had been made so far so as to save resources and not duplicate efforts. For instance, on October 20, 2025, both Mr. Wolpert and Ms. McLetchie emailed Mr. Rands requesting an update on which surgical providers NDOC had contacted. (**Ex. 13**; **Ex. 14**.) That same day, Mr. Rands responded that Dr. Williams had sent a referral to Dr. John Brosious at LV Plastic Surgery, who advised that they do not perform surgery on incarcerated person, and that Dr. Williams had sent another referral to an unknown person. (**Ex. 15**.) Despite the many efforts to speak with counsel and the follow up emails, neither Ms. Hundley nor her counsel has received any information about any doctors—aside from Dr. Brosious—to whom referrals for Ms. Hundley's GCS were made. (Wolpert Decl., ¶¶ 6 - 8.)

This lack of cooperation and attention is very frustrating, not only because it reflects a willful disobedience of the Order, the Parties had also stayed the case to discuss resolution (*see* ECF No. 118), which is of course not feasible if NDOC will not even comply with its existing obligations. (Wolpert Decl., ¶ 9.)

### IV. LEGAL STANDARD

The Court must exercise its inherent authority to enforce compliance with its orders through the imposition of sanctions. *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for

7

1    compliance."); *Maness v. Meyers*, 419 U.S. 449, 458 (1975) ("We begin with the basic
2    proposition that all orders and judgments of courts must be complied with promptly.");
3    *Brown v. Plata*, 563 U.S. 493, 511 (2011) ("Courts . . . must not shrink from their obligation
4    to enforce the constitutional rights of all persons, including prisoners." (internal quotation
5    marks and citation omitted)).

6          "[C]ourts have inherent power to enforce compliance with their lawful orders
7    through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276 (1990) (quotation
8    marks omitted); *Parsons v. Ryan*, 949 F.3d 443, 455 (9th Cir. 2020) ("*Parsons III*")
9    (affirming contempt order against state prison system); *Stone v. City & Cnty. of S.F.*, 968
10   F.2d 850, 856 (9th Cir. 1992) (affirming contempt order for noncompliance with jail
11   conditions decree).

12         The party seeking contempt must "show by clear and convincing evidence that [the
13   nonmoving party] violated the [court order] beyond substantial compliance, and that the
14   violation was not based on a good faith and reasonable interpretation of the [order]." *Wolfard*
15   *Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1322 (9th Cir. 1997). The burden then shifts
16   to the nonmoving party to demonstrate why they were unable to comply. They must show
17   how they took every reasonable step to comply.

18         Once a court finds a party in civil contempt, it has broad equitable power to order
19   appropriate prospective (and compensatory) relief. *See S.E.C. v. Hickey*, 322 F.3d 1123, 1128
20   (9th Cir. 2003). A court may issue civil contempt sanctions for two separate and independent
21   purposes: (1) to coerce that party into compliance with the court's order; and (2) to
22   compensate the complainant for losses sustained by the party's noncompliance. *Shell*
23   *Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) (citing *United States v.*
24   *United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947)). When considering a sanction
25   to bring about compliance with a court order, the court should consider "the character and
26   magnitude of the harm threatened by continued contumacy, and the probable effectiveness
27   of any suggested sanction in bringing about the result desired." *United States v. United Mine*
28   *Workers of Am.*, 330 U.S. 258, 304 (1947).

## V. LEGAL ARGUMENT

To find a *prima facie* case of contempt, a court must find that (1) the nonmoving party violated a specific and definite court order; (2) beyond substantial compliance; (3) not based upon a reasonable and good faith interpretation of the order; and (4) the foregoing has been shown by clear and convincing evidence. *See In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). As argued below, Ms. Hundley demonstrates the above three factors by clear and convincing evidence.

### A. Defendant Marks Should Be Held In Contempt.

#### 1. Defendant Marks Violated a Specific and Definite Court Order.

The Court's Preliminary Injunction Order is specific and definite: "(1) Dr. Marks is ordered to provide Hundley the hormone replacement therapy dosages, in pill or injection form, necessary to maintain Hundley's estradiol levels between 150-300 pg/mL." (ECF No. 116, p. 23:7-9.) There is nothing unambiguous about this order. As the evidence reflects, Ms. Hundley's blood estradiol level is not even close to the floor of 150 pg/mL, nor is it likely to reach this level under her current treatment regime, much less the inferior treatment regime that Dr. Marks placed her on. (*See generally* Gorton Decl., ¶¶ 9-15.)

