MARGARET A. MCLETCHIE, Nevada Bar No. 10931
LEO S. WOLPERT, Nevada Bar No. 12658
**MCLETCHIE LAW**
602 South Tenth Street
Las Vegas, Nevada 89101
Telephone: (702) 728-5300; Fax: (702) 425-8220
Email: maggie@nvlitigation.com
*Counsel for Plaintiff Jamee Deirdre Hundley*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| JAMEE DEIRDRE HUNDLEY, aka JAMES DERRICK HUNDLEY, | Case. No.: 3:19-cv-00458-ART-CSD |
| Plaintiff, | **FOURTH AMENDED COMPLAINT** |
| vs. | |
| STATE OF NEVADA ex. rel. BOARD OF PRISON COMMISSIONERS; STATE OF NEVADA ex. rel. NEVADA DEPARTMENT OF CORRECTIONS; JOSEPH LOMBARDO, in his official capacity; AARON FORD, in his official capacity; CISCO AGUILAR, in his official capacity; KENNETH WILLIAMS, in his official capacity; DAVID GREENE, in his official capacity; JAMES DZURENDA, in his individual and official capacities; NETHANJAH BREITENBACH, in her official capacity; ROMEO ARANAS, in his individual capacity; MICHAEL MINEV, in his individual capacity; DAVID BEQUETTE, in his individual capacity; RUSSELLE DONNELLY, in her individual capacity; DONALD POAG, in his individual capacity; MARTIN NAUGHTON, in his individual capacity; KIM ADAMSON, in his individual capacity; SARAH ALTAMIRANO (nee RUSHTON), in her individual capacity; DANA MARKS, in his individual and official capacities; BARBARA BARRETT, in her individual and official capacities; JOSEPH BENSON, in his individual and official capacities; BETTY OMANDAC, in | **[JURY TRIAL DEMANDED]** |

1

her individual and official capacities;
SYMOUR OMANDAC, in his individual
and official capacities; JILL RATHIE, in
her individual and official capacities;
RHIGEL J TAN, in his individual and
official capacities; LORENZO VILLEGAS,
in his individual and official capacities;
UNKNOWN PAST UTILIZATION
REVIEW PANEL MEMBERS I – XX;
UNKNOWN CURRENT UTILIZATION
REVIEW PANEL MEMBERS I – XX;
DOES I – X,

        Defendants.

Plaintiff JAMEE DEIRDRE HUNDLEY ("Ms. Hundley" or "Plaintiff")[1], an individual, files this Fourth Amended Complaint for damages and declaratory relief pursuant to 42 U.S.C. § 1983 (civil action for deprivation of rights), 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1367(a) (supplemental jurisdiction), 28 U.S.C. § 2201 (creation of remedy), and hereby alleges and complains as follows.

## I. NATURE OF THE ACTION

Plaintiff JAMEE DEIRDRE HUNDLEY is a transgender woman incarcerated at Lovelock Correction Center ("LCC"), a men's prison. Before and during her incarceration at LCC, Ms. Hundley was diagnosed with Gender Dysphoria ("GD") and has a serious medical need, but Defendant have refused and are continuing to refuse to provide appropriate medical treatment for this condition. Rather than provide Ms. Hundley with medically appropriate care, Defendants have violated and are continuing to violate Ms. Hundley's Eighth Amendment rights by refusing to consider Ms. Hundley for Gender Confirming Surgery ("GCS").

Additionally, Defendants have violated and are continuing to violate Ms. Hundley's Eighth Amendment rights and have breached and are breaching an April, 2012, settlement agreement with Ms. Hundley by refusing to provide Ms. Hundley consistent, medically

---

[1] Ms. Hundley is referred to herein by her female name and pronouns.

appropriate Hormone Replacement Therapy ("HRT"). Indeed, Defendants are not only refusing to provide HRT at levels that are medically necessary under community standards, they are not even following the prescriptions and directives a professional with specific expertise in transgender medicine that that they employed to assess Ms. Hundley's needs. Likewise, while the estrogen level that Ms. Hundley's primary doctor at NDOC, Dr. Marks believes is appropriate, is in fact far too low to sufficiently treat Ms. Hundley, Dr. Marks is not even treating Ms. Hundley at that level.

Further, Defendants have failed to and continue to fail to provide other medically necessary care for Plaintiff's GD such as treatment for hair loss, which is notably a problem that has been exacerbated by Defendants' failure to provide other necessary care for Plaintiff's GD over the last sixteen years.

Another aspect of Defendants' deficient medical care is mental health treatment; the treatment for GD has necessarily been deficient because mental health care professionals refuse to even use female pronouns to refer to Ms. Hundley. Notably, NDOC, its Director and the Board of Prison Commissioners that ultimately governs NDOC have entirely ignored a state law requiring them to address this very problem.

In addition to providing medically necessary care for Ms. Hundley's GD, Defendants also violated Ms. Hundley's Fourteenth Amendment right to equal protection by failing to provide her gender-appropriate clothing.

Finally, Defendants violated Ms. Hundley's First Amendment right to access the courts by retaliating against her for filing grievances and lawsuits.

Ms. Hundley is entitled to monetary and equitable relief for these violations of the United States Constitution and breach of the settlement agreement. Most importantly, Ms. Hundley has been seeking adequate care for sixteen (16) years and Defendants have each played a role in failing to provide medically necessary care for her GD over this time. Indeed, Defendants Nevada Department of Corrections and Dana Marks have even refused to provide one aspect of necessary care, hormonal replacement therapy, despite the former entering into a contract with Ms. Hundley in 2012, obligating it to provide appropriate hormonal treatment.

1  This intentional provision of subtherapeutic levels of hormones—particularly estradiol—has

2  continued throughout the pendency of this litigation and has caused Ms. Hundley immense

3  suffering.

4      Defendants are also liable for violations of the Nevada Constitution's provisions

5  which are analogous to the Federal Constitutional provisions herein.

6  ## II. <u>JURISDICTION AND VENUE</u>

7      1. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 *et seq.* for civil claims

8  arising under the Constitution and laws of the United States. Pursuant to § 1331, this Court

9  has original subject matter jurisdiction over Plaintiff's claims brought under 42 U.S.C. §

10  1983.

11      2. This Court has jurisdiction over claims arising under the laws of the State of

12  Nevada pursuant to supplemental jurisdiction provided for by 28 U.S.C. § 1367(a).

13      3. The prayer for relief is predicated on 28 U.S.C. § 2201 and Fed. R. Civ. P. 38.

14  This Court has jurisdiction to award Plaintiff damages pursuant to 42 U.S.C. § 1983.

15  Authorization for the request of attorneys' fees and costs is conferred by 42 U.S.C. § 1988(b).

16      4. Each of the Defendants acted, purported to act, and/or pretended to act in the

17  performance of their official duties, and thus each of the Defendants acted under color of law

18  and are subject to liability as state actors pursuant to 42 U.S.C. § 1983. *See McDade v. West*,

19  223 F.3d 1135, 1140 (9th Cir. 2000).

20      5. Because the individual, natural person Defendants are not arms of the State, Ms.

21  Hundley's request for damages against them is not barred by the Eleventh Amendment to

22  the U.S. Constitution. *See Eason v. Clark County School Dist.*, 303 F.3d 1137, 1147 (9th Cir.

23  2002); *Culinary Workers Union v. Del Papa*, 200 F.3d 614, 619 (9th Cir. 1999). Moreover,

24  the requests for

25      6. This Court is the proper venue for this action pursuant to 28 U.S.C § 1931(b)(2),

26  as all claims arise from events that took place in Nevada.

27  ## III. <u>PARTIES</u>

28  **<u>Plaintiff Jamee Deirdre Hundley</u>**

1    7. Ms. Hundley, NDOC inmate #51212, is an individual who has been housed in

2    NDOC custody since 1996.

3    8. Ms. Hundley was at all relevant times a prisoner under the supervision and care

4    of NDOC.

5    9. Ms. Hundley is a transgender woman who was first diagnosed with gender

6    dysphoria ("GD") in February 1995, prior to her incarceration.

7    10. Upon information and belief, Ms. Hundley has Klinefelter's Syndrome, a

8    genetic condition where persons are born with XXY sex chromosomes.

9    11. Upon information and belief, Ms. Hundley's Klinefelter's Syndrome causes her

10    to have lower testosterone levels than those who are born with XY sex chromosomes.

11    12. In July 2005, Ms. Hundley was moved from Nevada State Prison to Lovelock

12    Correctional Center ("LCC"), a men's prison, where she is currently incarcerated.

13    13. In or around 2009, Ms. Hundley began seeking help from NDOC officials to

14    treat her GD, including requests for counseling, information, gender-confirming clothing,

15    hormone replacement therapy ("HRT")[2], and gender confirming surgery ("GCS")[3].

16    14. On or about April 12, 2012, as a result of *Hundley v. Poag et. al.*, Case No.

17    3:10-cv-00406 before this Court (and appeal No. 11-15128 before the Ninth Circuit Court of

18    Appeals) Ms. Hundley entered into a settlement agreement with the State of Nevada

19    regarding medical treatment for her GD.

20    15. Pursuant to this settlement agreement, the State of Nevada pledged that if an

21    expert determined that Ms. Hundley was a candidate for HRT, then the State of Nevada

22    would provide, at the State's expense, "all recommended hormonal therapy to Hundley

23    during the period of time he [sic] is incarcerated by the NDOC[.]"

24    **Defendants**

25    16. Defendant the State of Nevada ex rel. Nevada Department of Corrections

26    ("**NDOC**") is the state agency that operates the correctional facilities where the Plaintiffs are

27    _____

28    [2] Also known as "estrogen hormone therapy" or "EHT."
     [3] Also known as "sex reassignment surgery" or "SRS."

5

currently located. *See* NRS 209.101 et seq.

17. NDOC is an executive agency within the Nevada government.

*Board of Prison Commissioner Defendants*

18. **Defendant the Board of State Prison Commissioners** (the "Board") had during relevant times, and "has full control of all grounds, buildings, labor, and property of [NDOC]." NRS 209.111 ("Powers and Duties of the Board").

19. Consistent with its expansive, plenary control of NDOC, the Board had during relevant times and has the power and duty to "[p]rescribe regulations for carrying on" NDOC's business. NRS 209.111(3).