#### 2. Defendant Marks Has Not Substantially Complied.

Regarding provision of adequate HRT dosages to bring Ms. Hundley's blood estradiol levels, clear and convincing evidence reflects that Dr. Marks did not substantially comply with the Preliminary Injunction Order. This is because Ms. Hundley has *already* been placed on similar oral estradiol dosages, and they have *already* proven ineffective at ameliorating her GD symptoms, much less at bringing her blood estradiol level up to 150 pg/mL. (*See generally* Gorton Decl., ¶¶ 4, 7-14.)

#### 3. Defendant Marks' Noncompliance Is Not Based Upon a Reasonable and Good Faith Interpretation of the Order.

Far from a good faith interpretation of the order, Dr. Marks told Ms. Hundley to her face that he was unwilling to follow its directives regarding provision of adequate HRT dosages. (Hundley Decl., ¶ 14.) And, as described above, Defendant Marks followed through

9

on this, merely raising Ms. Hundley's oral estradiol dosage to 6 mg daily, which he knew (or should, by now, know) to be insufficient to treat Ms. Hundley's GD with knowledge that the Court's order was in place. (Hundley Decl., ¶¶ 10, 13; Gorton Decl., ¶¶ 9-10, 13-14.) This alone is clear and convincing evidence of willfulness. *See Future Motion, Inc. v. Lai*, No. 3:23-CV-1742-AR, 2024 WL 5347389, at *4 (D. Or. Dec. 10, 2024) (citing *Evon v. Law Offs. of Sidney Mickell*, 688 F.3d 1015, 1035 (9th Cir. 2012) and *Stanford v. Gen. Ins. Co. of Am.*, 2021 WL 1267267, at *2 (N.D. Cal. Apr. 6, 2021)) ("That a party acted willfully may be established by proof that a party knew that a valid order was in place.").

### B. Defendant NDOC Should Be Held In Contempt.

#### 1. Defendant NDOC Violated a Specific and Definite Court Order.

The Court's Preliminary Injunction Order is specific and definite: "The State of Nevada is ordered to provide Hundley a referral to see an outside surgeon for evaluation for gender confirming surgery." (ECF No. 116, p. 23:10-11.) There is nothing unambiguous about this order.

#### 2. Defendant NDOC Has Not Substantially Complied.

As set forth above, Defendant NDOC has not provided Ms. Hundley or her counsel with adequate information regarding their attempts to procure a GCS referral for Ms. Hundley. This evinces non-compliance with the Order's plain mandate.

#### 3. Defendant NDOC's Noncompliance Is Not Based Upon a Reasonable and Good Faith Interpretation of the Order.

NDOC has not demonstrated that their noncompliance is based on a reasonable and good faith interpretation of the Order. A reasonable, good faith interpretation of the Order would require contacting more than one surgeon to whom Ms. Hundley can reasonably be transported for a consult—including surgeons in neighboring states such as California. However, NDOC has not provided any such list either to Ms. Hundley or her counsel. This indicates a lack of good faith and an unreasonable interpretation of the Order.

///
///

10

**C.      Heavy Sanctions Are Warranted to Compensate Ms. Hundley and to Punish—and Deter--Noncompliance.**

As reflected by Ms. Hundley's declaration, Defendant Marks' refusal to comply with the Court's Preliminary Injunction caused her severe damages. She has continued to suffer from an extremely low level of blood estradiol, exacerbating her GD symptoms. (Hundley Decl., ¶¶ 32-33.) Furthermore, Defendant Marks' willful noncompliance caused emotional distress for Ms. Hundley who—after litigating this matter for several years— finally won relief from the Court, only for Defendant Marks to make the Court's order a worthless piece of paper due to his noncompliance, retaliation, and apparent belief that he is above the law. (Hundley Decl., ¶ 34.)