20. The Board also has the power and duty to "[p]urchase, or cause to be purchased, all commissary supplies, materials and tools necessary for any lawful purpose carried on at any NDOC institution." NRS 209.111(1).

21. While NDOC also has a director, the "Director", as defined by NRS 209.131, [a]dmister[s] [NDOC] under the direction of the Board." NRS 239.131(1). For example, NRS 209.131(6) provides that the Director must "[e]stablish regulations with the approval of the Board…" NRS 239.131(6).

22. Thus, the Board is ultimately responsible for all NDOC regulations and governs and oversees all NDOC activities.

23. **Defendant Joseph Lombardo** is the Governor of the State of Nevada. As Governor, Lombardo is a member of the Board. Mr. Lombardo is sued in his official capacity.

24. **Defendant Aaron Ford** is the Attorney General of the State of Nevada. As Attorney General, Ford is a member of the Board. Mr. Ford is sued in his official capacity.

25. **Defendant Cisco Aguilar** is the Secretary of State of Nevada. As Secretary of State, Aguilar is a member of the Board. Mr. Aguilar is sued in his official capacity.

26. Defendants Lombardo, Ford, and Aguilar are referred to herein as "Commissioner Defendants."

27. While NDOC has a Utilization Review Panel ("URP")[4] that reviews certain requests for treatment of NDOC inmates, this Court has determined that the URP is not a person that may be sued.

28. Upon information and belief, the URP applies NDOC regulations controlled by the Board to make determinations about access to care.

29. The delegation of powers to the URP does not change the responsibilities of the Board, the Director, and/or the Medical Director for decisions about NDOC regulations that have served or serve as a barrier to care for Ms. Hundley. Nor does the existence of the URP change what the responsibilities of the Board, the Director, and/or the Medical Director are for decisions about Ms. Hundley's care and for refusing Ms. Hundley the care that is necessary to treat her GD.

*NDOC Defendants (roles not limited to medical care)*

30. **Defendant James Dzurenda** is the current Director of NDOC, and has been since January of 2023.

31. Defendant Dzurenda was also the Director of NDOC from March 2016 to August 2019

32. As the Director, Defendant Dzurenda had and has extensive powers and duties, including for the medical care of inmates. *See* NRS 209.121-153.

33. As the current Director of NDOC, Defendant Dzurenda is responsible for establishing regulations with Board approval. NRS 209.131(6).

34. Defendant Dzurenda is also responsible or the administration of NDOC "under the direction of the Board." NRS 209.131(1).

35. Defendant Dzurenda is also responsible for "enforce[ment] [of] all laws governing the administration of the Department and the custody, **care** and training of offenders." NRS 209.131(6) (emphasis added).

36. The Director must also "[t]ake proper measures to protect the **health** and safety of the staff and offenders in the institutions and facilities of the Department." NRS 209.21(7)

---

[4] Sometimes referred to as the "Utilization Review Committee."

(emphasis added).

37. Pursuant to NRS 209.132, "[t]he Director may delegate to a deputy director, manager, warden or employee of the Department the exercise or discharge in the name of the Director of any power, duty or function vested in or imposed upon the Director." However, "[t]he official act of any such person acting in the name of the Director and by his or her authority shall be deemed an official act of the Director."

38. Mr. Dzurenda is sued in his individual and official capacities.

39. Upon information and belief, **Defendant Nethanjah Breitenbach** is the current warden of LCC, where Plaintiff is currently incarcerated. As the current warden of LCC, he is responsible for ensuring that all LCC inmates have access to evaluation, placement, and appropriate treatment. Ms. Breitenbach is sued in her official capacity.

40. Upon information and belief, **Defendant David Bequette** was employed and/or contracted by NDOC during relevant events described herein. Mr. Bequette is sued in his individual capacity.

_NDOC Defendants (with specific medical roles)_

41. Upon information and belief, **Defendant Kenneth Williams** is the current Medical Director of NDOC.

42. As the current Medical Director of NDOC, Dr. Williams is responsible for ensuring both a medical and psychological evaluation for each inmate and that an appropriate plan has been established and is complied with by Medical and Mental Health Staff.

43. According to what Plaintiff believes is the operative job description:

The Medical Director is the clinical health **authority** for the Nevada Department of Corrections (NDOC); **responsible for clinical and medical determinations within the department.**[5]

44. Upon information and belief, as Acting Medical Director, Dr. Williams must also currently serve on the Utilization Review Panel ("URP").

---

[5] Emphases added; source: https://hr.nv.gov/uploadedFiles/hrnvgov/Content/Services/Recruitment/Medical%20Director%20-%20NDOC%2005.10.23.pdf (last checked 5/9/25).

45. Dr. Williams is sued in his official capacity.

46. Upon information and belief, **Defendant David Greene** is the current Mental Health Director of NDOC.

47. As the current Mental Health Director of NDOC, Dr. Greene is responsible for ensuring both a medical and psychological evaluation for each inmate and that an appropriate plan has been established and is complied with by Medical and Mental Health Staff. Dr. Greene is sued in his official capacity.

48. Defendants Rivas and Greene are referred to herein as the "Medical Director Defendants."

49. Upon information and belief, **Defendant Dana Marks** was and remains employed and/or contracted by NDOC as the sole physician at LCC during relevant events described herein and has treated Ms. Hundley since approximately July 2000.

50. On information and belief, Dr. Marks served on the URP when it refused Ms. Hundley a surgery consult on January 18, 2023, and continues to serve on the URP.

51. Dr. Marks is sued in his individual and official capacities.

52. **Defendant Dr. Joseph Benson** served as the Acting Medical Director of NDOC during relevant times, including on January 18, 2023. Defendant Benson is named in his individual capacity.

53. **Defendants Dr. Barbara Barrett; Betty Omandac, APRN; Symour Omandac, APRN; Jill Rathie, APRN; Rhigel Tan, APRN, and Lorenzo Villegas,** served on NDOC's "Utilization Review Committee" on January 18, 2023, along with Defendants Marks and Benson. These Defendants are collectively the "**2023 URP Member Defendants**"

54. The **2023 URP Panel Member Defendants** met on January 18, 2023, to consider and deny a request for "surgical evaluation for gender confirmation surgery/genital reconstruction" for Ms. Hundley, despite noting that her case should be at least monitored. The **2023 URP Panel Member Defendants** are sued in their individual capacities.

55. Upon information and belief, the URP has not taken any action on the request

1  for a surgery consultation for Ms. Hundley since January 18, 2023.

2  56. **UNKNOWN PAST UTILIZATION REVIEW PANEL MEMBERS I – XX**

3  are the members of the URP between January 18, 2023, and the present who failed to take

4  further action or follow up on Ms. Hundley's request, but are not current members of the

5  URP and are not 2023 URP Panel Member Defendants.

6  57. **UNKNOWN PAST UTILIZATION REVIEW PANEL MEMBERS I – XX**

7  are sued in their individual capacities.

8  58. **UNKNOWN CURRENT UTILIZATION REVIEW PANEL MEMBERS**

9  **I – XX** are the current members of the URP.

10  59. The **UNKNOWN CURRENT UTILIZATION REVIEW PANEL**

11  **MEMBERS I – XX** Members are sued in their individual and official capacities.

12  60. Upon information and belief, **Defendant Romeo Aranas** was a physician

13  employed and/or contracted by NDOC during relevant events described herein. Dr. Aranas

14  is sued in his individual capacity.

15  61. Upon information and belief, **Defendant Michael Minev** served as NDOC's

16  Medical Director from 2018 to 2022, and was a physician employed and/or contracted by

17  NDOC during relevant events described herein. Dr. Minev is sued in his individual capacity.

18  62. Upon information and belief, **Defendant Russelle Donnelly** was employed

19  and/or contracted by NDOC as a Director Of Nursing at LCC during relevant events

20  described herein. Ms. Donnelly is sued in her individual capacity.

21  63. Upon information and belief, **Defendant Donald Poag** was employed and/or

22  contracted by NDOC as a Director Of Nursing Services at LCC during relevant events

23  described herein. Mr. Poag is sued in his individual capacity.

24  64.Upon information and belief, **Defendant Martin Naughton** was employed

25  and/or contracted by NDOC as a physician during relevant events described herein. Dr.

26  Naughton is sued in his individual capacity.

27  65. Upon information and belief, **Defendant Kim Adamson** was employed and/or

28  contracted by NDOC as a physician during relevant events described herein. Dr. Adamson

is sued in his individual capacity.

66. Upon information and belief, Ms. Sarah Rushton's current last name is Altamirano. Upon information and belief, **Defendant Altamirano (Rushton)** was employed and/or contracted by NDOC as a nurse during relevant events described herein. Defendant Altamirano (Rushton is sued in her individual capacity.

67.The naming of Defendants herein is based upon information and belief. Ms. Hundley reserves her right to name additional defendants and modify her allegations concerning defendants named herein. Ms. Hundley further reserves her right to amend these allegations to identify by name any other person or persons she learns has responsibility for violations of her rights detailed in this Complaint.

### IV.<u>FACTUAL ALLEGATIONS</u>

**<u>General Facts Regarding Gender Dysphoria.</u>**

68. Ms. Hundley was assigned the male sex at birth, but is a transgender woman.

69. Ms. Hundley suffers from gender dysphoria ("GD"). The American Psychiatric Association published a revised version of its Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") in 2013, which replaced the "gender identity disorder" diagnosis with "gender dysphoria." The DSM-V characterizes the diagnosis of gender dysphoria as follows: "[i]ndividuals with gender dysphoria have a marked incongruence between the gender they have been assigned to (usually at birth, referred to as natal gender) and their experienced/expressed gender." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 453 (5th ed. 2013) ("DSM-V"). In addition to this marked incongruence, "[t]here must also be evidence of distress about this incongruence." *Id.*

70. A "triadic therapy" of real-life gender experience (i.e., allowing a person to express herself in the gender she feels comfortable), Hormone Replacement Therapy ("HRT"), and Gender Confirming Surgery ("GCS")—which involves, inter alia, reconstructing the genitalia to conform in appearance and function to that typically associated with the person's gender identity—can be medically necessary to treat GD.

71. For some, such as Ms. Hundley, "surgery is essential and medically necessary

to alleviate their gender dysphoria." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 770 (9th Cir. 2019) (quoting World Professional Association of Transgender Health ("WPATH") Standards of Care); *see also Kosilek v. Maloney*, 221 F. Supp. 2d 156, 159 (D. Mass. 2002) ("There are, however, some cases in which sex reassignment surgery is medically necessary and appropriate.")