Although Ms. Hundley's damages from Defendant Marks' noncompliance are difficult to quantify, this Court may compensate Ms. Hundley for the pain and suffering caused by Defendant Marks' deliberate indifference not only to her medical needs, but to the Order. *See Cadence Design Sys., Inc. v. Intelligent Automation (Zhuhai) Co.*, No. 24-CV-07031-PCP (VKD), 2025 WL 2960450, at *4 (N.D. Cal. Oct. 17, 2025) ("in addition to coercing compliance with a court order, civil contempt serves the purpose of compensating the moving party for losses sustained as a result of the alleged contemnor's non-compliance"); *San Francisco Baykeeper v. Vallejo Sanitation & Flood Control Dist.*, 36 F. Supp. 2d 1214, 1215 (E.D. Cal. 1999) ("injunctive relief is backed by the contempt power and deters in large part by the threat of monetary sanctions just as civil penalties do.").

The Court should also compensate Ms. Hundley for the attorney's fees and costs she incurred in vindicating her rights via the instant motion. *See, e.g.*, *Cadence Design Sys.*, 2025 WL 296045, at *4 (awarding compensatory sanction in the amount of $19,816.20); *BBK Tobacco & Foods, LLP v. Shen Zhen Shi Wu Qing Cheng Tech., Ltd.*, No. 2:22-CV-205 JCM (MDC), 2025 WL 1001248, at *1 (D. Nev. Apr. 2, 2025) (awarding attorney's fees and costs related to contempt motion); *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 516 F. Supp. 3d 1202, 1216–17 (W.D. Wash. 2021) (awarding $81,997.13 in attorney's fees related to contempt motion). Should the Court find Defendants

11

in contempt, Ms. Hundley will submit a motion for fees with supporting details to substantiate an award.

## VI. CONCLUSION

Dr. Marks unambiguously chose to defy both the Court and the Hippocratic Oath, harming Ms. Hundley with his deliberate decision to undertreat her gender dysphoria. This Court should order Dr. Marks to show cause why he should not be held in contempt.

Likewise, as there is no debate that Ms. Hundley should be provided a referral for GCS, this Court should order NDOC to show cause why it should not be held in contempt for its failure to procure the referral in compliance with the Order.

DATED this 21st day of November, 2025.

/s/ Leo S. Wolpert
MARGARET A. MCLETCHIE, Nevada Bar No. 10931
LEO S. WOLPERT, Nevada Bar No. 12658
602 South Tenth Street
Las Vegas, NV 89101
Telephone: (702) 728-5300; Fax: (702) 425-8220
Email: maggie@nvlitigation.com
*Counsel for Plaintiff Jamee Deirdre Hundley*

| **INDEX OF EXHIBITS TO MOTION FOR AN ORDER TO SHOW CAUSE AS TO WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT** |  |
|---|---|
| EX. | DESCRIPTION |
| n/a | Declaration of Deirdre Hundley |
| n/a | Declaration of Dr. Ryan Nicholas Gorton |
| n/a | Declaration of Leo S. Wolpert |
| 1 | Excerpts of Ms. Hundley's Medical Records (NDOC002993-NDOC3019) |
| 2 | August 18, 2025, email from Ms. McLetchie to Mr. Rands |
| 3 | August 19, 2025, email from Mr. Rands to Ms. McLetchie and Mr. Wolpert |
| 4 | September 2, 2025, email from Ms. McLetchie to Mr. Rands |
| 5 | September 3, 2025, email from Mr. Rands to Ms. McLetchie and Mr. Wolpert |
| 6 | September 8, 2025, email from Mr. Wolpert to Mr. Rands |
| 7 | September 8, 2025, email from Mr. Rands to Ms. McLetchie and Mr. Wolpert |
| 8 | September 10, 2025, email from Mr. Wolpert to Mr. Rands |
| 9 | September 15, 2025, email from Ms. McLetchie to Mr. Rands |
| 10 | September 15, 2025, email from Mr. Rands to Ms. McLetchie and Mr. Wolpert |
| 11 | September 29, 2025, email from Mr. Wolpert to Mr. Rands |
| 12 | September 30, 2025, email from Mr. Rands to Ms. McLetchie and Mr. Wolpert |
| 13 | October 20, 2025, email from Mr. Wolpert to Mr. Rands |
| 14 | October 20, 2025, email from Ms. McLetchie to Mr. Rands |
| 15 | October 20, 2025, email Mr. Rands to Ms. McLetchie and Mr. Wolpert |