72. Even though Ms. Hundley has been diagnosed with GD, NDOC and Defendants have refused to provide Ms. Hundley with adequate medical care for that condition, have discriminated against Ms. Hundley based on gender, and have retaliated against Ms. Hundley for exercising her First Amendment rights.

73. As a result, Ms. Hundley's GD has been exacerbated, and Ms. Hundley suffered and still suffers extreme pain, discomfort and emotional distress.

**NDOC's Relevant Policies and Nevada Statutes.**

74. NDOC Administrative Regulation 494 ("AR 494") describes NDOC's governs, inter alia, the treatment of transgender and intersex inmates.

75. As a result of prior litigation, AR 494 was modified in 2017 and again in 2020.

76. Prior to 2020, Hormonal Treatment was only available if "The inmate was scheduled for sex reassignment surgery no later than six (6) months prior to incarceration and was receiving hormonal treatment at a recognized university affiliated gender identity disorder clinic (as documented by receipt of definitive records) and was receiving hormonal treatment under that legally licensed clinic's supervision," "The inmate has been surgically castrated," or "The inmate had a valid and legal prescription prior to incarceration for hormonal treatment."

77. According to the version of AR 494 in effect for as of February 5, 2020 (a "temporary version", Bates Nos. NDOC000533-34), the Director of NDOC is responsible for the establishment of all Departmental policies to ensure public, staff, and inmate safety, including for transgender inmates.

78. According to that version of AR 494, an institution's Warden or designee is responsible for ensuring that all transgender inmates have access to evaluation, placement,

and appropriate treatment while recognizing the inherent limitations of resources, and the need to maintain facility security, order and discipline, and the health and safety of all inmates.

79. According to that version AR 494, the Medical Director and Mental Health Director have the responsibility to obtain a medical and psychological evaluation for each transgender inmate, to establish a plan and is complied with by Medical and Mental Health Staff.

80. Medical Directive 121 ("MD 121") describes NDOC's specific policies regarding the medical evaluation and treatment of inmates with GD.

81. Before October 2017, MD 121 banned "initiation of chemical or hormonal treatment for sexual reassignment, progression of such treatment to a new level, and surgical (including cosmetic) procedures directed toward sexual reassignment." Essentially, this blanket policy prevented inmates who were first diagnosed with GD in prison—or were not receiving medical treatment for GD at the time they were first incarcerated—from receiving any medical treatment for GD. As such, it was unconstitutional.

82. As a result of prior litigation against NDOC and its employees, MD 121 was modified in 2018 to provide treatment for inmates who receive GD diagnoses after incarceration. However, MD 121 remains problematic and inconsistent with ensuring NDOC does not act deliberatively indifferent to GD.

83. Upon information and belief, the current version of has not been updated to conform with standard medical practices with regard to treatment of gender dysphoria.

84. Indeed, the only treatment contemplated by the current version MD 121 is Hormone Replacement Therapy ("HRT").

85. The Ninth Circuit has held that when the medically necessary treatment for a prisoner's gender dysphoria is Gender Confirmation Surgery ("GCS"), and responsible prison officials deny such treatment with full awareness of the prisoner's suffering, those officials violate the Eighth Amendment's prohibition on cruel and unusual punishment. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 803 (9th Cir. 2019).

86. As a policy matter, NDOC never considers and/or provides GCS to transgender inmates.

87. Upon information and belief, NDOC considers GCS to be "elective/cosmetic surgery" not indicated for the treatment or prevention of a serious medical problem."

88. Upon information and belief, such "elective/cosmetic surgery" is generally prohibited from being provided to inmates under AR 618.

89. As a matter of unwritten policy and practice, NDOC fails to adequately provide HRT to transgender inmates and has no policies in place to prevent unwarranted alteration of HRT dosages or to ensure provision of necessary increases.

90. Additionally, in 2023, the Nevada Legislature passed, and Governor Lombardo signed, Senate Bill 153, which amended NRS 209 to mandate the Director "adopt regulations prescribing standards in each institution and facility of the Department for the supervision, custody, care, security, housing and medical and mental health treatment of offenders who are transgender, gender non-conforming, gender non-binary and intersex." NRS 209.358

91. These regulations must (1) Apply the generally accepted standards of care and best practices for the supervision, custody, care, security, housing and medical and mental health treatment of offenders who are transgender, gender non-conforming, gender non-binary and intersex; (2) Use respectful language and currently accepted terminology that accounts for and protects the rights of offenders who are transgender, gender non-conforming, gender non-binary and intersex; and, (3) Prohibit the discrimination of offenders who are transgender, gender non-conforming, gender non-binary and intersex. Id.

92. Senate Bill 153 specifically mandated that the Director "adopt any regulations which are 24 required by or necessary to carry out the provisions of this act" on or before January 1, 2024.

93. Upon information and belief, the Director did not adopt all such regulations on or before January 1, 2024.

94. Rather, on or about March 26, 2025, a new version of AR 494 went into effect. Under this version, the Director of NDOC is responsible for the implementation of AR 494,

the Medical Director, Mental Health Director, wardens, associate wardens are responsible for ensuring that their appropriate assigned subordinate supervisors have read and understand AR 494, and supervisors are responsible for ensuring that their appropriate subordinate staff members have read and understand AR 494

95. Pertinent here, the current version of AR 494 mandates that the "department medical and mental health staff will appropriately diagnose, treat, and manage DOC offenders with a gender dysphoria diagnosis as well as those who are transgender, intersex, or gender diverse ensuring a humane and safe correctional environment.

96. The current version of AR 494 also mandates that all "all staff will interact professionally and respectfully towards transgender, intersex, and gender diverse offenders."

97. The current version of AR 494 also mandates that "Transgender or gender diverse offenders, regardless of facility placement, will receive state issue under garments consistent with an individual's gender identity regardless of dysphoria diagnosis."

98. Regarding health care services, the current version of AR 494 mandates that "All offenders, including those who are transgender, will be treated with fairness, dignity, and respect in a gender-affirming environment" and that "All offenders, including those who are transgender, will receive evidence-based health care that is clinically and developmentally appropriate, culturally sensitive, and offered through a nonjudgmental, gender-affirming approach."

99. The current version of AR 494 also mandates that offenders diagnosed with gender dysphoria shall have access to psychological treatment, psychotherapy and/or psychopharmacological treatment, and other "treatment and accommodations that are determined to be medically necessary by a medical and/or mental health practitioner."

100. The current version of AR 494 also mandates that "If a diagnosis of gender dysphoria is made, a proposed individualized treatment plan will be developed which promotes the physical and behavioral stability of the offender. The development of the treatment plan is not solely dependent upon services provided or the offender's life experiences prior to incarceration."

101. The current version of AR 494 also explicitly contemplates that the treatment plan include hormone therapy.

Ms. Hundley Demonstrates Medical Need But is Denied Proper Medical Care (GCS).

102. As a result of the April 2012 Settlement Agreement, Ms. Hundley was diagnosed with GD in July 2012 by an independent psychiatrist hired by the Nevada Attorney General's Office, and began prescribed HRT in August 2012.

103. Although HRT helped abate the symptoms of her GD, it failed to alleviate the substantial ongoing anguish, anxiety, and pain that Ms. Hundley suffered every day from GD.

104. The presence of Ms. Hundley's male genitalia caused, and continues to cause, great emotional distress to Ms. Hundley resulting in depression, anxiety, and hatred of her own body, and therefore Ms. Hundley has established the medical need for GCS in addition to HRT and real-life gender experience.

105. On May 12, 2015, Ms. Hundley first formally requested GCS via medical kite.

106. The next day, Defendant Donald Poag replied, stating that GCS was not available through NDOC.

107. On May 18, 2015, Ms. Hundley again formally requested GCS via medical kite.

108. On June 3, 2015, Defendant Poag replied "I will forward your request to the medical director."

109. On July 21, 2015, Ms. Hundley met with Defendants Aranas and Poag in person to discuss issues with her HRT, as her estrogen dosage had been reduced. At this visit, Ms. Hundley twice asked about possibility of being evaluated for GCS, and twice received the response that "Nevada won't do that."

110. On or about April 22, 2016, the ACLU of Nevada mailed Defendant Dzurenda a nine-page letter explaining Ms. Hundley's condition and how NDOC was violating her constitutional rights by denying her adequate medical care such as GCS.

111. On or about May 9, 2016, Ms. Hundley wrote and mailed her own

"introduction" letter to Defendant Dzurenda, which reiterated her sincere medical need for GCS.

112. In spite of this knowledge shared with Defendant Dzurenda and other officials, NDOC and LCC officials have repeatedly denied Ms. Hundley the opportunity to be evaluated for GCS.

113. Indeed, Ms. Hundley sent several medical kites in 2018, 2019, and 2020 requesting to be seen by Defendants Adamson and Minev for evaluation for GCS, but each time either received no response, or received responses such as "now will be scheduled" or "schedule soon," but was never actually scheduled for evaluation for GCS, and was never actually evaluated for GCS.

114. In 2020, in response to grievances filed by Ms. Hundley, Defendant Minev stated, without any justification or individualized medical assessment, that "within the NDOC, there are no approved sex reassignment surgeries" and that "NDOC does not provide the type of surgery you are requesting."

115. On August 15, 2025, the Court granted Ms. Hundley's motion for preliminary injunction, mandating that Defendant NDOC provide Ms. Hundley a referral to an outside surgeon for a GCS consult.

116. As of the current date, Ms. Hundley has not been evaluated for GCS, by an outside provider or anyone at NDOC.

**Ms. Hundley's HRT Is Arbitrarily and Capriciously Altered Multiple Times**

117. As a result of the April 2012 Settlement Agreement, Ms. Hundley was prescribed HRT with dosages set by Doctors Scott and Hamilton.

118. Upon information and belief, Doctors Scott and Hamilton gradually increased the HRT dosages Ms. Hundley received due to her size and age, until Ms. Hundley was prescribed, *inter alia*, a weekly dose of 30 mg/ml of Delestrogen (estradiol valerate).

119. These HRT dosages partially alleviated Ms. Hundley's GD, and Ms. Hundley suffered no side effects from HRT.

120. On or about May 25, 2015, medical staff at LCC, on information and belief

under the direction of Defendants Aranas and Poag, completely halted Ms. Hundley's HRT dosages.

121. Upon information and belief, sudden decreases in HRT dosages are generally contraindicated as sudden adjustments in HRT dosages can cause physical and emotional injuries.

122. On or about June 6, 2015, Ms. Hundley was informed that she would receive a weekly dose of 10 mg/ml of Delestrogen.

123. This sudden reduction in HRT dosages caused Ms. Hundley physical and emotional illness which exacerbated the symptoms of her GD, including severe mood swings, increased facial and body hair, bad headaches, unwanted erections, depression and anxiety.

124. During her July 21, 2015 visit with Defendants Aranas and Poag, Defendant Aranas showed Ms. Hundley a print-out of blood-test results and told Ms. Hundley he was "concerned" with her high levels of prolactin and estrogen and low level of testosterone.

125. Defendant Aranas noted that Ms. Hundley's organ functions and levels were "good" but that her hormone levels were "so high." Defendant Aranas did not state any reason for his belief that Ms. Hundley's hormone levels were "so high" nor did he provide any basis for comparison—*e.g.*, what hormone levels would be "normal" for cisgendered women of Ms. Hundley's age.

126. Rather than provide explanation for his purportedly medical decisions, Defendant Aranas made a vague reference to "online research" he had recently conducted.

127. Upon information and belief, Defendants Aranas and Poag knew that Ms. Hundley was on HRT, and therefore her high prolactin and estrogen levels and low testosterone levels were medically indicated as treatment for her GD.

128. Ms. Hundley explained to Defendants Aranas and Poag that she was well aware of potential side effects and possible risks involved with HRT, and that prior to initiating HRT she signed a "release" waiver to this effect.

129. Defendant Poag falsely stated that NDOC medical staff had the right to reduce

1  Ms. Hundley's medications according the April 2012 settlement agreement, which Ms.

2  Hundley interpreted as a threat to further reduce her HRT dosages.

3       130. Ms. Hundley subsequently submitted another "waiver" to Defendant Aranas

4  stating that she had been counseled of the possible risks and side effects of HRT and agreed

5  to accept those risks.

6       131. Despite these repeated requests, Ms. Hundley's HRT dosages were kept at a

7  level lower than those medically indicated for her, and Ms. Hundley's GD symptoms

8  worsened.

9       132. On or around July 20, 2016, Ms. Hundley went to receive oral doses of HRT

10  medication, but was denied the doses.

11       133. That same day, Defendant Adamson called Ms. Hundley to the infirmary,

12  where Ms. Hundley explained her confusion about being cut off from hormone doses.

13       134. In response, Defendant Adamson said "I don't give a damn what you take by

14  injection, orally, or stick up your ass. I don't like your levels and I cut it."

15       135. On or about November 7, 2016, Ms. Hundley's oral HRT medications were

16  again changed, which resulted in a significant reduction of her estrogen levels and

17  progesterone levels, and a corresponding increase in the severity of her GD symptoms.

18       136. On or around December 16, 2016, Ms. Hundley was transported to Northern

19  Nevada Hopes in Reno, where her lab history and medical file were reviewed by Victoria

20  Skocdopole, APRN.

21       137. Victoria Skocdopole prescribed Ms. Hundley biweekly injections of 5 mg/ml

22  estradiol cypionate and monthly injections of 150 mg/ml Depo-Provera (progesterone).

23       138. In January 2017, Ms. Hundley began receiving the prescribed HRT in those

24  dosages.

25       139. Over the next three years, Ms. Hundley's HRT dosages were increased to

26  abate increased body hair, facial hair, unwanted erections, and other symptoms of GD: her

27  estradiol cypionate injections were increased to 6 mg/ml per week, and her Depo-Provera

28  was changed to 75 mg/ml bi-weekly.

140. On or about March 19, 2020, Ms. Hundley had an unscheduled and unrequested medical appointment with Defendant Naughton, which was done via videoconference.

141. During this appointment, Defendant Naughton told Ms. Hundley that he wanted to cut Ms. Hundley's hormone doses due to the possibility of developing a prolactinoma or hyperprolactinemia.

142. Upon information and belief, Ms. Hundley's risk of developing a prolactinoma or hyperprolactinemia due to HRT is extremely small, as according to the WPATH standards, this risk is highly unlikely after the first year of HRT.

143. Ms. Hundley's low risk of developing a prolactinoma or hyperprolactinemia is evidenced by her receiving HRT—albeit inconsistently—since 2012 without developing hyperprolactinemia.

144. Even if Ms. Hundley did have a risk of developing a prolactinoma or hyperprolactinemia from HRT, the medical benefits of HRT to treat Ms. Hundley would far outweigh this miniscule risk.

145. Because the risk of a prolactinoma or hyperprolactinemia was *de minimis*, Ms. Hundley inferred that it was being used as a pretext to deny her adequate GD treatment.

146. On or about April 6, 2020, Ms. Hundley had another unscheduled and unrequested medical appointment with Defendant Naughton.

147. During this appointment, Defendant Naughton again reiterated his intent to cut Ms. Hundley's HRT dosages, in contravention of the April 2012 Settlement Agreement.

148. Defendant Naughton, like Defendant Aranas, used the medically unsound pretext that HRT at sufficient doses would increase Ms. Hundley's risk of a prolactinoma or hyperprolactinemia.

149. Defendant Naughton stated that this reduction in HRT dosage—notwithstanding that it would exacerbate Ms. Hundley's GD and increase her suffering—was for Ms. Hundley's health and that "no judge will go against" his opinion.

150. When Ms. Hundley reminded Defendant Naughton of the terms of the April

2012 Settlement Agreement, Defendant Naughton stated, "I don't care. This is happening."

151. When Ms. Hundley asked how much Defendant Naughton was going to cut her HRT dosages, Defendant Naughton replied, "I haven't decided yet."

152. Defendant Naughton's statements that he "did not care" about Ms. Hundley's previous settlement and that he could not even provide an estimate for how much he would cut Ms. Hundley's HRT dosages evidence that there was no legitimate medical or penological basis for this decision.

153. On or about May 1, 2020, Ms. Hundley reported for her weekly scheduled HRT.

154. The nurse stated to Ms. Hundley that her estrogen injection had been cut from 6 mg/ml per week to 2 mg/ml per week, upon information and belief upon orders from Defendant Naughton.

155. The nurse further stated to Ms. Hundley that her Depo-Provera injections were wholly eliminated, even though she had been receiving 75 mg/ml injections biweekly.

156. These alterations in HRT dosages caused Ms. Hundley to physically manifest masculine characteristics, such as increased facial hair growth and unwanted erections, which exacerbated Ms. Hundley's GD and caused her severe anxiety and depression.

157. Upon information and belief, these alterations in HRT dosages also caused Ms. Hundley to suffer from a mini-stroke, which NDOC officials refused to treat.

158. These alterations in HRT dosages caused Ms. Hundley's blood estradiol levels to drop below 100 pg/ml, which exacerbated the symptoms of her GD.

159. Upon information and belief, the medically acceptable blood estradiol levels for transitioning transgender women is that of cisgendered women—approximately 200 pg/ml.

160. Upon information and belief, Defendant Altamarino (nee Rushton) persuaded Defendant Naughton to cut Ms. Hundley's HRT dosages and keep them low.

161. On or about November 20, 2020, LCC medical staff again denied Ms. Hundley her HRT injection at their normal time, stating that it was "moved to Sundays."

162. In 2020, 2021, and 2022 Ms. Hundley's HRT dosages were repeatedly delayed and altered by Defendant Altamarino (nee Rushton). Due to the fact that her HRT dosages were lowered in April 2020, even slight delays in administering Ms. Hundley's HRT caused Ms. Hundley acute and severe physical and emotional pain, including elevated heart rate, increased blood pressure, trouble breathing, and increases in anxiety and depression.

163. Upon information and belief, Defendant Altamarino (nee Rushton) purposefully delayed and hindered access to the HRT doses Ms. Hundley was supposed to receive on Sundays during this time period.

164. Ms. Hundley told Defendant Altamarino (nee Rushton) that delays in treatment caused her grinding headaches, nausea, extreme lethargy, anxiety, depression and exacerbated other symptoms of GD, but Defendant Altamarino (nee Rushton) continued to delay HRT dosages.

165. On or about April 2, 2022, Ms. Hundley filed an emergency grievance requesting that she receive her HRT dosages on Saturdays so that Defendant Altamarino (nee Rushton) would not interfere with them.

166. In response to this emergency grievance, Defendant Altamarino (nee Rushton) stated her intent to retaliate against Ms. Hundley, telling her, in reference to receiving HRT dosages, "well, now it will just take longer."

167. Upon information and belief, Defendant Altamarino (nee Rushton) stated her opposition to gender-affirming care to LCC staff and inmates, saying that "men shouldn't be given female hormones in prison."

168. On or about August 25, 2021, Ms. Hundley was able to get her HRT therapy scheduled for Saturdays, to avoid the delays imposed by Defendant Rushton on Sundays.

169. However, in December 2021, Defendant Altamarino (nee Rushton) began working on Saturdays, and Ms. Hundley's HRT dosages were delayed by Defendant Altamarino (nee Rushton) yet again.

170. Upon information and belief, in January 2022, Defendant Altamarino (nee Rushton) caused a three-week delay in refilling Ms. Hundley's testosterone blocker

prescription (spironolactone).

171. After Ms. Hundley's HRT dosages were lowered in April 2000, between 2020 and 2022, Defendant Marks repeatedly reviewed Ms. Hundley's blood test results.

172. During February 15, 2022, Defendant Marks related to Ms. Hundley that her estradiol levels were low and that they would attempt to raise them to the 200 ng/ml standard for transitioning transgender women.

173. Every Saturday following this appointment, Ms. Hundley asked the attending nurse whether her HRT dosage had been raised, and every time was told it had not been.

174. On or about July 30, 2022, Nurse Wickham related to Ms. Hundley the belief that NDOC's director or medical director was involved in causing her estrogen problem.

175. Nurse Wickham further related to Ms. Hundley that she had, over the years, provided numerous copies of WPATH's and the Endocrine Society's guidelines for treatment of transgender inmates to Defendants Aranas, Minev, and Marks.

176. On September 30, 2022, Ms. Hundley was seen by John "Rob" Phoenix, APRN via telemedicine.

177. Nurse Phoenix prescribed Ms. Hundley several prescriptions for HRT.

178. Upon information and belief, Defendant Marks blocked these prescriptions or otherwise prevented them from being filled and administered to Ms. Hundley.

179. In October 2022, Ms. Hundley was seen by Defendant Marks again, where Defendant Marks again confirmed that he was aware of how low Ms. Hundley's estradiol levels were.

180. On or about December 8, 2022, Ms. Hundley had another telemedicine appointment with Nurse Phoenix.

181. Nurse Phoenix confirmed that Ms. Hundley's estradiol levels were too low and should be between 150-300 pg/ml.

182. Nurse Phoenix prescribed higher doses of estrogen injections, reinstated the progesterone prescription that Defendant Naughton had taken away from Ms. Hundley, prescribed Finasteride for Ms. Hundley's scalp hair to grow back in, and Metformin for

weight gain caused by Defendants' alterations in her HRT.

183. While Nurse Phoenix warned Ms. Hundley that Defendant Marks may refuse his orders, Nurse Phoenix stated that Dr. Marks "should" give all those prescriptions to Ms. Hundley.

184. Despite this knowledge, Defendant Marks refused to increase Ms. Hundley's HRT dosages or provide her with the other prescriptions given to her by Nurse Phoenix.

185. On or about May 15, 2023, in response to medical kites and grievances, Defendant Marks send Ms. Hundley a printout from a medical manual of unknown origins with various sections highlighted, which was very similar to Endocrine Society information Ms. Hundley had previously provided to Defendant Marks.

186. Specifically highlighted was a passage stating that estrogen "concentrations should be monitored to avoid supraphysiologic levels (eg, maintain levels < 200 pg/mL)" even though, in the next (non-highlighted) sentence, the information indicates that one "author of this topic uses a higher cutoff of < 300 pg/ml.

187. This indicates that Defendant Marks was—and continues to be—well aware of Ms. Hundley's need to raise her blood estradiol levels above the medically necessary threshold of 200 pg/ml.

188. On or about May 31, 2023, in response to medical kites and grievances, Defendant Marks met with Ms. Hundley who informed her she would be prescribed pills, rather than injections, to raise her blood-estrogen levels.

189. However, Ms. Hundley did not receive pills; rather, she was prescribed a limited number of transdermal hormone treatment patches.

190. The transdermal hormone treatment patches were ineffective at increasing Ms. Hundley's blood-estrogen levels, as they were prone to fall off due to the hot and humid conditions of LCC during the summer.

191. In June 2023, Ms. Hundley began receiving 2 milligram estradiol tablets to take orally. However, these dosages were insufficient to raise her blood estradiol level to the medically necessary threshold of 200 pg/ml.

192. In January 2024, Ms. Hundley received bloodwork results reflecting that her blood estradiol levels had fallen to 47.2 pg/ml, far below the medically necessary threshold of 200 pg/ml.

193. Upon information and belief, Defendant Marks reviewed this lab work and determined that no prescription orders were needed.

194. On or about February 28, 2024, in a response to a medical kite sent by Ms. Hundley requesting increases in oral estradiol dosages to increase her blood estradiol level from its nadir of 47.2 pg/ml, Defendant Marks claimed that the Endocrine Society's recommended range was 100-200 pg/ml.

195. In that same response, Defendant Marks alleged that a "53 point drop to 47 is small compared to month-to-month changes in cis women."

196. It is, or should be, obvious to a medical professional that endogenously generated estrogen variations in cisgender women are not relevant to the treatment of GD in transgender women, who require exogenous estrogen.

197. On or about March 18, 2024, Ms. Hundley received the results of bloodwork taken March 7, 2024. These results indicated that her blood estradiol level was at 54.0 pg/ml, which the results characterized as "high."

198. The characterization of this blood estradiol level as "high" demonstrates further deliberate indifference to Ms. Hundley's medical needs, as such a level would only be considered "high" for a cisgender male, not a transgender female.

199. On or about April 10, 2024, Ms. Hundley was informed that she had missed pill call for the previous week. Ms. Hundley was not aware that she was required to attend pill call, as she had been permitted to keep her estradiol doses on her person.

200. Ms. Hundley was subsequently informed that she would no longer be able to keep her estradiol doses on her person, but would only be able to receive them at pill call in "crushed and floated" form.

201. Upon information and belief, this change in protocol was per Defendant Marks' orders.

202. Upon information and belief, no other transgender female inmate at LCC has been required to receive HRT dosages exclusively at pill call, or in "crushed and floated" form. This raises the inference that Defendant Marks deliberately altered the protocol to inconvenience Ms. Hundley in retaliation for filing grievances and the instant lawsuit.

203. Since the submission of Ms. Hundley's Third Amended Complaint and the Motion for Preliminary Injunction, Ms. Hundley has continued to be repeatedly denied hormone treatment.

204. Upon information and belief, Defendant Marks has repeatedly and intentionally prevented Ms. Hundley from receiving her prescribed estradiol and spironolactone.

205. For one example, on March 14, 2025, Ms. Hundley filed a grievance reflecting that her estradiol prescriptions had been delayed for three months in a row. As these prescriptions were already at subtherapeutic levels, fully withholding them from Ms. Hundley caused her extreme distress.

206. For another example, on March 19, 2025, Ms. Hundley filed a grievance reflecting that her spironolactone prescription was overdue by 2.5 weeks and had not been renewed or refilled, without an explanation.

207. For another example, in June, 2025, Ms. Hundley's provisions of "keep on person" hormones ran out and were not immediately refilled, despite Ms. Hundley's emergency grievances and medical kites.

208. Additionally, in May and June 2025, despite requesting to see the results of her blood labs, Ms. Hundley has been routinely denied access to the same.

209. On or about August 12, 2025, Ms. Hundley had blood drawn for lab work. The lab work revealed that her blood estradiol levels were extremely low, 27.0 pg/ml.

210. On August 15, 2025, the Court granted Ms. Hundley's motion for preliminary injunction, mandating that Defendant Marks raise Ms. Hundley's estradiol dosages so that her blood estradiol levels reach a minimum of 150 pg/ml.

211. On or about September 9, 2025, Ms. Hundley was taken to medical to visit

1  Defendant Marks.

2      212. Instead of adequately increasing Ms. Hundley's HRT dosages, Dr. Marks

3  complained to Ms. Hundley about the instant matter, expressing resentment at being called

4  "deliberately indifferent."

5      213. Ms. Hundley explained—as she has numerous times previously via grievances

6  and kites—the severity of her symptoms and the necessity of adequate HRT dosages as

7  mandated by the Court's order.

8      214. Defendant Marks explicitly stated he was refusing to comply with the Order:

9  he said that her necessary GD treatment was "new science" and that Ms. Hundley could find

10  a doctor who could give her "everything she asks for" but that he would not be that doctor.

11      215. On or about September 9, 2025, Defendant Marks raised Ms. Hundley's oral

12  estradiol dosage from 4 mg to 6 mg daily. He also cancelled one of Ms. Hundley's

13  prescriptions unrelated to gender dysphoria, the steroid painkiller prednisone.

14      216. In a lab collected on or about September 9, 2025, Ms. Hundley's blood

15  estradiol level was just 44.0 pg/mL.

16      217. On or about October 2, 2025, Ms. Hundley received a new prescription for 8

17  mg of oral estradiol daily, an increase of 2 mg; the prescribing physician was not Defendant

18  Marks, but Defendant Williams, NDOC's medical director.

19      218. On or about October 15, 2025, Ms. Hundley was examined by APRN Jen

20  Sanabia, who informed Ms. Hundley that she had an endocrinology referral, and that she had

21  a surgical referral had not yet been authorized.

22      219. Ms. Hundley suggested that, to get her blood estradiol level above 150 pg / mL,

23  APRN Sanabia return her to what her hormone dosages and method of administration were

24  in February 2020; APRN Sanabia replied that she was not allowed to do this and maintained

25  Ms. Hundley's oral estradiol dosage at 8 mg daily.

26      220. On or about November 5, 2025, Ms. Hundley was transported from LCC to an

27  endocrinologist office in Reno, where she was examined by Dr. Gonzales.

28      221. In addition to the 8 mg of oral estradiol, Dr. Gonzales prescribed Ms. Hundley

100 mg of progesterone daily, which was not provided to Ms. Hundley by NDOC until over a month later on or about December 8, 2025.

222. Also troublingly, Dr. Gonzales misstated Ms. Hundley's desires regarding GCS, incorrectly asserting in his medical report that Ms. Hundley did not desire bottom surgery (*i.e.*, penectomy, orchiectomy, and vaginoplasty).

223. Although the addition of progesterone may assist in treating Ms. Hundley's GD, it is unlikely to raise her blood estradiol level to the prescribed level of 150 pg/mL.

224. In a lab collected on or about November 14, 2025, Ms. Hundley's blood estradiol level was just 112 pg/mL.

225. As of the current date, Ms. Hundley's HRT dosages have not been increased sufficiently to raise her blood estradiol levels to the medically acceptable level of 200 pg/ml, or even the court-ordered level of 150 pg/ml, which has exacerbated Ms. Hundley's GD and caused Ms. Hundley wanton pain and suffering.

226. Such suffering includes restless leg syndrome, which causes Ms. Hundley's legs to have extreme cramps which limit her sleep to under two hours per night.

227. Such suffering also includes severe forgetfulness, anxiety, depression, and other symptoms of GD such as ideation about self-castration.

228. Such suffering includes restless leg syndrome, which causes Ms. Hundley's legs to have extreme cramps which limit her sleep to under two hours per night.

229. Such suffering also includes severe forgetfulness, anxiety, depression, and other symptoms of GD such as ideation about self-castration.

**Ms. Hundley Is Denied Necessary Mental Health Treatment.**

230. In addition to necessary GCS and HRT, Ms. Hundley was denied medically necessary mental health treatment during her incarceration.

231. For instance, Ms. Hundley has been repeatedly misgendered by health care providers and prison officials.

232. For example, in responding to Ms. Hundley's medical kite on June 25, 2023, Dr. Marks addressed Ms. Hundley as "Mr. Hundley."

233. It is well known that when treating transgender patients, medical providers should refer to said patients by their preferred name and pronouns because misgendering causes significant negative medical health consequences for transgender people and can worse their gender dysphoria.

234. It is also well known that, conversely, use of a transgender person's preferred name and pronouns, is strongly correlated with a reduction in gender dysphoria and associated mental health symptoms such as depression, suicidal ideation, and post traumatic stress disorder.

235. By addressing Ms. Hundley as "mister," using male pronouns to address Ms. Hundley, or refusing to refer to Ms. Hundley by her chosen first name or nickname, Dr. Marks and others intentionally inflicted emotional distress upon Ms. Hundley.

**Ms. Hundley Is Denied Gender-Confirming Clothing.**

236. The National Commission on Correctional Health Care notes that "staff should ensure that commissary items consistent with an individual's gender identity are available."

237. In or around May, 2014, Ms. Hundley was approved to receive state issued bras in the same quantity and style as female inmates.

238. Until December, 2018, Ms. Hundley received state-issued bras from laundry, albeit inconsistently.

239. On or about December 6, 2018, Ms. Hundley went to laundry for her six-month issue of state clothing and undergarments.

240. The clothing and undergarments Ms. Hundley was provided with—t-shirts, socks, and men's boxer shorts—was inconsistent with Ms. Hundley's gender and did not contain any bras.

241. When Ms. Hundley explained to the issuing inmate that the state clothing was inconsistent with her gender, the issuing inmate replied, "Mr. Bequette thought you would say that" and called Defendant Bequette over.

242. When Defendant Bequette reached Ms. Hundley, he yelled at her, in front of other inmates, "Look, you're a male inmate. You have a penis and you're in a male prison.

1    I'm not ever going to give you female underwear."

2    243. Upon information and belief, the version of AR 494 in place in December,

3    2018, mandated gender confirming clothing at intake based on the inmate's request,

4    including bras and gender-confirming underwear.

5    244. Upon information and belief, Defendant Bequette provides all other inmate

6    with the clothing issue of their choice that confirms to their genders.

7    **NDOC Employees Display Animus Toward Ms. Hundley Based on Her Gender.**

8    245. On or about June 19, 2015, Ms. Hundley reported to the LCC infirmary to

9    receive her estradiol injection.

10   246. While there, Ms. Hundley inquired of the treating nurse how many "units" of

11   hormone therapy were being administered.

12   247. Twice, a correctional officer told Ms. Hundley to stop asking questions; after

13   the second time, Ms. Hundley responded that she was not asking questions anymore.

14   248. In response, Defendant Donnelly loudly and sarcastically stated, in a display

15   of animus toward Ms. Hundley, "well, shut your mouth then, jeez!"

16   249. Defendant Donnelly's animus toward Ms. Hundley's condition is further

17   demonstrating by Defendant Donnelly repeatedly misgendering Ms. Hundley by referring to

18   her as "Mister" or by masculine pronouns.

19   250. On or about November 8, 2019, Ms. Hundley requested that her ibuprofen

20   prescription be maintained at 60 count rather than the 30 count to which it had been changed.

21   251. In response to this request, Defendant Donnelly intentionally misgendered Ms.

22   Hundley, "what's the problem, Mr. Hundley?"

23   252. Defendant Donnelly further berated and mocked Ms. Hundley for taking

24   ibuprofen for her arthritis, claiming that Ms. Hundley's arthritis was not as bad as Defendant

25   Donnelly's, and that Ms. Hundley should "buck up and stop being a pussy."

26   253. For another instance, in 2020, Defendant Donnelly replied to Ms. Hundley's

27   grievances by twice referring to her as "Mr. Hundley."

28   254. During transport to and from her November 5, 2025, consult with Dr.

Gonzales, Ms. Hundley was strip-searched by male officers, which Ms. Hundley believes was retaliatory and in violation of NDOC's policies.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

(VIOLATION OF THE EIGHTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES PURSUANT TO 42 U.S.C. § 1983)
(DENIAL OF MEDICALLY NECESSARY CARE – GENDER CONFIRMATION SURGERY)
(Against Commissioner Defendants, Medical Director Defendants, Administrator Defendants, 2023 URP Member Defendants, Unknown Past Review Panel Members I – XX, Unknown Current Review Panel Members I – XX, and Defendants Aranas, Minev, Poag, Adamson, Dzurenda, Marks, and Benson)

255. Plaintiff incorporates Paragraphs 1 through 254 of this Complaint as if fully set forth in this section.

256. A prison official violates the Eighth Amendment when he acts with "deliberate indifference" to the serious medical needs of an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

257. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

258. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Id.* at 104-105.

259. To establish an Eighth Amendment violation, Plaintiff must satisfy both an objective standard – that the deprivation was serious enough to constitute cruel and unusual punishment – and a subjective standard – deliberate indifference. *Snow v. McDaniel,* 681 F.3d 978, 985 (9th Cir. 2012).

260. To meet the objective standard, Plaintiff "must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant

injury or unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

261. To meet the subjective standard, the Plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id.*

262. A prisoner does not need to show that she was completely denied medical care; deliberate indifference can be established by prison officials' intentional interference with medical treatment. *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000).

263. GD is a medical condition that, if not treated properly, can, and has, resulted in further significant injury and wanton infliction of pain upon Ms. Hundley.

264. As Defendants 2023 URP Member Defendants, Unknown Past Review Panel Members I – XX, Unknown Current Review Panel Members I – XX, and Defendants Aranas, Minev, Poag, Adamson, Dzurenda, Marks, and Benson—through Ms. Hundley's many kites, grievances and other communications—that her extreme pain and suffering were proximately caused by GD and that HRT had not sufficiently treated Ms. Hundley's GD, Defendants were on notice that GCS was medically necessary to treat Ms. Hundley's GD.

265. Defendants 2023 URP Member Defendants, Unknown Past Review Panel Members I – XX, Unknown Current Review Panel Members I – XX, and Defendants Aranas, Minev, Poag, Adamson, Dzurenda, Marks, and Benson denied Ms. Hundley evaluation for GCS based on MD 121, which categorically prohibits the provision of GCS to NDOC inmates.

266. This was a categorical denial of surgery which constitutes deliberate indifference. *See Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015) (state's acknowledgement that "no California prisoner has ever received SRS" amounted to categorical denial of surgery which could constitute deliberate indifference).

267. Further, financial constraints may not be used to justify the creation or perpetuation of constitutional violations. *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 392, 112 S. Ct. 748, 764, 116 L. Ed. 2d 867 (1992).

268. Defendants 2023 URP Member Defendants, Unknown Past Review Panel Members I – XX, Unknown Current Review Panel Members I – XX, and Defendants Aranas, Minev, Poag, Adamson, Dzurenda, Marks, and Benson—who had responsibility for Ms. Hundley's care and knew or should have known about Ms. Hundley's serious medical needs—violated Ms. Hundley's rights through their deliberate indifference to Ms. Hundley's serious medical needs. Specifically, they were deliberately indifferent to her serious medical need for GCS and violated her rights by not permitting her to fulfill that need by *inter alia*, denying her request for surgical evaluation on January 18, 2023.

269. As a result of the violation of her rights, Ms. Hundley has suffered, is suffering, and will continue to suffer harm and damages in an amount subject to proof, and Ms. Hundley is entitled to monetary, compensatory, and punitive damages, as well as attorney's fees and costs, from Defendants 2023 URP Member Defendants, Unknown Past Review Panel Members I – XX, Unknown Current Review Panel Members I – XX, and Defendants Aranas, Minev, Poag, Adamson, Dzurenda, Marks, and Benson .

270. The Commissioner Defendants, Medical Director Defendants, Administrator Defendants, and Unknown Current Review Panel Members I – XX all are responsible for the governance of NDOC facilities, and for ensuring that Ms. Hundley's Eighth Amendment rights are not violated in the future. Ms. Ms. Hundley is entitled to injunctive and declaratory relief against the Commissioner Defendants, Medical Director Defendants, Administrator Defendants, and Unknown Current Review Panel Members I – XX.

### SECOND CAUSE OF ACTION
VIOLATION OF THE EIGHTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
PURSUANT TO 42 U.S.C. § 1983
(DENIAL OF MEDICALLY NECESSARY CARE – HORMONE TREATMENT)
(Against Commissioner Defendants, Medical Director Defendants, Administrator Defendants, Aranas, Minev, Poag, Naughton, Altamarino (nee Rushton), and Marks)

271. Plaintiff incorporates Paragraphs 1 through 270 of this Complaint as if fully set forth in this section.

272. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

273. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Id.* at 104-105.

274. Prison officials exhibit a deliberate indifference to a serious medical need where a prisoner diagnosed with Gender Dysphoria has their HRT dosages adjusted in ways that are contraindicated or exacerbate the prisoner's GD.

275. In relying upon a medical opinion which a reasonable person would likely determine to be inferior to a treating physician's recommendation, prison officials' actions may have amounted to the denial of medical treatment, and the unnecessary and wanton infliction of pain. *Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014).

276. Deliberate indifference occurs where prison officials and doctors deliberately ignore the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992).

277. Defendants Aranas, Minev, Poag, Naughton, Altamarino (nee Rushton), and Marks—who had responsibility for Ms. Hundley's care and knew or should have known about Ms. Hundley's serious medical needs—violated Ms. Hundley's rights through their deliberate indifference to Ms. Hundley's serious medical needs. Specifically, they acted in deliberate indifference to Hundley's serious medical needs by ignoring Ms. Hundley's treatment plans and by arbitrarily and capriciously changing her hormone doses without medical indication.

278. Prison officials' refusal to adequately administer the hormone therapy treatment prescribed to Ms. Hundley has caused Ms. Hundley to hate her body and the unwanted masculine characteristics which reappear when HRT dosages are lowered, and experience emotional distress, anxiety, depression and paranoia.

279. Defendants Aranas, Minev, Poag, Naughton, Altamarino (nee Rushton), and Marks violated Ms. Hundley's rights through their deliberate indifference to Ms. Hundley's serious medical needs.

280. As a result of the violation of her rights, Ms. Hundley has suffered, is suffering, and will continue to suffer harm and damages in an amount subject to proof, and Ms. Hundley is entitled to monetary, compensatory, and punitive damages, as well as attorney's fees and costs from Defendants Aranas, Minev, Poag, Naughton, Altamarino (nee Rushton), and Marks.

281. The Commissioner Defendants, Medical Director Defendants, and Administrator Defendants are responsible for the governance of NDOC facilities, and for ensuring that Ms. Hundley's Eighth Amendment rights are not violated in the future. Ms. Hundley is entitled to injunctive and declaratory relief against the Commissioner Defendants, Medical Director Defendants, and Administrator Defendants.

### **THIRD CAUSE OF ACTION**
VIOLATION OF THE FOURTEENTH AMENDMENT
PURSUANT TO 42 U.S.C. § 1983
(EQUAL PROTECTION)
(Against Commissioner Defendants, Medical Director Defendants and Administrator Defendants, Defendants Aranas, Minev, Poag, Donnelly, Bequette, Adamson, Naughton, Altamarino (nee Rushton), and Marks)

282. Plaintiff incorporates Paragraphs 1 through 281 of this Complaint as if fully set forth in this section.

283. To state an equal protection claim, Plaintiff must demonstrate that defendants "acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class," or that defendants purposefully treated her differently than similarly situated individuals without any rational basis for the disparate treatment. *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001).

284. When a defendant's action is based upon the fact that the Plaintiff fails "to conform to socially-constructed gender expectations," the defendant has engaged in gender-based discrimination.

35

285. Upon information and belief, Defendants Aranas, Minev, Poag, Donnelly, Bequette, Adamson, Naughton, Altamarino (nee Rushton), and Marks took the actions described above (*see generally* ¶¶ 74-254, *supra*) against Ms. Hundley due to animus toward Ms. Hundley for being a female transgender inmate in a male prison.

286. While she was incarcerated at LCC, Defendant Bequette refused to allow Ms. Hundley the same commissary and property as female inmates, effectively singling her out and discriminating against her based on her gender expression in a male prison.

287. As a result of the violation of her rights, Ms. Hundley has suffered, is suffering, and will continue to suffer harm and damages in an amount subject to proof, Ms. Hundley is entitled to monetary, compensatory, and punitive damages, as well as attorney's fees and costs from Defendants Aranas, Minev, Poag, Donnelly, Bequette, Adamson, Naughton, Altamarino (nee Rushton), and Marks.

288. The Commissioner Defendants, Medical Director Defendants, and Administrator Defendants are responsible for the governance of NDOC facilities, and for ensuring that Plaintiffs' Fourteenth Amendment rights are not violated in the future. Plaintiffs are entitled to injunctive and declaratory relief against the Commissioner Defendants, Medical Director Defendants, and Administrator Defendants.

### FOURTH CAUSE OF ACTION
VIOLATION OF THE FIRST AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
PURSUANT TO 42 U.S.C. § 1983
(RETALIATION)
(Against Commissioner Defendants, Medical Director Defendants and Administrator Defendants, and Defendants Aranas, Minev, Poag, Donnelly, Bequette, Adamson, Naughton, Altamarino (nee Rushton), and Marks)

289. Plaintiff incorporates Paragraphs 1 through 288 of this Complaint as if fully set forth in this section.

290. Prisoners have a First Amendment right to file prison grievances and to pursue civil rights litigation in the courts. *See Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2004).

291. To state a viable First Amendment retaliation claim in the prison context, a

plaintiff must allege: "(1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of her First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567-68.

292. On or about August 2019, Ms. Hundley filed a lawsuit under 42 U.S.C. § 1983, requesting injunctive relief such as GCS and other GD treatment.

293. Upon information and belief, Defendants took the actions described above (*see generally* ¶¶ 74-254, *supra*) in response to Ms. Hundley filing grievances and lawsuits.

294. Defendants' retaliatory conduct chilled Ms. Hundley's exercise of her First Amendment rights.

295. Defendants' retaliatory conduct did not reasonable advance legitimate correctional or medical goals, but was rather intended to punish Ms. Hundley for exercising her First Amendment rights.

296. As a result of the violation of her rights, Ms. Hundley has suffered, is suffering, and will continue to suffer harm and damages in an amount subject to proof, and Ms. Hundley is entitled to monetary, compensatory, and punitive damages, as well as attorney's fees and costs from Defendants Aranas, Minev, Poag, Donnelly, Bequette, Adamson, Naughton, Altamarino (nee Rushton), and Marks.

297. The Commissioner Defendants, Medical Director Defendants, and Administrator Defendants are responsible for the governance of NDOC facilities, and for ensuring that Ms. Hundley's First Amendment rights are not violated in the future. Ms. Hundley is entitled to injunctive and declaratory relief against the Commissioner Defendants, Medical Director Defendants, and Administrator Defendants.

### FIFTH CAUSE OF ACTION
BREACH OF CONTRACT
(PURSUANT TO NEVADA LAW)
(Against Commissioner Defendants, Medical Director Defendants and Administrator Defendants)

298. Plaintiff incorporates Paragraphs 1 through 297 of this Complaint as if fully

set forth in this section.

299. The April 12, 2012, Settlement Agreement entered into by Ms. Hundley and the State of Nevada constitutes a valid contract.

300. Ms. Hundley performed under the terms of the Settlement Agreement.

301. Defendants breached this contract by failing to provide all recommended hormonal therapy to Ms. Hundley—*i.e.*, by lowering and delaying Ms. Hundley's dosages below medically acceptable levels.

302. Defendants' failure of performance was unexcused.

303. As a result of this breach, Ms. Hundley has suffered, is suffering, and will continue to suffer harm and damages in an amount subject to proof, and Ms. Hundley is entitled to attorney's fees and costs from Commissioner Defendants, Medical Director Defendants, and Administrator Defendants.

304. The damages caused by Defendants' breach of the Settlement Agreement were reasonably foreseeable.

305. The Commissioner Defendants, Medical Director Defendants, and Administrator Defendants are responsible for the governance of NDOC facilities, and for ensuring that NDOC and its employees do not breach the terms of the contracts the State of Nevada enters into. Ms. Hundley is entitled to injunctive and declaratory relief against the Commissioner Defendants, Medical Director Defendants, and Administrator Defendants.

### SIXTH CAUSE OF ACTION

VIOLATION OF ARTICLE 1, SECTION 6 OF THE NEVADA CONSTITUTION
(DENIAL OF MEDICALLY NECESSARY CARE – GENDER CONFIRMATION SURGERY)
(Against Commissioner Defendants, Medical Director Defendants, Administrator Defendants, 2023 URP Member Defendants, Unknown Past Review Panel Members I – XX, Unknown Current Review Panel Members I – XX, and Defendants Aranas, Minev, Poag, Adamson, Dzurenda, Marks, and Benson)

306. Plaintiff incorporates Paragraphs 1 through 305 of this Complaint as if fully set forth in this section.

307. Prisoners have a right to be free from "cruel or unusual punishment" under

Article 1, Section 6 of the Nevada Constitution.

308. Cruel and unusual punishment claims under the Nevada Constitution generally follow the same standards as the United States Constitution. *Fowler v. Sisolak*, Case No. 2:19-cv-01418-APG-DJA, 2020 U.S. Dist. LEXIS 198520, n.1 (D. Nev. Oct. 26, 2020).

309. A prison official violates Article 1, Section 6 of the Nevada Constitution when he acts with "deliberate indifference" to the serious medical needs of an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

310. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under Article 1, Section 6 of the Nevada Constitution. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

311. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Id.* at 104-105.

312. To establish an violation of Article 1, Section 6 of the Nevada Constitution, Plaintiff must satisfy both an objective standard – that the deprivation was serious enough to constitute cruel or unusual punishment – and a subjective standard – deliberate indifference. *Snow v. McDaniel,* 681 F.3d 978, 985 (9th Cir. 2012).

313. To meet the objective standard, Plaintiff "must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

314. To meet the subjective standard, the Plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id.*

315. A prisoner does not need to show that she was completely denied medical care; deliberate indifference can be established by prison officials' intentional interference with medical treatment. *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000).

1    316. GD is a medical condition that, if not treated properly, can, and has, resulted

2    in further significant injury and wanton infliction of pain upon Ms. Hundley.

3    317. As Defendants 2023 URP Member Defendants, Unknown Past Review Panel

4    Members I – XX, Unknown Current Review Panel Members I – XX, and Defendants Aranas,

5    Minev, Poag, Adamson, Dzurenda, Marks, and Benson knew—through Ms. Hundley's many

6    kites, grievances and other communications—that her extreme pain and suffering were

7    proximately caused by GD and that HRT had not sufficiently treated Ms. Hundley's GD,

8    Defendants were on notice that GCS was medically necessary to treat Ms. Hundley's GD.

9    318. Defendants 2023 URP Member Defendants, Unknown Past Review Panel

10   Members I – XX, Unknown Current Review Panel Members I – XX, and Defendants Aranas,

11   Minev, Poag, Adamson, Dzurenda, Marks, and Benson  denied Ms. Hundley evaluation for

12   GCS based on MD 121, which categorically prohibits the provision of GCS to NDOC

13   inmates.

14   319. This was a categorical denial of surgery which constitutes deliberate

15   indifference. *See Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015) (state's

16   acknowledgement that "no California prisoner has ever received SRS" amounted to

17   categorical denial of surgery which could constitute deliberate indifference).

18   320. Further, financial constraints may not be used to justify the creation or

19   perpetuation of constitutional violations. *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367,

20   392, 112 S. Ct. 748, 764, 116 L. Ed. 2d 867 (1992).

21   321. Defendants 2023 URP Member Defendants, Unknown Past Review Panel

22   Members I – XX, Unknown Current Review Panel Members I – XX, and Defendants Aranas,

23   Minev, Poag, Adamson, Dzurenda, Marks, and Benson —who had responsibility for Ms.

24   Hundley's care and knew or should have known about Ms. Hundley's serious medical

25   needs—violated Ms. Hundley's rights through their deliberate indifference to Ms. Hundley's

26   serious medical needs. Specifically, they were deliberately indifferent to her serious medical

27   need for GCS and violated her rights by not permitting her to fulfill that need.

28   322. As a result of the violation of her rights, Ms. Hundley has suffered, is

suffering, and will continue to suffer harm and damages in an amount subject to proof, and Ms. Hundley is entitled to monetary, compensatory, and punitive damages, as well as attorney's fees and costs, from Defendants 2023 URP Member Defendants, Unknown Past Review Panel Members I – XX, Unknown Current Review Panel Members I – XX, and Defendants Aranas, Minev, Poag, Adamson, Dzurenda, Marks, and Benson .

323. The Commissioner Defendants, Medical Director Defendants, Administrator Defendants, and Unknown Current Review Panel Members I – XX all are responsible for the governance of NDOC facilities, and for ensuring that Ms. Hundley's Eighth Amendment rights are not violated in the future. Ms. Ms. Hundley is entitled to injunctive and declaratory relief against the Commissioner Defendants, Medical Director Defendants, Administrator Defendants, and –URP Defendants.

## SEVENTH CAUSE OF ACTION

VIOLATION OF ARTICLE 1, SECTION 6 OF THE NEVADA CONSTITUTION
(DENIAL OF MEDICALLY NECESSARY CARE – HORMONE TREATMENT)
(Against Commissioner Defendants, Medical Director Defendants, Administrator
Defendants Aranas, Minev, Poag, Naughton, Altamarino (nee Rushton), and Marks)

324. Plaintiff incorporates Paragraphs 1 through 323 of this Complaint as if fully set forth in this section.

325. Prisoners have a right to be free from "cruel or unusual punishment" under Article 1, Section 6 of the Nevada Constitution.

326. Cruel and unusual punishment claims under the Nevada Constitution generally follow the same standards as the United States Constitution. *Fowler v. Sisolak*, Case No. 2:19-cv-01418-APG-DJA, 2020 U.S. Dist. LEXIS 198520, n.1 (D. Nev. Oct. 26, 2020).

327. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under Article 1, Section 6 of the Nevada Constitution. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

328. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Id.* at

104-105.

329. Prison officials exhibit a deliberate indifference to a serious medical need where a prisoner diagnosed with Gender Dysphoria has their HRT dosages adjusted in ways that are contraindicated or exacerbate the prisoner's GD.

330. In relying upon a medical opinion which a reasonable person would likely determine to be inferior to a treating physician's recommendation, prison officials' actions may have amounted to the denial of medical treatment, and the unnecessary and wanton infliction of pain. *Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014).

331. Deliberate indifference occurs where prison officials and doctors deliberately ignore the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992).

332. Defendants Aranas, Minev, Poag, Naughton, Altamarino (nee Rushton), and Marks—who had responsibility for Ms. Hundley's care and knew or should have known about Ms. Hundley's serious medical needs—violated Ms. Hundley's rights through their deliberate indifference to Ms. Hundley's serious medical needs. Specifically, they acted in deliberate indifference to Hundley's serious medical needs by ignoring Ms. Hundley's treatment plans and by arbitrarily and capriciously changing her hormone doses without medical indication.

333. Prison officials' refusal to adequately administer the hormone therapy treatment prescribed to Ms. Hundley has caused Ms. Hundley to hate her body and the unwanted masculine characteristics which reappear when HRT dosages are lowered, and experience emotional distress, anxiety, depression and paranoia.

334. Defendants Aranas, Minev, Poag, Naughton, Altamarino (nee Rushton), and Marks violated Ms. Hundley's rights through their deliberate indifference to Ms. Hundley's serious medical needs.

335. As a result of the violation of her rights, Ms. Hundley has suffered, is suffering, and will continue to suffer harm and damages in an amount subject to proof, and Ms. Hundley is entitled to monetary, compensatory, and punitive damages, as well as

1    attorney's fees and costs from Defendants Aranas, Minev, Poag, Naughton, Altamarino (nee

2    Rushton), and Marks.

3        336. The  Commissioner  Defendants,  Medical  Director  Defendants,  and

4    Administrator Defendants are responsible for the governance of NDOC facilities, and for

5    ensuring that Ms. Hundley's Eighth Amendment rights are not violated in the future. Ms.

6    Hundley is entitled to injunctive and declaratory relief against the Commissioner Defendants,

7    Medical Director Defendants, and Administrator Defendants.

8                        **EIGHTH CAUSE OF ACTION**

9        VIOLATION OF ARTICLE 1, SECTION 24 OF THE NEVADA CONSTITUTION
                              (EQUAL PROTECTION)
10   (Against Commissioner Defendants, Medical Director Defendants and Administrator
     Defendants, Defendants Aranas, Minev, Poag, Donnelly, Bequette, Adamson, Naughton,
11                   Altamarino (nee Rushton), and Marks)

12       337. Plaintiff incorporates Paragraphs 1 through 336 of this Complaint as if fully

13   set forth in this section.

14       338. The right to equal protection under the Nevada Constitution is coextensive

15   with or broader than the right to equal protection under the Federal Constitution.

16       339. To state an equal protection claim, Plaintiff must demonstrate that defendants

17   "acted with an intent or purpose to discriminate against the plaintiff based upon membership

18   in a protected class," or that defendants purposefully treated her differently than similarly

19   situated individuals without any rational basis for the disparate treatment. *Lee v. City of Los*

20   *Angeles*, 250 F.3d 668, 686 (9th Cir. 2001).

21       340. When a defendant's action is based upon the fact that the Plaintiff fails "to

22   conform to socially-constructed gender expectations," the defendant has engaged in gender-

23   based discrimination.

24       341. Upon information and belief, Defendants Aranas, Minev, Poag, Donnelly,

25   Bequette, Adamson, Naughton, Altamarino (nee Rushton), and Marks took the actions

26   described above (*see generally* ¶¶ 74-254, *supra*) against Ms. Hundley due to animus toward

27   Ms. Hundley for being a female transgender inmate in a male prison.

28       342. While she was incarcerated at LCC, Defendant Bequette refused to allow Ms.

Hundley the same commissary and property as female inmates, effectively singling her out and discriminating against her based on her gender expression in a male prison.

343. As a result of the violation of her rights, Ms. Hundley has suffered, is suffering, and will continue to suffer harm and damages in an amount subject to proof, Ms. Hundley is entitled to monetary, compensatory, and punitive damages, as well as attorney's fees and costs from Defendants Aranas, Minev, Poag, Donnelly, Bequette, Adamson, Naughton, Altamarino (nee Rushton), and Marks.

344. The Commissioner Defendants, Medical Director Defendants, and Administrator Defendants are responsible for the governance of NDOC facilities, and for ensuring that Plaintiffs' Fourteenth Amendment rights are not violated in the future. Plaintiffs are entitled to injunctive and declaratory relief against the Commissioner Defendants, Medical Director Defendants, and Administrator Defendants.

**NINTH CAUSE OF ACTION**
VIOLATION OF ARTICLE 1, SECTIONS 9 AND 10 OF THE NEVADA CONSTITUTION
(RETALIATION)
(Against Commissioner Defendants, Medical Director Defendants and Administrator Defendants, and Defendants Aranas, Minev, Poag, Donnelly, Bequette, Adamson, Naughton, Altamarino (nee Rushton), and Marks)

345. Plaintiff incorporates Paragraphs 1 through 344 of this Complaint as if fully set forth in this section.

346. Prisoners have a right to file prison grievances and to pursue civil rights litigation in the courts under Article 1, Sections 9 and 10 of the Nevada Constitution. *See Evans v. Hawes*, No. 2:22-cv-02171-JAD-DJA, 2024 U.S. Dist. LEXIS 33261, at *31 (D. Nev. Feb. 26, 2024) (citing *S.O.C., Inc. v. Mirage Casino-Hotel*, 117 Nev. 403, 23 P.3d 243, 251 (Nev. 2001)) ("state-based, free-speech provision is 'coextensive to, but no greater than, that of the First Amendment to the United States Constitution.'").

347. The standard that applies to this claim "is identical to that under the First Amendment." *Evans*, 2024 U.S. Dist. LEXIS 33261, at *31 (quoting *Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't*, 120 Nev. 712, 100 P.3d 179, 187 (Nev. 2004)).

348. To state a viable First Amendment retaliation claim in the prison context, a plaintiff must allege: "(1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of her First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567-68.

349. On or about August 2019, Ms. Hundley filed a lawsuit under 42 U.S.C. § 1983, requesting injunctive relief such as GCS and other GD treatment.

350. Upon information and belief, Defendants took the actions described above (*see generally* ¶¶ 74-254, *supra*) in response to Ms. Hundley filing grievances and lawsuits.

351. Defendants' retaliatory conduct chilled Ms. Hundley's exercise of her rights under Sections 9 and 10 of the Nevada Constitution.

352. Defendants' retaliatory conduct did not reasonable advance legitimate correctional or medical goals, but was rather intended to punish Ms. Hundley for exercising her rights under Article 1, Sections 9 and 10 of the Nevada Constitution.

353. As a result of the violation of her rights, Ms. Hundley has suffered, is suffering, and will continue to suffer harm and damages in an amount subject to proof, and Ms. Hundley is entitled to monetary, compensatory, and punitive damages, as well as attorney's fees and costs from Defendants Aranas, Minev, Poag, Donnelly, Bequette, Adamson, Naughton, Altamarino (nee Rushton), and Marks.

354. The Commissioner Defendants, Medical Director Defendants, and Administrator Defendants are responsible for the governance of NDOC facilities, and for ensuring that Ms. Hundley's rights under Article 1, Sections 9 and 10 of the Nevada Constitution are not violated in the future. Ms. Hundley is entitled to injunctive and declaratory relief against the Commissioner Defendants, Medical Director Defendants, and Administrator Defendants.

## VI. PRAYER FOR RELIEF

WHEREFORE, Ms. Hundley respectfully prays as follows:

a.    A trial by jury on all issues;

b.    Declaratory relief;

c.    Injunctive relief;

d.    Monetary, compensatory, and punitive damages allowable under law in an amount to which the Plaintiff is found to be entitled;

e.    An additional amount to account for additional taxes Plaintiff may be called upon to pay in relation to awards made herein;

f.    Attorney's fees and costs incurred herein pursuant to 42 U.S.C. § 1988 and all applicable statutory authority; and

g.    Entry of such other and further relief the Court deems just and proper.

RESPECTFULLY SUBMITTED this 12th day of January, 2026.

*/s/ Leo S. Wolpert*
MARGARET A. MCLETCHIE, Nevada Bar No. 10931
LEO S. WOLPERT, Nevada Bar No. 12658
**MCLETCHIE LAW**
602 South Tenth Street
Las Vegas, Nevada 89101
Telephone: (702) 728-5300; Fax: (702) 425-8220
Email: maggie@nvlitigation.com
*Attorney for Plaintiff Jamee Deirdre Hundley*